1305

1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2
JACKSON DIVISION

3

UNITED STATES OF AMERICA
4
VS.                                    CRIMINAL NO. 3:07cr9HTW-JCS
5

JAMES FORD SEALE
6

7

8
TRIAL TRANSCRIPT
VOLUME 6
9

10

BEFORE THE HONORABLE HENRY T. WINGATE
11
UNITED STATES DISTRICT JUDGE
AND A JURY
12
JUNE 6, 2007
JACKSON, MISSISSIPPI
13

14
APPEARANCES:

15

FOR THE GOVERNMENT:   MS. PAIGE FITZGERALD
16
MR. ERIC GIBSON
MR. DUNN LAMPTON
17
MS. ANGELA GIVENS

18
FOR THE DEFENDANT:    MS. KATHY NESTER
MR. GEORGE LUCAS
19

20

REPORTED BY:   CHERIE GALLASPY BOND
21
Registered Merit Reporter
Mississippi CSR #1012
22

23
_____

24
245 E. Capitol Street, Room 120
Jackson, Mississippi  39201
25
(601) 965-4410

133

1306

TABLE OF CONTENTS

1

2     Exhibits G-1A, G-1B, G-1C, G-2A ....... 1314

3     through F, G-3A through L

4  JAMES BLADH                                 1316

5    Direct Examination By Mr. Gibson ....... 1316

6    Cross-Examination By Mr. Lucas ......... 1341

7    Redirect Examination By Mr. Gibson ..... 1345

8    Recross-Examination by By Mr. Lucas .... 1347

9  OSCAR HUGHES                                1349

10   Direct Examination By Ms. Fitzgerald ... 1349

11   Cross-Examination By Mr. Lucas ......... 1358

12   Redirect Examination By Ms. Fitzgerald . 1360

13  JOHN BRIGGS                                1366

14   Direct Examination By Mr. Lampton ...... 1366

15     Exhibit G-32D for ID ................. 1369

16   Cross-Examination By Ms. Nester ........ 1371

17   Redirect Examination By Mr. Lampton .... 1379

18     Exhibit G-32A ........................ 1411

19     Exhibit G-32D ........................ 1412

20     Exhibit G-86 for ID .................. 1414

21   Direct Examination By Mr. Lampton ...... 1416

22   Direct Examination By Mr. Lampton ...... 1416

23     Exhibit G-85 ......................... 1418

24   Cross-Examination By Ms. Nester ........ 1439

25   Redirect Examination By Mr. Lampton .... 1457

1    CHASTISY MIDDLETON                        1459

2       Direct Examination By Mr. Lampton  ...... 1459

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Good morning.  I have a written or a brief

2   from the government, but I don't have one response from the

3   defense.

4    MS. NESTER:  I just got it about five minutes ago,

5   Your Honor, so that's why you don't have a response from me.

6    THE COURT:  Okay.  Let me turn to the government.

7    MR. LUCAS:  Your Honor, I'm sorry.  Can we get the

8   hearing aid for Mr. Seale?

9    THE COURT:  Okay.  Now, then, let me repeat what I

10  said.  Is the microphone -- is the earphone working,

11  Ms. Nester?

12   MS. NESTER:  Yes, sir.

13   THE COURT:  What I said was that I have a brief

14  submitted to the court by the government.  This brief is in ten

15  pages and it includes some exhibits.  In addition, the

16  government has provided to me a number of cases, about seven

17  cases, I believe, for the court to review on this issue.  I

18  don't have a response from the defense.  Ms. Nester, how long

19  will it be before you can give me a response?

20   MS. NESTER:  Obviously, I'm going to need an

21  opportunity to go back and read their authorities, read their

22  materials, read their exhibits, do my own response.  If Your

23  Honor wants to complete Mr. Edwards' redirect and then if we

24  need to reopen him based on this, we can do that later.  I

25  don't have an objection to that, but obviously I'm not in a

1  position when I get handed something five minutes before.  I

2  was on my e-mail last night until after 10:30 and had not seen

3  this come across, and I just got it this morning when I arrived

4  in court.

5         THE COURT:  Okay.  Well, it wasn't filed last night, I

6  don't believe.

7         MS. FITZGERALD:  It was, Your Honor.  It was filed at

8  approximately 11:30 last night and that's as soon as I could

9  get it done.  I filed it electronically so it would be

10 available to the court and all the parties as fast as I could.

11        THE COURT:  All right.  I'm not complaining about the

12 time.  I was just commenting that it wasn't until -- it had to

13 be much later because I didn't leave here until about 10:00

14 myself last night.  So I would have seen it had it come across,

15 but I understand.

16     So to the government, I agree with the procedure that

17 defense counsel has suggested, which is to allow her an

18 opportunity to respond and then if the court rules in your

19 favor, to allow you to recall this witness.  What's your

20 response?

21        MS. FITZGERALD:  Your Honor, I would note that this is

22 an issue that was certainly brought to the attention of defense

23 counsel before we left yesterday afternoon and counsel had just

24 as much opportunity to research this issue last night as the

25 government did.  The fact that the government has provided

1   ample authority to this court to support its position to allow

2   these statements to come in at this point and to do a thorough

3   and complete and persuasive redirect of this witness, I need to

4   be able to reference those statements.  Otherwise, this is

5   going to look -- it's not going to be nearly the presentation

6   that I'm entitled to do with this particular witness and

7   bringing it in piecemeal.  I don't think it's going to be -- I

8   don't think it's going to be effective.  I don't expect that

9   absent those statements my redirect would be very long, and so

10  if we're going to -- recalling him is not going to be

11  significantly different in length by allowing me to do the

12  entire redirect at one time rather than doing it piecemeal, and

13  I would object to that.  I'd like to be able to do my entire

14  redirect in one piece.

15          THE COURT:  Well, then, that will require that I

16  require defense at this point to respond to your brief, which

17  wasn't filed in its detail until late last night.

18          MS. FITZGERALD:  Yes, Your Honor.

19          THE COURT:  So, then, I will not proceed that way;

20  otherwise, that would be unfair to the defense.  So, then, we

21  have two options.  One is for you to conclude your redirect and

22  then await the court's determination as to whether redirect may

23  be reopened upon a favorable ruling by the court or to simply

24  defer redirect to later in the trial, to proceed with another

25  witness and come back to Edwards after the court has made its

1    ruling.  Now, which one of those procedures would you prefer?

2            MS. FITZGERALD:  May I have just a moment to confer

3    with my cocounsel?

4            THE COURT:  Go right ahead.

5        (Short Pause)

6            MS. FITZGERALD:  Your Honor, the government would

7    request that the court instruct the jury that the court needs

8    to decide a legal issue before we can continue the redirect of

9    Mr. Edwards, and so they will be hearing from him again at a

10   later time and not to form any opinions as to his testimony at

11   this time, and we would proceed with another witness.

12           THE COURT:  Okay.  That's what I'll do.

13           MS. NESTER:  I would object to the language about not

14   forming any opinions as to his testimony.  Obviously, they are

15   entitled to form opinions based on his cross-examination.  I

16   know Your Honor will use the proper language, but that

17   particular phrase I would object to.

18           THE COURT:  Okay.  Now, then, who will be your next

19   witness?

20           MS. FITZGERALD:  Your Honor, we're going to need a few

21   minutes to get somebody over here.

22           THE COURT:  Okay.  Then --

23           MS. FITZGERALD:  It will be James Bladh.

24           THE COURT:  Who?

25           MS. FITZGERALD:  James Bladh.  He's one of the Navy

1312

1    divers.

2            THE COURT:  Is ten minutes enough time?

3            MS. FITZGERALD:  Yes, Your Honor.

4            THE COURT:  We'll be in recess for ten minutes.

5            MS. FITZGERALD:  Thank you.

6        (Recess)

7            MS. FITZGERALD:  Your Honor, I want -- the court might

8    consider taking an extended lunch break to allow Ms. Nester to

9    respond so that we might have to have the possibility of

10   Mr. Edwards concluding his testimony rather than having it

11   broken up by at least an entire day of the court, especially

12   since the witness is, in fact, here.

13           THE COURT:  I will agree with that.  We will -- I will

14   take an extended lunch break and allow Ms. Nester to do that.

15           MS. FITZGERALD:  Thank you, Your Honor.

16           THE COURT:  Okay.  Who do you tell me the first

17   witness will be?

18           MR. LAMPTON:  James Bladh.

19           THE COURT:  Okay.  Now, where is the witness, where is

20   he now?

21           MS. FITZGERALD:  I don't know.  I told him that he was

22   released until lunch.

23           THE COURT:  Okay, then.  So he's not in the building?

24           MS. FITZGERALD:  He's not in the building.  At least I

25   don't believe that he's in the building.

1          THE COURT:  Okay, then.

2          MS. FITZGERALD:  I told him that he did not need to

3    remain here and they were on their way out of the courthouse.

4    I assume that they are gone.

5          THE COURT:  Okay, then.

6          MS. FITZGERALD:  Your Honor, if I may in advance

7    request a five-minute break in between the first witness and

8    the second witness.  The second witness is not here yet.  He is

9    elderly and I have promised him that I would speak with him at

10   least briefly before I put him on the witness stand, and I have

11   not had an opportunity to do that this morning.  I would

12   request simply five minutes to speak with him before I put him

13   on the witness stand.

14         THE COURT:  Okay.  Ms. Nester?

15         MR. GIBSON:  Your Honor, I believe we're ready at the

16   court's convenience.

17         THE COURT:  Okay.  Thank you.

18         MR. GIBSON:  Your Honor, Mr. Lucas and I have gone

19   through a number of exhibits that will be used through

20   Mr. Bladh's testimony.  There's no dispute as to any of them, I

21   believe.

22         THE COURT:  Okay.  Just one second.  Counsel, why

23   don't you give me a list of exhibits to which there are no

24   objections.

25         MR. GIBSON:  Referring to the government's exhibit

1    list, Your Honor, it is essentially the first two pages and the

2    first two exhibits on page 3, and I'll go through those, G-1A,

3    which is the dive report prepared by this witness; G-1B, which

4    is a diagram prepared by this witness and included in the

5    report that is G-1A; G-1C, a diagram also prepared from

6    information provided by this witness which he's going to

7    utilize in his testimony; and then G-2A through F is a series

8    of photographs of the dive activity the night it was recovered;

9    G-3A through L is another set of photographs of the dive and

10   items recovered, including personnel who participated in the

11   dive.

12            THE COURT:  G-1A, G-1B, G-1C, G-2A through F, G-3A

13   through L.  Those are the exhibits?

14            MR. GIBSON:  Correct.

15            THE COURT:  All right.  What says the defense,

16   Mr. Lucas?

17            MR. LUCAS:  We have no objection to those exhibits,

18   Your Honor.

19            THE COURT:  They will be admitted.

20        (Exhibits G-1A, G-1B, G-1C, G-2A through F, G-3A through L

21        marked)

22            THE COURT:  Are you ready for the jury now?

23            MR. GIBSON:  Yes, sir.

24            THE COURT:  Defense ready?

25            MR. LUCAS:  Yes, Your Honor.

1    THE COURT:  Bring in the jury.

2  (Jury In)

3    THE COURT:  Good morning.  When you recessed, the

4  witness, Mr. Charles Edwards, was testifying.  He has now

5  testified on direct and on cross, and the next time you hear

6  from him he will be testifying on redirect.  Remember that a

7  witness is subjected to direct examination, then

8  cross-examination, and then if the calling party wishes to ask

9  additional questions based upon a cross-examination, then that

10  party conducts a redirect examination.  So ordinarily at this

11  point, Mr. Edwards would be on the stand under redirect

12  examination.  However, he is not going to testify on redirect

13  examination now.  We're going to take some witnesses up and

14  then come back to him.  So his testimony is incomplete at this

15  point and will be complete when he is examined on a redirect

16  examination.  So that will be sometime later in the trial.

17    Now, we're going to proceed with the next witness.  Who is

18  the government calling?

19    MR. GIBSON:  Government calls James Bladh.

20    THE COURT:  All right.  You have your pictures on him,

21  do you not?  Okay.  We're ready to go forward.

22    MR. GIBSON:  Your Honor, may we have a moment?  The

23  witness may have gone to the restroom.

24    THE COURT:  Okay.

25    MR. GIBSON:  May I step out for a moment?

1       THE COURT:  You may.

2     (Short Pause)

3                     JAMES BLADH,

4     Having first been duly sworn, testified as follows:

5                  DIRECT EXAMINATION

6  BY MR. GIBSON:

7  Q.  Good morning, Mr. Bladh.

8  A.  Good morning.

9  Q.  Sir, could you spell your last name for the record, please,

10  for the stenographer?

11  A.  Bladh, B-L-A-D-H.

12  Q.  Thank you, sir.  Now, I notice you're wearing a hearing

13  aid.  If at any point during our discussion you can't hear

14  what's being said, I need you to indicate that to me in some

15  fashion.

16  A.  All right.

17  Q.  Okay.  And I need you to lean forward so that that

18  microphone can capture what you're saying so the ladies and

19  gentlemen of the jury can hear you.  Okay?

20  A.  All right.

21  Q.  Now, sir, were you once in the United States Navy?

22  A.  Repeat.

23  Q.  Were you in the United States Navy, sir?

24  A.  Yes.

25  Q.  Are you having difficulty with your hearing aid?

1317

1   A.  You're loud enough, but it's distorted.

2         THE COURT:  Let's try the earphones.

3   BY MR. GIBSON:

4   Q.  We have a device to assist you with that.  We're going to

5   give that a try.  Okay?

6   A.  All right.  Speak slow for me, please.

7   Q.  That's often a problem for me.  I have to speak slow

8   anyway.  Sir, were you once in the United States Navy?  Were

9   you in the Navy, sir?

10  A.  I'm sorry.  I just can't hear you.

11        THE COURT:  We need to determine what's the proper

12  approach here, so let me excuse you just for a few minutes

13  while we experiment.

14      (Jury Out)

15        THE COURT:  Now, then, let's see if we can hook him up

16  again with the earphones.  Now, let's see -- let's make sure

17  it's up, make sure the volume is up.  Let's try it.  Can you

18  hear me, sir?

19  BY MR. GIBSON:

20  Q.  Can you hear us, sir?

21        MR. GIBSON:  Can we try a different headset, perhaps.

22        THE COURT:  Okay.  Try a different one.

23  A.  I believe my hearing aids are better than this.

24        MR. GIBSON:  Let's try another set first.

25  A.  Okay.

1      THE COURT:  Can you hear?

2   BY MR. GIBSON:

3   Q.  Can you hear us, sir?

4   A.  Yeah.  But this is my deaf ear, and it's coming in here.  I

5   don't understand that.

6   BY MR. GIBSON:

7   Q.  You can understand me, sir?  You can hear me?

8   A.  Yes.

9        THE COURT:  Can you hear okay now?

10       THE WITNESS:  I hear you -- it's plenty loud, Your

11  Honor, but it just sort of crowds together, you know.

12       THE COURT:  What about now?

13  A.  It's okay.

14       THE COURT:  Listen to his test, give a test.

15  BY MR. GIBSON:

16  Q.  Can you hear me, sir?

17  A.  Yes, I hear you.

18  Q.  Can you understand what I'm saying?

19  A.  Right now, yes.

20  Q.  Is it coming through clearly?

21  A.  It's coming through clearly.

22       THE COURT:  Okay.  All right.  Now, then, let's bring

23  the jury back in.

24     (Jury In)

25       THE COURT:  You may proceed.

1    BY MR. GIBSON:

2    Q.  Good morning again, sir.

3    A.  Good morning.

4    Q.  Now, how old are you today, sir?

5    A.  I'm 71.

6    Q.  Okay.

7    A.  I mean 81.  Excuse me.

8    Q.  And did you serve as an officer in the United States Navy?

9    A.  Yes, I did.

10   Q.  How long were you in the United States Navy?

11   A.  Thirty years.

12   Q.  And when did you go into the Navy?  What year did you

13   start?

14   A.  1943.

15   Q.  What year did you retire, sir?

16   A.  1973.

17   Q.  Are you retired currently?

18   A.  Repeat.

19   Q.  Are you retired now?

20   A.  Am I retired now?

21   Q.  Yes, sir.

22   A.  I do some consulting work but, yes, I am retired.

23   Q.  Who do you consult for?

24   A.  I work for -- with the American Salvage Association and

25   with Pax River, Patuxent River Naval Command, and that's all.

1320

1   Just a few hours a week.

2   Q.  Very good.  What was your rank when you retired from the

3   United States Navy?

4   A.  Lieutenant commander.

5   Q.  And did you have a specialty while you were in the United

6   States Navy?

7   A.  Yes, I did.

8   Q.  What was that specialty, sir?

9   A.  I was with the diving and salvage.

10  Q.  And how long were you a United States Navy diver?

11  A.  I went through diving school in 1955 and then continued

12  with diving in the diving part of the Navy until my retirement.

13  Q.  Now, if I could, sir, I'd like to direct your attention to

14  1964.  At that time, what was your rank in the United States

15  Navy?

16  A.  At that time, I was a lieutenant.

17  Q.  And in 1964 as a lieutenant in the Navy, did you command a

18  Navy dive team?

19  A.  Yes, I did.

20  Q.  And was that dive team responsible for salvage and recovery

21  operations?

22  A.  Yes, it was.

23  Q.  Now, specifically, sir, do you recall receiving orders to

24  go to Mississippi in October of 1964?

25  A.  Yes, I did.

1   Q.  Were you in command of the team that conducted dive

2   operations from October 25th of 1964 through October 31st of

3   1964?

4   A.  I was.

5   Q.  And in connection with that dive, were you required to

6   prepare an official United States Navy report of your

7   activities during those days in 1964?

8   A.  Yes, I was.

9   Q.  Sir, as to the dates and the times and the specificity of

10   the operations in 1964, do you have an independent memory of

11   that without reference to the report?

12   A.  Some of it, yes.

13   Q.  Will the report assist you with respect to the dates and

14   times that you don't recall?

15   A.  Yes, it would.

16          MR. GIBSON:  I have marked as Government's Exhibit 1A

17   a document which I'd like to show to the witness at this point.

18   We discussed this previously.

19          THE COURT:  All right.  Let me advise the jury that I

20   have admitted into evidence the following exhibits:  G-1A,

21   G-1B, G-1C, G-2A through F, G-3A through L.  They have already

22   been admitted outside your presence.  Now, then, counsel may

23   proceed.

24          MR. GIBSON:  May I have G-1A shown to the witness,

25   please?

1    THE COURT:  You may.

2    BY MR. GIBSON:

3    Q.  I'd like you to take a moment, please, and look at the

4    document in your hand that's been labeled G-1A.  Do you

5    recognize that?

6    A.  Yes, I do.

7    Q.  Okay.  Is that the report you prepared in 1964 in reference

8    to the dive?

9    A.  Yes, it is.

10   Q.  Now, could you tell us a little bit about the circumstances

11   under which you found yourself here in 1964.  Who was with you

12   on the dive team?

13   A.  I had a dive team of about five people.  You want their

14   names?

15   Q.  Yes, please.

16   A.  Okay.  It was Chief Kilgore, Chief Mintz, Chief Mays, Louie

17   Mets, I think, and Wright.

18   Q.  Now, I'd like to show this exhibit which has been

19   previously marked as G-3L.  Sir, do you see the television

20   screen in front of you?

21   A.  Yes.  This was the dive team.

22   Q.  Are you in that photograph, sir?

23   A.  Yes, I am.

24   Q.  Where are you in the photograph?

25   A.  I'm on the extreme left.

1    Q.   Is that you standing?

2    A.   Yes.

3    Q.   With about the same haircut?  Just kidding, sir.  Now, when

4    you got to Mississippi, do you recall why were you directed to

5    Mississippi?  What was the purpose of the dive operation?

6    A.   It was a recovery operation.

7    Q.   And what specifically were you to be searching for, sir?

8    A.   Repeat that.

9    Q.   What were you to be searching for?  You indicated it was a

10   recovery.

11   A.   It was, and there was some stuff in the paper, but we in

12   the diving lockers, because we get involved in airplane

13   crashes, all this, and this is what we referred to as a body

14   job.

15   Q.   It was your understanding that you were to search for human

16   remains.  Is that correct?

17   A.   To look for human remains.

18   Q.   When you got to Mississippi, did you -- what equipment did

19   you bring with you to Mississippi to conduct the operation?

20   A.   We brought our diving gear, which was scuba bottles.  We

21   brought our search lines for performing both jackstay and

22   circle line searches.

23   Q.   Okay.  Now, when you first got here, did you determine that

24   there may or may not be a need for additional equipment?

25   A.   Oh, we didn't know until we made the first dive and we saw

1324

1   how cluttered the river bottom was and muddy where we couldn't

2   see anything.  Then we decided we're going to need some locater

3   gear to help us on this job.

4   Q.  Okay.  Now, as a result of the dive operations that you

5   conducted in '64, as part of your report, did you prepare a

6   diagram of the operation?

7   A.  Yes.

8        MR. GIBSON:  If I could have the witness shown

9   Government's Exhibit G-1B, B as in boy.

10  BY MR. GIBSON:

11  Q.  Now, sir, could you again take a look at the screen in

12  front of you.  Is that the diagram that you prepared for your

13  report?

14  A.  Yes, it is.

15  Q.  Okay.  And I'm going to come back to that in a minute.

16        MR. GIBSON:  I'd like to show the witness what has

17  been marked as G-1C for identification, please.

18  BY MR. GIBSON:

19  Q.  Can you take a look at the screen.  Do you recognize G-1C,

20  sir?  You have to answer audibly, sir.

21  A.  This was not my diagram.  This is one that I sent to one of

22  the agents and he composed this diagram.

23  Q.  Was that using information that you had provided to him?

24  A.  Yes.

25  Q.  And is this a fair and accurate depiction of the area that

1    you searched back in October of 1964?

2    A.   Yes, it was.  And this -- and I -- this was all done by

3    seaman's eye, by estimates.  We didn't have any instruments to

4    take measurements, but it's very close.

5    Q.   Okay.  So you are referring to the specific measurements in

6    feet.  You did that based on seaman's eye, as you say?

7    A.   Yes.

8    Q.   Okay.  Now, when you first got to Mississippi, where did

9    you stay?  This dive took place over several days, you told us.

10   Where did you stay?

11   A.   We stayed in Vicksburg.

12   Q.   Okay.  And you stayed overnight in Vicksburg.  Would you

13   then drive to the dive site every day?

14   A.   Yes.

15   Q.   Now, there was an indication on the diagram that was

16   prepared by the FBI that there was a campsite on that diagram.

17   Do you recall there being a campsite?

18   A.   I'm sorry.  I didn't hear.

19   Q.   Do you recall there being a campsite also at the dive

20   location?

21   A.   I still can't get that.

22   Q.   Do you recall there being a campsite, sir, some tents?

23   A.   The campsite there, yes.

24   Q.   Okay.  Why was the campsite there?  What was the purpose of

25   that?

1   A.   My understanding from talking to the agents, that it was to

2   protect our divers.

3   Q.   And did agents stay behind at the campsite in the evenings

4   when you would return to Vicksburg?

5   A.   We were in Vicksburg and then so many agents and state

6   police people stayed at the campsite.

7   Q.   Okay.  Now, on the day that you began search operations,

8   did you come into contact or did you see any livestock?

9   A.   Did I see what?

10  Q.   Any livestock, sir, on the day when you started dive

11  operations?

12  A.   I didn't hear you.

13  Q.   Any animals, sir, any cattle or livestock?

14  A.   Oh, no, no.  Didn't see any livestock.  I think over on the

15  other side of the river, but I didn't pay any attention to it.

16  There were some cattle.

17  Q.   Did you have occasion to encounter those cattle or to have

18  to address the situation with the cattle at any time during

19  your dive operation?

20  A.   At one time -- if I understand your question, at one time

21  when I had the divers, they drove about a -- I don't remember

22  how many -- but they drove a few cattle across the river.

23  There was no threat.  I got the drivers out of the water before

24  the cattle got there, but it did interrupt the diving

25  operations.

1   Q.   So prior to the cattle being driven across the river, you

2   had already started dive operations.   Is that correct?

3   A.   That's correct.

4   Q.   And you had to terminate those diving operations because

5   the cattle were driven through that area?

6   A.   That's correct.

7   Q.   Can you indicate for the ladies and gentlemen of the jury,

8   using this diagram, where about did that cattle drive take

9   place?

10  A.   As I recall, I would say from the southern end of the

11  diagram at Parker's Landing just about straight across or a

12  little bit more to the east.

13  Q.   Did you have any warning before that cattle drive started?

14  A.   Did I have any what?

15  Q.   Did anybody warn you that they were bringing cattle across

16  before you had to get your men out of the water?

17  A.   I don't recall.   I think probably the agents said, "Looks

18  like we've got some cattle coming this way" or something like

19  that, but I don't remember.

20  Q.   Okay.   And as you were conducting search operations, were

21  there any individuals not associated with the dive team who

22  were watching the dive?

23  A.   Any individuals not associated with the diving team?

24  Q.   Watch the dive?   Was there anybody watching what you were

25  doing from the banks?

1328

1    A.   Yes, all the agents that were there.

2    Q.   Did you see anybody else watching while you were there?

3    A.   I never noticed them.

4    Q.   Now, when you arrived and began conducting dive operations,

5    was there any discussion about where you wanted to start your

6    search?

7    A.   Well -- yes, there was.   I wanted to start the diving right

8    in the area that's marked as Parker's Landing.   To me, if

9    something was put in the river, that's probably in the area it

10   would be.   But the agent in charge wanted me to go further

11   to the -- let's see.   That would be further to the -- I think

12   over to the east to start the operation and sort of -- this is

13   my own assumption.   I think that they didn't want us to go

14   right to where the remains were on the first dive because it

15   would indicate that we knew exactly what was there and when we

16   were -- that they were tipped off.   So they -- I guess they

17   didn't want their source known.

18   Q.   So on October 27th of 1964, you described the specific

19   initial dive operations as a, quote, blind.   Is that correct?

20   A.   Yes.

21   Q.   Now, could we go back to G-1B, please, for a moment.   Now,

22   on this diagram --

23        MR. GIBSON:   If we could blow it up, please.

24   BY MR. GIBSON:

25   Q.   The number 1 that appears on the key, that indicates dive

1  operations for the first set of dives.  Is that correct?

2  A.  On the blue one, the braided wire?

3  Q.  Yes, sir.

4  A.  Yes, all this was on there.

5  Q.  And let's talk about how you searched, how you conducted

6  the search.

7  A.  To start with, where you see the circles, that's where you

8  call it a circle line search.  And depending on the bottom

9  terrain and all that, you put an anchor down to, say, a 30-foot

10  line at the anchor and then one diver goes to the bottom and

11  sits on the anchor.  The other diver stretches a line out at

12  the 30 feet and then he swims around the diver -- the anchor

13  then goes slowly in and out on that line so he covers all the

14  area in the circle.

15  Q.  Now, what was the necessity for the use of the ropes?  Why

16  were you using the ropes?

17  A.  Well, to keep track of it.  Like you have your anchor, your

18  anchor is fixed, and a rope is out there and it circles around.

19  And you know exactly that you have covered a diameter the

20  length of that rope in a complete circle.

21  Q.  And how is this search being conducted?  Is there any

22  visibility in this area where you're searching?

23  A.  Absolutely no visibility.  It's all done by hand.

24  Q.  What was interfering with your ability to see under water?

25  Tell us what that was like.

1   A.   Say that again.

2   Q.   Why couldn't you see under the water?  Describe the water

3   for us, please.

4   A.   Well, it was all the mud that was kicked up.  Even if there

5   was a vague visibility when you start, the minute you touch the

6   bottom, all the clouds come up and you're absolutely blind.

7   Q.   So what are you using to search if you're not using your

8   eyes?  What are the divers using to actually search?

9   A.   What are the divers using what?

10  Q.   To search?  If they can't use their eyes, how are they

11  searching the bottom?

12  A.   Just by feel.

13  Q.   As indicated on your diagram, you did three of those circle

14  line searches during the blind search on October 27th.  Is that

15  right?

16  A.   Correct.

17  Q.   Now, you also mentioned a little bit earlier that you

18  utilized a technique called a jackstay search.  Could you

19  describe that for us, please.

20  A.   The jackstay -- first of all, the first stay searches were

21  at the two extreme ends where we did the circle line, then the

22  jackstay searches, the river is not that far across, maybe

23  100 feet or something like that, and you string a line from one

24  end -- straight across the river, and then the divers start and

25  they, the two divers together, one on each side of the line,

1   and they go across the bottom of the river searching.  And when

2   they get above, then they move the jackstay up, whatever, it's

3   about 20 feet, and do the same thing.  They go back and forth.

4   Q.  So I notice you also did -- excuse me -- another three

5   circle line searches on the first day but much further to the

6   north.  Is that correct?

7   A.  Did what?

8   Q.  You also did three circle line searches much further to the

9   north during that first day.  Is that correct?

10  A.  Yes.

11  Q.  That was also part of the blind search?

12  A.  Yes.

13  Q.  On the second day, you started the jackstay searches.  Is

14  that right?

15  A.  That's correct, yes.

16  Q.  Was anything located on the second day during the jackstay

17  search?

18  A.  No, nothing was located.

19  Q.  When you got to the third search, how did you perform the

20  third-day search?

21  A.  The third-day search was jackstay searches and all those

22  little circles were really the divers just dropping down at the

23  end of the pier at different spots and searching at the end of

24  the pier because we thought if something was thrown in, it

25  might be right at the end of that pier or barge, whatever it

1   was.

2   Q.   And that search was unsuccessful right off the pier.   Is

3   that correct?

4   A.   That was unsuccessful too.

5   Q.   Okay.   Now, on the fourth day, were you still conducting

6   jackstay searches on the fourth day?

7   A.   Yes.

8   Q.   And did you begin to find items on the fourth day?

9   A.   Yes, we did.   Different things, some of them we couldn't

10  identify, but yes.

11  Q.   When you found something, whether it appeared to be of

12  significance in the case or not, you still marked where you

13  found something.   Is that right?

14  A.   Yes, we would mark it on a map.

15  Q.   In fact, you marked them on this diagram in the areas where

16  you found items.   Is that correct?

17  A.   Right.   These were estimated, of course.

18  Q.   And on October 13th of 1964, did you find anything of

19  significance?

20  A.   On that day, there debris was found, but nothing really of

21  significance.

22  Q.   Well, sir, referring specifically to your report on

23  October 30th, can you read for us what you recorded as having

24  been determined on that day.

25  A.   What we determined is what we would call into a hot area

1   and that we were in the right place and continued searching.

2   Q.  And please read from the report, tell us what you

3   documented in your report as to what was located that day for

4   October 30th, 1964.

5   A.  Was October 30th the fourth day or the fifth day?

6   Q.  On your report, sir, it's dated October 30th.

7         MR. GIBSON:  Can we bring that up, Government's

8   Exhibit G-1A, please.  Go to page 3.  Can we highlight October

9   30th.

10   BY MR. GIBSON:

11   Q.  Sir, I'd like you to take a look at the screen for

12   October 30th.  Do you see that?

13   A.  Yes, sir.

14   Q.  Can you read that?

15   A.  Yes, sir.

16   Q.  Can you read that to us, please.

17   A.  It says, "Jack Wellhoner arrived at 0100, covered area

18   indicated as day 4 in enclosure 3.  The MTG" -- the motor grade

19   gravitometer -- "operated as designed."

20   Q.  Take your time, sir.  Actually, what is the MTG?  What is

21   that?

22   A.  That's an instrument that will pick up metal objects.

23   Q.  A metal detector?

24   A.  Pardon?

25   Q.  It's a metal detector?

1    A.   Yes.

2    Q.   Okay.  And then you go on to describe assorted pieces of

3    scrap metal.  Can you indicate that to us, please.  You may

4    refer to the screen, sir.  It's larger print.  Mr. Bladh?

5    A.   Yes.

6    Q.   You may refer to the screen in front of you, the larger

7    print.  Can you read that?

8    A.   Yeah.  Let me get it on mine.  I can read it better than

9    that screen.

10   Q.   Let me read it to you and you tell me if I get it correct.

11   Okay?

12   A.   All right.

13   Q.   "Jack Wellhoner arrived at 0100.  Covered area indicated as

14   day 4 in enclosure 3.  The MTG operated as designed.  Assorted

15   pieces of scrap metal were buoyed and recovered.  On the fifth

16   pass, Chief Martin and Chief Bends recovered two pieces of

17   railroad track approximately four and a half feet long and two

18   heavy metal rollers all connected together with logging

19   chains."

20   A.   That's correct.

21   Q.   "The divers also recovered a shirt and what appeared to be

22   human rib bones.  These were approximately 150 feet southwest

23   of Parker's Landing off the north bank indicated by drop 5 on

24   enclosure 3.  Diving operations ceased at this point until the

25   following day.  Lieutenant Stewart and Wilson, MNI, arrived at

1  1400 with their backup locating equipment."

2  A.  That's correct.

3  Q.  Now -- and that's what you documented in your dive report

4  to the United States Navy.  Correct?

5  A.  Sir?

6  Q.  That's what you wrote down for the United States Navy.

7  Correct?

8  A.  Yes.

9  Q.  And that's what you recorded in your diagram?

10  A.  Yes.

11  Q.  Okay.  Now, on October 31st, you returned again to the same

12  location to conduct additional dives.  Is that correct?

13  A.  Yes.

14  Q.  And that's also indicated on your diagram and also in your

15  report.  Is that fair to say?

16  A.  That's correct, yes.

17  Q.  Now, directing your attention to October 31st, the entry on

18  your report of 1964, I'm going to read it and you tell me if

19  I'm getting it correct.  Okay?

20  A.  I didn't get that.

21  Q.  I'll read it to you and you tell me if I'm reading your

22  report correctly.  Okay?

23  A.  Okay.

24  Q.  "October 31st, Chief Bends and Chief Martin made another

25  dive on drop 5 to recover any additional remains that may

1   possibly have been in this area.  Continued searching, using

2   the MTG indicated as day 5 on enclosure 3.  Three contacts were

3   made and buoyed.  On drops 7 and 8, Lieutenant Stewart and

4   Wilson, MNI, recovered an engine block with a piece of logging

5   chain.  In the chain was a shirt and what appeared to be more

6   human remains.  Next to the engine, a human skull was

7   recovered.  This was located approximately 50 feet upstream

8   from the other contact where apparent human remains were found.

9   This completed the diving and recovery operations.  Made

10  preparations to secure and return all equipment."  Did I read

11  that correctly, sir?

12  A.  That's correct.

13  Q.  Okay.  Now, after you finished the October 31st dive, the

14  very last dive where the engine block was recovered, what

15  happened next?  Did you stay in Mississippi or what happened?

16  A.  No, the agent in charge said for us to pack up and go

17  directly from the dive site back to Panama City.  Don't stop

18  anyplace, just go, and that they would check us out of the

19  hotel room and anything that we left behind they would ship to

20  us.

21  Q.  And Panama City, was that where you had been stationed,

22  sir?

23  A.  That's where I was stationed.

24  Q.  And Panama City is located where?

25  A.  Pardon?

1   Q.   Panama City is where?   In what state?

2   A.   It's on the Gulf Coast of Florida.

3   Q.   Okay.   Now, if I understood you correctly, you weren't

4   permitted to go back to the hotel to get your belongings.   Is

5   that what you told us?

6   A.   We did not.

7   Q.   Why was that, sir?

8   A.   I assume it was because that we might be threatened or some

9   reason.   I don't know.

10  Q.   Now, when you initially got there, was there any discussion

11  about whether you would openly display Navy insignia or Navy

12  uniforms?

13  A.   No, we were told not to wear any uniforms or discuss it --

14  discuss this outside of the actual dive area to anybody or why

15  we were there.

16  Q.   Okay.   Now, what I'd like to do is show you some

17  photographs, sir, if I could.   And I'd like to start with what

18  was previously marked as Government's Exhibit 2, A through E.

19  These photographs will appear on the screen in front of you,

20  sir.   First up will be G-2A.   Do you recognize that, sir?

21  A.   Yes, that's one of the divers -- I'm not sure which one --

22  with some rollers and looks like railroad track.

23  Q.   Okay.   And if I could direct your attention to G-2B.   Do

24  you recognize that, sir?

25  A.   Yeah.   That looks like some more of the same, the rollers.

1    Q.   And that's basically how they looked in 1964?

2    A.   Yes.

3    Q.   Okay.   If we could go to G-2C.   Do you recognize G-2C?

4    A.   Well, that's two divers standing there and looks like some

5    debris at their feet of some type that I can't make out.

6    Q.   Taking a look at G-2D, do you recognize what's depicted in

7    G-2D?

8    A.   Yes.

9    Q.   What is that?

10   A.   That's a skull.

11   Q.   Now, sir, do you have any specific recollection of when the

12   skull was found?   Do you remember that day?

13   A.   Well, yeah.   My -- that particularly stands out because it

14   really amazed me that it was almost a polished black.

15   Q.   Had you ever seen anything like that before, sir?

16   A.   Pardon?

17   Q.   Had you ever seen that kind of coloring before to a skull?

18   A.   No.

19   Q.   And to what did you attribute the color?   Why was it that

20   color?

21   A.   I'm guessing, I don't know, but I would say because it was

22   in the mud or something like that.

23   Q.   And do you recall who the diver was who found the skull,

24   sir?

25   A.   Pardon?

1    Q.   Do you recall who the diver was who found the skull, sir?

2    A.   Yes.

3    Q.   Who was it?

4    A.   It was -- I believe it was lieutenant -- as I recall, it

5    was Lieutenant Stewart.

6    Q.   And how did he first indicate to you that he had found

7    anything?

8    A.   He was out and when he came up, he waved to me and then he

9    went like that, and I guess he was indicating that he had a

10   skull there.

11        THE COURT:   You may indicate for the record that he

12   pointed to his skull while he was testifying on this matter.

13        MR. GIBSON:   Thank you, Your Honor.   Indicating for

14   the record pointing to his skull with the index finger.

15        THE COURT:   Okay.

16        MR. GIBSON:   Hand over his head.

17        THE COURT:   The record so reflects.

18   BY MR. GIBSON:

19   Q.   If we could take a look at the next photograph, G-2E.  ·Do

20   you recognize that, sir?

21   A.   That appears to be the engine block.

22   Q.   And is that basically how it looked when you all discovered

23   it in 1964?

24   A.   The what?

25   Q.   Is that basically how it looked when you found it in 1964?

1    A.   Yes.

2    Q.   I'm going to show you a few more photographs.  We're going

3    to move to Government's Exhibit G-3.  Beginning with G-3A.  Can

4    you take a look at the screen.  Do you recognize that, sir?

5    A.   Yes, I do.

6    Q.   What's depicted in that photograph?

7    A.   That's the engine block and then the skull.

8    Q.   I also see -- is that logging chain in there?

9    A.   Sir?

10   Q.   Do you see a chain in the photograph, sir?

11   A.   Do I see --

12   Q.   Chain, links of chain?

13   A.   Oh, yes.

14   Q.   Going to G-3C, do you recognize that, sir?

15   A.   Yes.  That's another picture of the skull.

16   Q.   Moving to G-3D, do you recognize that, sir?

17   A.   Yes, I do.  Another picture of the same.

18   Q.   Okay.  Now, I'd like to show you what's been marked as

19   G-3E.  Is that basically a photograph of the area in which you

20   were conducting dive operations?

21   A.   Yes, it does.  I won't say it's the area, but it looks like

22   the area.

23   Q.   Showing you what's been marked as G-3F.  Is that a

24   photograph of the dive operations?

25   A.   Yes, it is.

1   Q.   Showing you what's been previously marked as 3G, G-3G.   Do

2   you recognize that?

3   A.   Yes.   It appears to be that they are lifting an engine

4   block upwards.

5   Q.   And showing you what's been marked as G-3H.   Do you

6   recognize that?

7   A.   Yes, that's the engine block and chain.

8   Q.   Now, if we could go to G-3K.   Do you recognize that, sir?

9   A.   I don't specifically recognize it, but it appears to be

10  Parker's Landing area.

11  Q.   And does that appear to contain a barge in the photograph

12  and some boats?

13  A.   Yes.

14  Q.   Okay.   Sir, I don't believe I have any other questions for

15  you right now.   Mr. Lucas is going to ask you some questions

16  now.

17  A.   All right.

18         MR. LUCAS:   Just a second, Your Honor.

19                       CROSS-EXAMINATION

20  BY MR. LUCAS:

21  Q.   How are you this morning?

22  A.   I'm okay.

23  Q.   Do you understand me?

24  A.   Yes.

25  Q.   My name is George Lucas, and I represent Mr. Seale.   I've

1  got a couple of questions for you about the environment that

2  you were working in in October of 1964.  Were you familiar with

3  what type of body of water that was?

4  A.  Not until I got there and, as I remember, it's sort of a

5  tributary off of the Mississippi River.

6  Q.  It wasn't actually connected to the Mississippi River at

7  that time of year, was it?

8  A.  I'm not sure.

9  Q.  Okay.  Could you tell that the water was lower than it

10  often was from the bank and from the characteristics of that

11  body of water?

12  A.  I didn't notice that.

13  Q.  Okay.  Now, you started searching that body of water and

14  you searched it for five days.  Is that correct?

15  A.  That's correct.

16  Q.  And during those five days, I believe at one time you said

17  some cattle came across the river?

18  A.  Repeat.

19  Q.  Some cattle came across the river?

20  A.  Some cattle, yes.

21  Q.  Was there a point in the river that was shallow enough for

22  those cattle to come across?

23  A.  I don't know.  I mean, they came across where we were, and

24  I know what that depth was.  If they was any shallower, I don't

25  know.

1  Q.  Did they swim across?

2  A.  They swam across.

3  Q.  And I guess you said that caused problems because it

4  muddied the water, or what was --

5  A.  Well, not really, because the water, the minute you put a

6  diver in the water, the water gets muddy.  It was just an

7  inconvenience.  We had to quit diving.

8  Q.  Okay.  Now, you said in your report that they -- that there

9  was found a four and a half foot piece of rail connected to two

10  wheels.  Is that correct?

11  A.  Yes.

12  Q.  And it was very important that your report be accurate,

13  wasn't it?

14  A.  Repeat.

15  Q.  You endeavored to make your report as accurate as possible,

16  didn't you?

17  A.  Yes, it was.

18  Q.  And in your report when you said that there was one

19  four-feet piece -- four and a half foot piece of rail connected

20  to two wheels, that's what you found.  Is that correct?

21  A.  That's right.

22  Q.  Okay.  And if it had been two two-foot pieces of rail

23  connected to wheels, that's what you would have put in your

24  report?

25  A.  Yes.  And you have to remember I'm saying this from memory.

1344

1   I have to read my report to know what I did.

2   Q.  I understand, but your report said that you found two

3   pieces of wheel -- two wheels connected to one four and a half

4   foot piece of rail.

5        You also mentioned earlier when Mr. Gibson was questioning

6   that the skull that you found seemed to be a polished black.

7   Is that correct?

8   A.  That's what it appeared to be.

9   Q.  Did that black clean off or was that --

10  A.  I didn't touch it, and I don't know.

11  Q.  You also mentioned that the place that you -- was

12  productive where you actually found things was all down river

13  or downstream from Parker's Landing?

14  A.  Yes.

15  Q.  Was there a current in the river at that time of year in

16  October?

17  A.  It wasn't -- couldn't detect any current.

18  Q.  But you could tell that during periods of high water that

19  there was, in fact, a current?

20  A.  There was a high watermark, but we didn't pay much

21  attention to that.

22  Q.  And I presume from what you're saying, the Mississippi

23  River wouldn't be a very good place to do any recreational

24  diving, would it?

25  A.  No.

1  Q.  Can't see much in there?

2  A.  Can't see anything.

3  Q.  And you have no idea how all of those objects got into that

4  body of water?

5  A.  No, I didn't.

6  Q.  You have no idea what happened on May 2nd, 1964?

7  A.  No.

8        MR. LUCAS:  Thank you so much.

9        THE COURT:  Redirect?

10                    REDIRECT EXAMINATION

11  BY MR. GIBSON:

12  Q.  Sir, if I could, I'd like to go back to G-1A, your report,

13  if I could, at page 3 at the October 30th entry.

14  A.  Okay.

15  Q.  And you tell me if I'm reading the third sentence in that

16  paragraph correctly.  "On the fifth pass, Chief Martin and

17  Chief Bends recovered two pieces of railroad track."  Did I

18  read that correctly?

19  A.  Yes.

20  Q.  And that's what you wrote down?

21  A.  What?

22  Q.  That's what you wrote down in your report.  Correct?

23  A.  Yes.

24  Q.  Okay.  Now, if we could take a look at G-1C, please, the

25  diagram that is going to appear on your screen.  Now, as

1  indicated on the diagram, one side of the old Mississippi is

2  Louisiana.  Is that correct?

3  A.  One side is what?

4  Q.  Louisiana?

5  A.  Yes.

6       MR. LUCAS:  Objection, Your Honor.  This isn't proper

7  redirect.  I didn't go into the state borders in my

8  cross-examination.

9       THE COURT:  I'll allow you further examination on this

10  point if you wish.  Go ahead.

11  BY MR. GIBSON:

12  Q.  On the other side is the state of Mississippi.  Is that

13  correct?

14  A.  Correct.

15  Q.  And the items that you found, were they closer to the

16  Louisiana side or to the Mississippi side as documented in the

17  diagram?

18  A.  It's closer to the upper area.

19  Q.  Which would be Louisiana to the north?

20  A.  Yes.

21  Q.  Okay.  Thank you, sir.

22       THE COURT:  Mr. Lucas, I'll allow you

23  cross-examination on this point.

24       MR. LUCAS:  Thank you, Your Honor.

25                    RECROSS-EXAMINATION

1   BY MR. LUCAS:

2   Q.  You did not draw this diagram, did you?

3   A.  No.

4   Q.  You had no training in surveying or drawing of maps, do

5   you?

6   A.  No.

7   Q.  You have no knowledge as to where the actual border between

8   Mississippi and Louisiana is --

9   A.  No.

10  Q.  -- on that area?

11  A.  No.

12  Q.  The only basis you have of saying that either one of these

13  borders is Mississippi or Louisiana is this diagram that you

14  have right in front of you.  Isn't that correct?

15  A.  Repeat that, please.

16  Q.  The only basis that you have for saying that this is

17  Louisiana and this is Mississippi is the diagram that you have

18  in front of you?

19  A.  That's correct.

20  Q.  So you're basing your testimony just off what Mr. Gibson

21  has shown you?

22  A.  We didn't have survey equipment out there, and I don't know

23  exactly.  Like I said, it was sort of a seaman's eye there.

24          MR. LUCAS:  Thank you so much.

25          THE COURT:  Any reredirect?

1    MR. GIBSON:  No, Your Honor.

2    THE COURT:  All right.  You may step down.

3    MR. GIBSON:  Your Honor, may I step away from the bar

4  a minute, Your Honor?

5    THE COURT:  You may.

6    MS. FITZGERALD:  Your Honor, you may recall that I

7  asked if we could have a few moments in between these

8  witnesses.

9    THE COURT:  You did.  We'll be in recess for ten

10  minutes.  All rise.

11    (Jury Out)

12    (Recess)

13    MR. LAMPTON:  Your Honor, before the jury comes in,

14  let me ask counsel if they're going to object to some documents

15  from the next witness.

16    THE COURT:  You mean this witness?

17    MR. LAMPTON:  No, sir, the next witness.

18    THE COURT:  Well, then, take it up then subsequent

19  because the jury is already about to come in now.

20    (Jury In)

21    THE COURT:  You may be seated.  We'll now swear the

22  witness.

23    (Witness Sworn)

24    THE COURT:  Before you start, hold it, we have to do

25  one other matter.  I told y'all I'd be giving y'all some

1  binders to you.  We'll pass those out now.  We're all ready.

2  Now you may begin.

3                    OSCAR HUGHES,

4     Having first been duly sworn, testified as follows:

5                  DIRECT EXAMINATION

6  BY MS. FITZGERALD:

7  Q.  Reverend Hughes, if you would, please, state your name and

8  spell it for the court reporter.

9  A.  Oscar Hughes.  I live in Crosby, Mississippi.

10 Q.  Is your last name spelled H-U --

11 A.  H-U-G-H-E-S.

12 Q.  And we brought you in before the jury came in so that we

13 could practice seeing if that hearing device would assist you?

14 A.  Yes.

15 Q.  Is it working okay for you?

16 A.  Yes.

17 Q.  Will you let me know if at any time you can't hear me or

18 don't understand a question?

19 A.  Yes.

20 Q.  And I'm going to need you to speak very slowly and clearly

21 into that microphone.  Okay?

22 A.  Yes.

23 Q.  Sir, are you, in fact, a reverend?

24 A.  Beg your pardon?

25 Q.  Are you a preacher?

1   A.  No.

2   Q.  Have you been a preacher?

3   A.  No.

4   Q.  You've never been a preacher?

5   A.  No.

6   Q.  Okay.  Did you know Preacher Briggs?

7   A.  Yes.

8   Q.  Tell me about how you came to know Preacher Briggs.

9   A.  I came to first -- my first time of knowing him was before

10  he went into the Army in the year of 1941.

11  Q.  When I say "Preacher Briggs," what was Preacher Briggs'

12  first name?

13  A.  Clyde.

14  Q.  You first met Clyde Briggs in 19 --

15  A.  I didn't meet him.  I just saw him then, but I met him

16  personally after he came out of the service and that was long

17  about 1946, somewhere in that year.

18  Q.  And before I jump into that, I actually want to hear a

19  little bit more about you.  Where are you from?

20  A.  Crosby, Mississippi.

21  Q.  How long have you lived there?

22  A.  Since 1935.

23  Q.  And are you employed?

24  A.  Retired.

25  Q.  What did you do before you were retired?

1  A.  I was a sawmill employee for Crosby Lumber and

2  Manufacturing Company.  From that I worked for the Hood Lumber

3  Company.  I was sawmill most of my life.

4  Q.  You indicated that you became -- or you became acquainted

5  with Reverend Briggs --

6  A.  By visiting churches by Franklin County and Wilkinson

7  County.  He was with Franklin County, and I started visiting

8  churches.  That's when he started -- went into the ministry,

9  and that's when I got more acquainted with him after those

10  years.

11  Q.  Did you become close friends with Reverend Briggs?

12  A.  Yes, very close with him.

13  Q.  And did he -- did you attend a church?

14  A.  Yes.

15  Q.  Where was your church?

16  A.  My church is Union Baptist Church in Crosby, but I was

17  sitting in church with him at the Roxie First Baptist Church.

18  Q.  Do you know where Reverend Briggs preached?

19  A.  Beg your pardon?

20  Q.  Where did Reverend Briggs preach?

21  A.  He preached at that church.

22  Q.  At which church?

23  A.  Roxie Baptist Church, Crosby Union Baptist Church, Sweet

24  Home Baptist Church, and he also preached at Centreville

25  Baptist Church and from one church to another to preach at.

1   Q.  Can you tell me how that worked, how he managed to preach

2   at all of these different churches?

3   A.  Well, small congregations and not much finance, and he was

4   a preacher at one church one Sunday and go to the next one the

5   next Sunday.  So he was there at our church on the fourth

6   Sunday.

7   Q.  Are you, in fact, a deacon at the Crosby Union Baptist

8   Church?

9   A.  Yes.

10  Q.  How long have you been a deacon there?

11  A.  Since 1947, January 1947.

12  Q.  And do you remember what year Preacher Briggs began

13  preaching at the Crosby Union Baptist Church?

14  A.  1953.

15  Q.  Do you know when Reverend Briggs passed away?

16  A.  January 1965.

17  Q.  I'm going to ask you some questions about a Saturday

18  afternoon in the summer of 1964.  Do you recall a Saturday

19  afternoon in the summer of 1964 when Reverend Briggs came to

20  visit you?

21  A.  Yes.

22  Q.  Can you tell me about that.

23  A.  Well, we were sitting down in the living room just talking

24  on Saturday evening.  Finally somebody knocked on the door.  At

25  that time, we didn't keep doors locked, so I just said, "Come

1   in."

2   Q.  Who came in?

3   A.  It was Kirby Schell.

4   Q.  Who is Kirby Schell?

5   A.  He used to be sheriff of Franklin County.  He is deceased

6   now.  But --

7   Q.  At the time that he came to your house --

8   A.  At the time he came to my house, he wasn't the sheriff

9   then.  I think he -- I think he was deputy.  He was either

10  deputy or he was the game warden.  He was one or the other.

11  But that's who came in.

12  Q.  On the day that he came to your house --

13  A.  When he came in the house.

14  Q.  -- was he a law enforcement officer?

15  A.  If my memory serves me right, he was.

16  Q.  And he came to your home?

17  A.  Yeah, he knocked on the door and I told him to come in and

18  he came in and he spoke and he said, "We want to see you in

19  Roxie, Clyde," that's what he said.  He said, "Now?"  He said,

20  "Yeah, we want to see you right now."  And he got up and come

21  out.  When Reverend Briggs gets up and come out of the house, I

22  gets up and come out on the porch too, and it was highway

23  patrolman cars sitting in my driveway.

24  Q.  Was it a marked highway patrol car sitting in your

25  driveway?

1   A.   Marked highway patrol car.

2   Q.   Did you see if there was any law enforcement officer in

3   that highway patrol car?

4   A.   Nobody -- that's all that was sitting in the car.

5   Q.   I'm sorry.  I didn't understand you.  Can you repeat that.

6   A.   I said it was just nobody in that car but the highway

7   patrolman.

8   Q.   So there was a highway patrol officer in the car?

9   A.   There was highway patrol.

10  Q.   And Kirby Schell, the law enforcement officer that came

11  into your home, is he a white guy or a black guy?

12  A.   Beg your pardon?

13  Q.   Was he a white guy or a black guy?

14  A.   White.

15  Q.   What about the highway patrolman that was sitting in the

16  marked patrol car in your driveway?

17  A.   White.

18  Q.   Was there anybody else with them that you saw at that time?

19  A.   No.

20  Q.   And you indicated that Mr. Schell told Reverend Briggs

21  what?

22  A.   He told him, said, "You just come on in your car.  You

23  drive your car and come on."  So they left.

24  Q.   Where did he tell him he wanted him to go?

25  A.   In Roxie, Roxie.  He told him when he walked in the house,

1  he said, "We want to see you in Roxie."  That's what he told

2  him.

3  Q.  Did Reverend Briggs leave?

4  A.  Yeah.

5  Q.  Was there something about this exchange that seemed odd to

6  you?

7  A.  Well, not knowing what it was and like things was going on.

8  After they left, I gets in my car and I drive on to Roxie

9  shortly after that.

10  Q.  When you say "things were going on," what do you mean by

11  that?

12  A.  Well, they was having the racial riots and so forth and

13  things like that were going on.

14  Q.  Were you concerned for Reverend Briggs' safety?

15  A.  Yes, I was.

16  Q.  What did you do?

17  A.  I wanted to see what did they want him for because they

18  wanted to see him, so I gets in my car and I drives to his

19  house in Roxie.

20  Q.  Can you tell me about how far away your home in Crosby was

21  from the Roxie First Baptist Church?

22  A.  I would say not over 20 miles.

23  Q.  And how long did it take to go from your home in Crosby to

24  the Roxie First Baptist Church by car back in 1964?

25  A.  Twenty or 25 minutes.

1   Q.  Did you make that drive?

2   A.  Yes, I made that drive.

3   Q.  Did you go to the Roxie First Baptist Church?

4   A.  I went there after.  I went to his house first.

5   Q.  Did you find him there?

6   A.  No, he wasn't at home.  I asked his wife and she said he

7   was at the church.  When I stopped at the church, he had done

8   been to the church and gone, but his brother was there working

9   on a lock on the door.  And I asked him what was the matter,

10  and he said, "It's rumor out that they are going to do

11  something to his church, and they told us to show up to the

12  church and secure it."  He was working on the lock.  I left

13  then and I went on to Natchez and I came back and I didn't see

14  him anymore until the next day, and he said it was a rumor out

15  that some things was going on at the church and the church was

16  going to be set afire or burned or something.  That's where it

17  was left at.  I questioned no more about it after that.

18  Q.  Okay.  Did you know Charles Moore?

19  A.  No.

20  Q.  Did you know Henry Dee?

21  A.  No.

22  Q.  Do you know Charles Edwards?

23  A.  No.

24  Q.  Have you ever had a conversation with a man named Charles

25  Edwards --

1   A.   No.

2   Q.   -- about a search that happened at the Roxie First Baptist

3   Church on a Saturday afternoon in 1964?

4          MR. LUCAS:   Objection to leading, Your Honor.

5          THE COURT:   Overruled.

6   BY MS. FITZGERALD:

7   Q.   Have you ever had a conversation ever with a man named

8   Charles Edwards about a search at the Roxie First Baptist

9   Church --

10  A.   No.

11  Q.   -- that occurred on a Saturday in 1964?

12  A.   No.

13         MS. FITZGERALD:   Can I have just one moment, Your

14  Honor?

15      (Short Pause)

16  BY MS. FITZGERALD:

17  Q.   Back in the 1960s, did anybody ever come to talk to you

18  about what you might know about the Roxie First Baptist Church

19  being searched on a Saturday afternoon in 1964?

20         MR. LUCAS:   Your Honor, I've got to object to this

21  leading.   He's never said one word --

22         THE COURT:   I understand.   Don't lead.   Rephrase your

23  question.

24  BY MS. FITZGERALD:

25  Q.   Has any law enforcement officer -- have you ever had a law

1  enforcement officer come to talk to you back in the 1960s about

2  what we've been talking about here today?

3  A.  No.

4        MS. FITZGERALD:  I don't have anything further.  Thank

5  you, Your Honor.

6        THE COURT:  Cross-examination.

7        MR. LUCAS:  Thank you, Your Honor.

8                    CROSS-EXAMINATION

9  BY MR. LUCAS:

10 Q.  Good morning, Mr. Hughes.  How are you today?

11 A.  Fine.

12 Q.  Can you hear me all right?

13 A.  Yes.

14 Q.  Now, you said that you were visiting -- Reverend Briggs was

15 visiting at your home at the time that these law enforcement

16 officers came and asked him to come to Roxie.  Is that correct?

17 A.  He was visiting at my house.

18 Q.  Right.  In Crosby?

19 A.  In Crosby.

20 Q.  And after you visited -- after the visit -- after he left,

21 you became concerned and went to the church in Roxie.  Is that

22 right?

23 A.  No.  I went to his house first.

24 Q.  Went to his house and he wasn't at his house and then you

25 went to the church?

1   A.   Right.   Yes.

2   Q.   I'm sorry?

3   A.   I said yes, I went to the church by myself.

4   Q.   When you got to the church, his brother was there changing

5   the locks on the church?

6   A.   Yeah, he was working on the locks on the -- one of the back

7   doors of the church.

8   Q.   And his brother told you that the reason he was doing that

9   is because they had been informed that there might be a threat

10  against the church?

11  A.   Yes, it was a rumor.   That's what he said, yes.

12  Q.   And the next day, you saw Reverend Briggs?

13  A.   No.   I didn't see him the next day.

14  Q.   Okay.   I'm sorry.   I misunderstood you.

15  A.   I said no, I didn't see him the next day.   I saw him after

16  that.   I don't know if it was the next day, but I know I didn't

17  see him the next day because the next day was on a Sunday.   I

18  didn't see him that Sunday.   He didn't come to Crosby on that

19  day.   But when I did talk with him again, that's what he told

20  me it was.   He told me the same thing his brother told me.

21  Q.   He told you that the reason that the law enforcement had

22  come to see him was because they thought that there was a

23  threat against that church?

24  A.   Yeah, the particular church.

25  Q.   And you knew Reverend Briggs very well, did you not?

1    A.   Yes.

2    Q.   Did you -- were you familiar with Reverend Briggs'

3    membership in a group called The Deacons for Defense?

4    A.   No.

5    Q.   Were you a member of that organization?

6    A.   No.

7            MR. LUCAS:   If I may have a moment, Your Honor.

8       (Short Pause)

9            MR. LUCAS:   Nothing else, Your Honor.   Thank you.

10           THE COURT:   Redirect?

11           MS. FITZGERALD:   Very briefly, Your Honor.

12                    REDIRECT EXAMINATION

13   BY MS. FITZGERALD:

14   Q.   You were just asked a question about what Reverend Briggs

15   conveyed to you.   What Reverend Briggs told you was that law

16   enforcement officers --

17           MR. LUCAS:   Objection, Your Honor, to leading.

18           THE COURT:   Don't lead.   You're leading.

19   BY MS. FITZGERALD:

20   Q.   In response to the question that defense counsel asked you,

21   did Reverend Briggs tell you that he himself knew the reason

22   for the search or --

23           MR. LUCAS:   Objection, Your Honor.   May we approach?

24           THE COURT:   No.

25           MS. FITZGERALD:   May I continue?

1       THE COURT:  Ask your question.

2    BY MS. FITZGERALD:

3    Q.  Did he tell you whether or not he had personal knowledge of

4    why the search was conducted or whether he was told something

5    by the law enforcement officers?

6       MR. LUCAS:  Objection once again.

7       THE COURT:  Hold it before you answer the question.  I

8    need to excuse the jury.

9       (Jury Out)

10      THE COURT:  Do I need to excuse the witness while we

11   discuss this matter?

12      MS. FITZGERALD:  That's probably best, Your Honor.

13      THE COURT:  Okay.

14      MS. FITZGERALD:  We'll bring you right back,

15   Mr. Hughes.

16      (Short Pause)

17      THE COURT:  Okay.  Now explain what's going on.

18      MS. FITZGERALD:  Your Honor, I'm simply trying to

19   clarify that the information that he got from Reverend Briggs

20   wasn't from Reverend Briggs' personal knowledge.  Reverend

21   Briggs was told by the law enforcement officers, the government

22   will contend later in argument falsely, that the reason for the

23   church search was because of bombs, that they tried to make

24   this appear as though it was a benevolent search.  In fact,

25   they were conducting a search that Charles Edwards has already

1   testified to and they were looking for the guns, and this

2   corroborates his testimony.  That's where I'm going.

3         THE COURT:  I see.  What question do you propose to

4   ask him?

5         MS. FITZGERALD:  I wanted to just simply ask him

6   whether or not Reverend Briggs told him he knew this of his own

7   knowledge or whether this was something that was told to him by

8   the law enforcement officers.  That's exactly what counsel

9   inquired of.

10        THE COURT:  What's your objection?

11        MR. LUCAS:  Your Honor, there has never been one word

12  out of this witness' mouth about a search.  The only thing this

13  witness has testified to is that Reverend Briggs was at his

14  house, law enforcement came and asked him to return to Roxie,

15  went back -- he went to Roxie with those law enforcement and

16  then later on this witness went down and his brother was

17  changing the locks on the church and said there was a danger,

18  and later Reverend Briggs said that there was some danger to

19  the church.  He never has said one word, not in his 302 nor in

20  his testimony, about there being a search, about his knowledge

21  of a search.  The only time a search has been mentioned has

22  been Ms. Fitzgerald.

23        THE COURT:  Ms. Fitzgerald, what's the question you're

24  going to ask him again?

25        MS. FITZGERALD:  Counsel is correct, and I apologize.

1    I have misphrased the question.  I will phrase it in terms of

2    did Reverend Briggs indicate to you that he had personal

3    knowledge of this purported bomb threat or was that something

4    that was told to him by law enforcement officers.

5         THE COURT:  Okay.

6         MR. LUCAS:  To that question I will have no objection,

7    Your Honor.

8         THE COURT:  Okay, then.

9         MS. FITZGERALD:  It's invited if there's an objection

10   as to hearsay.

11        THE COURT:  Okay.  Let's bring the jury in.  First of

12   all, bring the witness in.

13        MS. FITZGERALD:  I apologize to the court and to

14   counsel.  I did misphrase the question.

15        THE COURT:  Well, he is correct that the witness never

16   said anything about a search.  You can bring the witness back

17   in and the jury.

18      (Jury In)

19        THE COURT:  You may be seated.  Counsel.

20        MS. FITZGERALD:  Thank you, Your Honor.

21   BY MS. FITZGERALD:

22   Q.  Mr. Hughes?

23   A.  Yes.

24   Q.  When you spoke with Reverend Briggs, did he indicate to you

25   whether he had personal knowledge that there was this purported

1  threat to the church or whether that was something that was

2  told to him by the law enforcement officers?

3  A.  It was told to him by the law enforcement officers.

4            MS. FITZGERALD:  Nothing further.  Thank you.

5            THE COURT:  Either side anticipate recalling this

6  witness?

7            MS. FITZGERALD:  No, Your Honor.

8            MR. LUCAS:  No, Your Honor.

9            THE COURT:  You may step down and be finally excused.

10  Call your next witness.

11            MR. LAMPTON:  Your Honor, before I do that, from

12  talking with defense counsel, I believe the court is going to

13  have to rule on a matter of evidence preliminarily, and I think

14  you need to do that outside the presence of the jury.

15            MS. NESTER:  It is going to require a predicate from

16  the witness, so, I mean, I don't understand how the court is

17  going to rule on that before the witness lays the predicate.

18            THE COURT:  I don't even know what y'all are talking

19  about.

20            MS. NESTER:  It's a document he's trying to introduce.

21  It's going to require a predicate.  I don't know how we could

22  do it now.  He's going to have to do it after he lays the

23  predicate and then ask for the court --

24            THE COURT:  Is there objection to a document based

25  upon what you presume to be a lack of a predicate?

1    MS. NESTER:  No.

2       THE COURT:  Then I guess I can't dance around it

3  without having to excuse you all.  Let me excuse you.  This

4  won't take but a moment.

5    (Jury Out)

6       THE COURT:  Mr. Lampton?

7       MR. LAMPTON:  Yes, sir, Your Honor.  The government is

8  going to offer into evidence a journal of Reverend Clyde Briggs

9  that we contend is in his handwriting.  We contend that it is

10  over 20 years old, that it qualifies for admission into

11  evidence as an ancient document, and I believe to do that I'm

12  going to have to lay a predicate.  If the court decides that

13  that document is not admissible, then, frankly, this witness

14  was seven years old at the time of the deaths of Mr. Moore and

15  Mr. Dees, and I would not call him as a witness.  So but for

16  the -- I'll be happy to do it in front of the jury, but I think

17  the court would probably want to make that ruling first.

18      And then also on the same page, there's some writing,

19  there's some information that doesn't exactly concern the

20  search of the church.  I contend that that information is

21  admissible.  I think the court is going to need to rule on the

22  admissibility of that portion of information that's on the same

23  page.  So I think the court is going to have to make a couple

24  of rulings, and I don't think I need to be displaying this to

25  the jury or anything until the court has ruled that it is, in

1    fact, admissible.

2            THE COURT:  Okay.  Bring in the witness and let's see

3    what the --

4            MR. LAMPTON:  Excuse me.  John Briggs.

5                          JOHN BRIGGS,

6      Having first been duly sworn, testified as follows:

7                        DIRECT EXAMINATION

8    BY MR. LAMPTON:

9    Q.  Good morning.

10   A.  Good morning, sir.

11   Q.  And would you, please, state your name for the judge.

12   A.  Yes.  My name is John Ellis Briggs.

13   Q.  And who was your father?

14   A.  My father is Reverend Clyde Bennie Briggs.

15   Q.  And how old are you?

16   A.  I am 49.

17   Q.  Is your father alive or is he deceased at this time?

18   A.  My father is deceased at '65.

19   Q.  Did you have an occasion to find a journal that you know to

20   have been prepared by your father before his death?

21   A.  Yes, sir.

22   Q.  And do you have that journal with you today?

23   A.  Yes, sir, I do.

24           MR. LAMPTON:  Your Honor, may --

25   BY MR. LAMPTON:

1   Q.   Do you have that journal with you?

2   A.   I have it, yes, sir.

3        MR. LAMPTON:   Your Honor, may I provide the court with

4   the original journal because I believe that's one thing the

5   court can consider, is the appearance of the journal, whether

6   it matches the assertion that it is over 20 years of age.

7        THE COURT:   Okay.

8        MS. NESTER:   I've never seen it, Judge.   I'd like to

9   see it too, please.

10       MR. LAMPTON:   Okay.

11       THE COURT:   Show it to defense counsel.

12       MS. NESTER:   I'm sorry.   I did see this in

13  Mr. Lampton's office.   I apologize.   I thought this was a

14  different one.

15     (Short Pause)

16       MS. NESTER:   Thank you, Your Honor.

17       MR. LAMPTON:   Your Honor, could I direct the court's

18  attention to page 92 and 93.   That's the only pages that we

19  contend have any information that is relevant to this case.

20  The other information may help authenticate it, but those pages

21  contain information that we think is relevant.

22       THE COURT:   Okay.   You may question.

23  BY MR. LAMPTON:

24  Q.   Are you familiar with the document that you brought to

25  court and the judge has had a chance to review?

1    A.   Yes, sir, I am.

2    Q.   And for how long have you been familiar with that journal?

3    A.   With this journal?  Since 1984, approximately.

4    Q.   And we're talking about Exhibit 32 -- G-32A.  And you said

5    you first knew of its existence when?

6    A.   I first knew of its existence in '81, '82, but my first

7    time actually seeing it was in '84.

8    Q.   And does that document contain handwriting of your

9    father's, Reverend Clyde Briggs?

10   A.   Yes, sir, to the best of my knowledge.

11   Q.   And how did you obtain the knowledge of your father's

12   handwriting?

13   A.   Well, from all the journals and other things that I have,

14   and I also have a certificate of service on his World War II

15   service.  I have a signature with his -- well, his service

16   record with his signature on the back.

17   Q.   Do you have that document with you?

18   A.   Yes, I have a copy of it.

19          MR. LAMPTON:  And, Your Honor, that is Exhibit 32D --

20   G-32D.  May I approach the witness?

21          THE COURT:  You may.

22          MR. LAMPTON:  Your Honor, may I tender that document

23   to the -- first of all, I'd ask that it be admitted as an

24   exhibit to his testimony for the purpose of this hearing and

25   then allow the court to examine the signature on the document.

1        MS. NESTER:  I think that it needs to be marked for ID

2  under those circumstances.  Otherwise, it's going to go back to

3  the jury.  I would not object to it being marked for

4  identification for purposes of this hearing.

5        THE COURT:  That's fine, ID is fine.  All right.  Go

6  ahead.

7        MR. LAMPTON:  Can it be tendered to the court?

8        THE COURT:  G-32D.

9     (Exhibit G-32D for ID marked)

10 BY MR. LAMPTON:

11 Q.  While you knew of the journal's existence, had you ever

12 read the entire journal or examined its contents?

13 A.  No, I haven't until I guess maybe '89 or '90, first time I

14 really went through and read the entire thing, yes.

15 Q.  And when, if ever, did that journal attract your attention

16 or when, if ever, did you have a chance to look at that journal

17 or think that it might be significant to the events of May 2nd

18 of 1964?

19 A.  Well, the most significance is when someone who I think is

20 from your office who wanted to know whether or not I was

21 familiar with a searching of the church and brought some

22 encyclopedias, and I went to look for a search warrant for the

23 church being searched and in looking for the search warrant, I

24 ran back across this document and other documents that had been

25 placed in a safe place.

1   Q.  And when you say those documents that you looked at, and

2   particularly that journal, that was in a safe place, it was in

3   a safe place where?

4   A.  At my mother and father's home in the loft there at the

5   house.

6   Q.  And how long had that been your mother and father's home?

7   A.  All our life that I know.  At least -- I'm 49, so at least

8   50, 50 something years, I guess.

9   Q.  Your father was living in the home where that journal was

10  found in 1964?

11  A.  Yes, sir.  Yes.

12  Q.  It was found in the home that your father occupied?

13  A.  Yes, sir.

14  Q.  And it was found with what other kind of documents and what

15  other kind of papers?

16  A.  Newspaper clippings, journals from my father's church

17  records, letters, cards, military records.

18  Q.  All of those family documents either written by your father

19  or kept by your father?

20  A.  Yes, sir, exactly.

21  Q.  Is there any writing in that journal other than your

22  father's handwriting?

23  A.  Yes, sir, there is.

24  Q.  And whose writing is that?

25  A.  In '89, I had an entry in it, and also I had a radio

1    interview in January of this year, and I have had some notes

2    that I have put in for a radio interview also.

3    Q.  Are any of those notes on pages 92 or 93?

4    A.  No, sir.

5    Q.  And is there anything about that journal or about where it

6    was found or anything that you know that would make you believe

7    that this journal was not prepared by your father in 1964 and

8    is not in his handwriting?

9    A.  Nothing that I know of.  I think it's my father's.

10   Q.  Is it unusual for your father to refer to himself in his

11   writings in the third person as he did in this journal entry?

12   A.  Well, in the journal, he quite a bit refers to himself in

13   the third person.

14   Q.  That's not unusual, is it?

15   A.  No, sir, not from this particular journal, no, sir.

16          MR. LAMPTON:  Your Honor, at this time, I would tender

17   the witness for examination before I offer the document.

18          THE COURT:  Okay.

19                      CROSS-EXAMINATION

20   BY MS. NESTER:

21   Q.  Good morning.

22   A.  Good morning, ma'am.

23   Q.  I just want to follow up a little bit with you on the

24   history of this document.  Okay?

25   A.  Yes.

1  Q.  You said that the first time you became aware of this

2  document was in 1984?

3  A.  I became aware of it in '81 and '82, but the first time I

4  seen it was in '84 after the funeral of my oldest brother.

5  Q.  Let's go back, then.  You said your father passed away in

6  '65?

7  A.  Yes.

8  Q.  Where was this journal from 1965 until the early '80s?

9  A.  I haven't the slightest idea.  I'm under the assumption

10  that perhaps my older brother had it or someone else in the

11  family had it.

12  Q.  You don't know where it was for those 20 years?

13  A.  No, sir -- no, ma'am, I don't know.

14  Q.  You don't know whose hands it was in?

15  A.  I can't say for sure as to '84.  After '84, it was in the

16  hands of my other brother, Major Clyde Briggs.

17  Q.  Is your mother still living?

18  A.  No, ma'am.

19  Q.  When did she pass away?

20  A.  June of '87.

21  Q.  So when's -- the first time you became aware that it

22  physically existed was someone in your family told you about

23  it?

24  A.  Yes, exactly.  My mother.

25  Q.  Your mother?

1   A.   And, like I say, in '81.   I was on my way to Europe in '81.

2   I think that's when she told me about not just the journal but

3   other writings, because I have always been inquisitive about my

4   father.   I was very little when he passed.   I've always been

5   very inquisitive about his life, and in one of our

6   conversations, I was told that he did leave some writings, yes.

7   Q.   And the first time you physically saw the journal was?

8   A.   '84, yes.

9   Q.   '84.   And where did you see it?

10  A.   At my mom and dad's house.

11  Q.   But you can't testify that it was there the 20 years in

12  between?

13  A.   I can't testify to that, no, I can't.

14  Q.   Also since that time after you have seen it, what did you

15  do with it?

16  A.   I was able to reason with -- read some of the entries in

17  '84 and, like I say, my other brother had it, and I came back

18  down from Washington state in '97 and my brother had taken ill

19  and basically at that time his prognosis was one to where he

20  thought that he should let me know what was going on with

21  everything.

22  Q.   So from '84 to '97, the journal was in the possession of

23  your brother possibly?

24  A.   That's to the best of my knowledge.

25  Q.   But not you?

1    A.  Right, exactly.

2    Q.  All right.  Then in '97 when your brother became ill, he

3    gave the document to you?

4    A.  Well, he allowed me to take possession.  He told me to take

5    care of it.  Exactly.

6    Q.  So has it been in your custody consistently since 1997?

7    A.  It hasn't been in my custody.  It's been at my mother and

8    father's house until --

9    Q.  Is that where you live?

10    A.  Oh, no, no.  No, ma'am.

11    Q.  So you didn't have it then either.  You just took it to

12    your mom and dad's house?

13    A.  Yes, I stored it at the attic there at my mom's and dad's

14    house.

15    Q.  Who was living there at the time?

16    A.  My brother Charles still lives there.

17    Q.  So did it stay there in the attic for a period of time?

18    A.  Yes, ma'am.  I guess from -- I guess maybe the early 2000,

19    2001 or so is when it was -- my brother died in 2002, so

20    actually he had asked me to take care of it in '97, but he

21    passed away in 2002, but he was still in possession of it.  He

22    had let me know to look after it.

23    Q.  So did you take control of it in 2002?

24    A.  Yes, ma'am.  But I did not take it out of the house.  It

25    was still there in the attic at their house.

1    Q.  And you weren't living there then either?

2    A.  No, ma'am.

3    Q.  You can't testify if it was altered in any way or what

4    anybody did when you didn't have it.  Right?

5    A.  Oh, no, ma'am, I can't testify to that.

6    Q.  Okay.  And then at some point, have you provided copies to

7    people involved in this case?

8    A.  Yes, ma'am.

9    Q.  All right.  And also I believe you were interviewed by the

10   Jackson Free Press.  Is that right?

11   A.  Yes, ma'am.

12   Q.  Did you allow them to have possession of that document?

13   A.  To make copies of it, yes.

14   Q.  How long did they have it?

15   A.  Maybe ten minutes or 15 minutes.  Actually, they just took

16   photographs of it, I think.

17   Q.  So you didn't turn it over to them.  You were there when

18   they had it?

19   A.  I turned it over to them, they went and made some copies of

20   it, took pictures of it.

21   Q.  They gave it back to you?

22   A.  Yes.

23   Q.  Any other media that you shared that document with?

24   A.  A radio station in Gulfport, WJZD.

25   Q.  And did they take possession of it at any point?

1    A.   No, ma'am, just copied it.

2    Q.   Now, I notice that you said that to the best of your

3    knowledge that's your dad's handwriting?

4    A.   Yes, ma'am.

5    Q.   Now, the handwriting throughout, there's no signature of .

6    your father anywhere in that journal, is there?

7    A.   In this particular journal, I don't think there is.

8    Q.   As a matter of fact, nowhere in the journal is it written

9    from the first person, in other words, like myself, it always

10   talks about the preacher being someone else, doesn't it,

11   throughout the entire journal?

12   A.   In most of the spots, yes, ma'am.  I think there may be

13   some instances where he may have some, like, names of members

14   of his church or about some different things that was going on

15   in the church and activities with the church.

16   Q.   At no point in that journal is it ever written from the

17   perspective of the preacher himself?

18   A.   From the first person, no, ma'am, not that I'm aware of.

19   Q.   He had a church secretary, didn't he, that worked with him

20   fairly closely?

21   A.   Yes, he had a secretary.  I'm not sure how closely they

22   worked.

23   Q.   Do you know whether he or his secretary was in charge of

24   that journal?

25   A.   I don't know.

1    Q.  And have you ever looked at that secretary's handwriting to

2    compare?

3    A.  No, I haven't.

4    Q.  All right.  Have you ever had any training in handwriting

5    comparison?

6    A.  No, ma'am.

7    Q.  And I think you said you relied on his signature on his

8    certificate of service but, again, there's no signature in this

9    journal.  Correct?

10   A.  Correct.

11   Q.  And you personally have altered the journal?

12   A.  I have put entries in it, yes, ma'am.

13   Q.  At one place in the journal, there's a writing of the year

14   1964.  Are you able to say under oath by just looking at those

15   numbers that your father wrote those numbers in that journal?

16   A.  Not under oath.  I didn't witness him writing it, no,

17   ma'am.

18   Q.  Can you even identify that those are how he wrote his

19   numbers?  Do you know that your father wrote 1964 in that

20   journal?

21   A.  I don't know because I haven't considered his -- the way he

22   wrote numbers.

23   Q.  Okay.  Also I think you said you used that other journal to

24   kind of compare the writing.  Is that right?

25   A.  Yes, there's another journal that is more of like the

1378

1    records of --

2    Q.  Of the church activities?

3    A.  Yes, ma'am.

4    Q.  And is your father's signature anywhere in that journal?

5    A.  I think it is.  I'm not sure.  I can't say for sure right

6    now, but I think there's some notes in there because my father

7    had done some work with education also.  I think there's some

8    entries with -- maybe something with his name on it in there.

9    Q.  All right.  But is it possible that the same person who did

10   both journals -- because the two journals were kept in the

11   church.  Is that right?

12   A.  Well, I don't know how long they were kept in the church.

13   Q.  Let me ask it this way:  I asked that wrong.  I apologize.

14   The second journal, the one you used for comparison is also

15   related to church activities?

16   A.  Yes, ma'am.

17   Q.  So it would make sense that it was also kept and maintained

18   at the church at some point?

19   A.  I guess.  I can't say.  I don't know whether it was

20   maintained at the church or with my father or who it was

21   maintained with.

22   Q.  But it was all related to church activities?

23   A.  Yes, ma'am.

24   Q.  So it's very possible that the same person did both

25   journals?

1379

1    A.  Could be possible, yes.  Possible, yes.

2            MS. NESTER:  That's all I have.  Thank you, Your

3    Honor.  Thank you.

4            MR. LAMPTON:  Your Honor, I'd like --

5            MS. FITZGERALD:  Could we turn the Elmo on for just a

6    moment, Your Honor?

7            THE COURT:  All right.

8            MR. LAMPTON:  For comparison purposes, if permissible,

9    I'm going to show him his father's signature on his discharge

10   certificate and his father's name or handwriting in the exhibit

11   that I have tendered, page 93.

12           MS. NESTER:  Your Honor, this witness was never

13   identified by the government as an expert witness in

14   handwriting analysis.  If they are now trying to get him to

15   perform a handwriting analysis, then they're acting outside of

16   their expert designation.  Obviously, the defense -- if we are

17   to believe that they believed he has the training to compare

18   handwriting, we would have also gotten a handwriting expert,

19   but we were sure that they were not going to call a handwriting

20   expert.  We object to this entire line of questioning.

21           THE COURT:  Okay.  You may proceed.

22                     REDIRECT EXAMINATION

23   BY MR. LAMPTON:

24   Q.  Would you examine the monitor in front of you, please,

25   Mr. Briggs.

1380

1   A.   Yes, sir.

2   Q.   And can you see your father's signature on the discharge

3   certificate?

4   A.   Yes, sir.

5   Q.   Right above his name in the journal?

6   A.   Yes, sir.  I see what you're saying, yes, sir.

7   Q.   And do you see any differences between the Clyde Briggs in

8   the discharge certificate and the Clyde Briggs on page 93 of

9   that document?

10  A.   From what I'm seeing here, there's a difference in the C,

11  perhaps, in Clyde, and everything else seems to be the same.

12  There may be a difference in the R on the certificate of

13  service compared to the R in the journal but, otherwise,

14  everything looks the same.

15  Q.   Speak loud enough so the court can --

16  A.   The C in Clyde, it looks like there may be some difference

17  as far as there being a loop in the C, and on the Briggs, there

18  looks like there may be a difference in the R.

19  Q.   And I'm going to ask you to compare it to or just bring it

20  to your attention on the bottom of page 93 is also the name

21  Reverend Clyde Briggs and the discharge certificate is above it

22  and just ask if you can -- being familiar with your father's

23  handwriting, if you see similarities between or can you tell us

24  that the signature on the discharge and the signature on this

25  document was prepared by the same person?

1    A.  Yes, sir, looks pretty identical to me.

2            THE COURT:  Now, you're showing the signature of Clyde

3    Briggs on the discharge paper?

4            MR. LAMPTON:  Yes, sir.

5            THE COURT:  And you're just imposing that to a Clyde

6    Briggs which appears -- a written Clyde Briggs which appears on

7    pages 93 and 94?

8            MR. LAMPTON:  Yes, sir.

9            THE COURT:  And on the pages 93-94 is where the writer

10   uses -- refers to a Clyde Briggs and where the prosecution

11   contends that he was merely describing himself in third person?

12           MR. LAMPTON:  Yes, sir.  That is correct.

13           THE COURT:  Leave it there just for a moment.

14      (Short Pause)

15           THE COURT:  Okay.

16   BY MR. LAMPTON:

17   Q.  You were questioned whether or not this document may have

18   been kept at the church where your father was a pastor, and I

19   believe you said it might have been kept at the church.  You

20   didn't know?

21   A.  I don't know, yes.

22   Q.  But which church would it have been kept at?

23   A.  That's a good question, sir.  My father had five different

24   churches.  I don't know.  I mean, it could have been at Roxie,

25   it could have been at Crosby, it could have been at

1   Centreville, Doloroso, any of the five congregations that my

2   father -- if it was kept at one of his churches.

3   Q.  It would have been more reasonable for your father to have

4   kept that journal where?

5   A.  On his person or in his home, being that several references

6   deal with the -- especially now that the journal deals with the

7   different congregations, different membership and the different

8   congregations.

9   Q.  And when you talk about your brother having the journal,

10  that's also the son of Reverend Briggs?

11  A.  Yes.

12  Q.  And he is now living or deceased?

13  A.  My brother passed in 2002.

14  Q.  Was it just this document that your brother gave you?

15  A.  No, sir.

16  Q.  I mean, he gave you --

17  A.  A whole bunch of my daddy's papers.  Like I say, I'm

18  assuming that it was papers that was passed on from my mother

19  after my first brother died.

20  Q.  It was not just this journal, it was a stack of documents

21  all dealing with either church or family matters of your

22  father, Reverend Clyde Briggs?

23  A.  Yes, sir.

24  Q.  And is there anything that would make you believe that the

25  writing on page 92 and 93 had been changed or altered or

1    modified at any time since your father passed away or since

2    it's been in the custody of your family?

3    A.   No, sir, nothing that I can notice of any change.

4              MR. LAMPTON:   That's all I have, Your Honor.

5              THE COURT:   I want you to read the journal entries on

6    92 and 93.

7              THE WITNESS:   92 and 93?

8              THE COURT:   Yes, the ones that the government has

9    identified as pertaining to this case, read those.

10             THE WITNESS:   Starting on page 92 or in the sequence

11   that they were entered?

12             THE COURT:   Mr. Lampton, what entries interests the

13   government?

14             MR. LAMPTON:   Yes, sir, if you would start on the top

15   of page 93 and read there, the very top handwriting on page 93.

16             THE WITNESS:   Yes, sir.  Page 93 of a journal under

17   the heading, "Things happened in 1964 in Franklin County.  On

18   Saturday May 2nd, state highway patrol and deputy sheriff Kirby

19   Shell came to Roxie, Mississippi, to get pastor of the Roxie

20   colored Baptist Church, Reverend Clyde Briggs, because they had

21   been informed that a group of guns was hid in the church and

22   some white men was going to bomb the church that night.  No

23   guns were found in the church, but the law officers advised the

24   pastor to see to the church being locked when all leave the

25   church."

1     The second entry says, "On Sunday night, May 24, Reverend

2     Clyde Briggs was coming from church service at New Bethel

3     Baptist Church east of Meadville, Mississippi, and when he got

4     near Roxie, Mississippi, two carload of white men tried to stop

5     him on the highway, but he would not stop.  They followed him

6     all the way home, and one of the men, Jack Davis, got out of

7     the car and did a lot of big talk and told Reverend Briggs that

8     the next time they tried to stop him he had better stop."

9     Last entry on page 93 with an arrow pointing over to page

10    92 says, "On Monday, July 13," and it looks like a 13 has been

11    written over the 12, "the body of two young Negro men was found

12    in the Mississippi River.  The men were Henry Dee and Charles

13    Moore of Meadville, Mississippi.  On that same night someone

14    shot into the home of Reverend Clyde Briggs with a rifle."  And

15    pointing from that entry, like I said, over to page 92, that

16    arrow points to an entry that says --

17    BY MR. LAMPTON:

18    Q.  Just a moment, please.

19    A.  Sorry.

20    Q.  Go ahead, please.

21    A.  That entry says, "Those two young men" --

22    Q.  If you would, once again, start at the top of the page and

23    work your way down.

24    A.  On page 92, the first entry under 1964, it says, "On Sunday

25    morning, June 21st, at dawn of day, they turned a young Negro

1  man out of Meadville jail and the Ku Klux Klan took charge of

2  him and beat him unmercifully and left him for dead.  The young

3  man came to and made his escape.  He left Franklin County or

4  Mississippi."  And then another entry says, referring to page

5  93, "Those two young men had not been seen since the early part

6  of May in Meadville, Mississippi."

7  Q.  The reference to Crosby, Mississippi, do you know Oscar

8  Hughes?

9  A.  Yes, sir, Deacon Hughes, yes.

10  Q.  And do you know where he lived in 1964?

11  A.  In Crosby.

12  Q.  And there was also in that journal a newspaper clipping?

13  A.  Yes, sir, along with other clippings, yes, sir.

14  Q.  And were any of those clippings relevant to the case

15  involving the death of Charles Moore and Henry Dee?

16  A.  Yes, sir.  There's a clipping from, I think,

17  November 6th or 7th under the headline of "Arrested for Torso

18  Murders" and that clipping has a picture of Mr. Seale and

19  Mr. Edwards.

20  Q.  And is that picture inside the journal that Judge Wingate

21  has -- I'm sorry.

22  A.  Yes, it's here.

23       MR. LAMPTON:  Your Honor, may I put that on the Elmo,

24  please, so the court can see it?

25       THE COURT:  I saw it earlier.

1  BY MR. LAMPTON:

2  Q.  Was that clipping located inside that journal when you

3  first looked at the journal?

4  A.  Yes, sir.  Like I said, with other clippings, yes.

5  Q.  And the -- you removed the other clippings?

6  A.  Yes, sir.

7  Q.  But you allowed that clipping to remain?

8  A.  Yes, sir.

9  Q.  And at one point in time that clipping was stapled to page

10  92?

11  A.  92, yes, sir.

12  Q.  And who stapled that clipping to page 92?

13  A.  I stapled that, yes.

14  Q.  And then, I believe, last night that clipping was unstapled

15  so it would be in the journal like it was when you first found

16  it?

17  A.  In the original way it was when I found it.

18  Q.  And who unstapled it?

19  A.  I took the staple off, yes, sir.

20  Q.  And other than the writing of you and your father, on every

21  page of that journal there's some initials and a date of, I

22  believe, May 8th of this year?

23  A.  I guess it was May the 18th.

24  Q.  May 18th?

25  A.  Yes, sir.

1    Q.  And whose initials are those?

2    A.  Those are my initials and also initial of an investigator

3    who I turned the original document over to.

4    Q.  And was that -- is that document today in the same

5    condition as it was when you first saw it other than the

6    initials that had been placed on it recently that appear on

7    every page?

8    A.  Yes, sir, it's the same compared to the copies that the

9    investigator have asked me to make before I turned it over to

10   you guys.

11            MR. LAMPTON:  Nothing else, Your Honor.

12            THE COURT:  All right.  Ms. Nester?

13            MS. NESTER:  Yes, sir, nothing further.

14            THE COURT:  What's your position on this matter?

15            MS. NESTER:  We still object to authenticity.  The

16   document was out of this witness' hands for decades, and

17   certainly there's no chain of custody that can be testified to.

18   It's been altered.  He's not an expert in handwriting.  For all

19   of those reasons, we object to that document.

20            THE COURT:  Do you have any case authority you'd like

21   to share with the court?

22            MS. NESTER:  Simply that the cases that's under the

23   ancient documents provision.  If you'll give me just a second.

24   Just a minute, Your Honor.

25       (Short Pause)

1388

1      MS. NESTER:  The section that, I think, they are
2  trying to get it under is 803(16), which is ancient documents,
3  and even ancient documents authenticity is required to be
4  proved first.  "The failure of the party" -- "failure of the
5  party to authenticate a purported ancient document means that
6  its contents do not qualify for the hearsay exception."  The
7  case that is cited under the annotations to the rules, you have
8  to show a three-part test, which is that the document in order
9  to authenticate it, it has to be in a condition as to create no
10  suspicion concerning its authenticity and that is no suspicion.
11  It was in a place where it, if authentic, would likely be and
12  that it has been in existence 20 years or more at the time that
13  it is offered.
14      The case that -- that they cite there in a case called
15  Kalamazoo River Study Group versus Menasha, M-E-N-A-S-H-A,
16  Corporation, 228 F.3d 648 (6th Cir. 2000).  A document which
17  was purportedly prepared by the EPA was found in the files of
18  another organization and evidence of EPA authorship was
19  tentative.  The court properly excluded it as lacking
20  reliability.  Even if the document is of the requisite age and
21  meets authentication requirements, the judge can still exclude
22  it if the possibility of prejudice or confusion outweighs any
23  probative value.
24      We certainly recognize the probative value of the
25  government's attempt to introduce it.  But in this particular

1   case, Your Honor, while we have no reason to believe the

2   witness is misstating anything about the history of the

3   document, he just doesn't have personal information about

4   decades worth of this document, including where it was

5   originated, who actually put the entries in the document, where

6   it was kept or maintained, if it was added to or subtracted to

7   by anyone.  There's simply just no testimony that he can give.

8   He's given what he can, but he simply was a child back then.

9   And so we would submit that before you can ever get to the

10   ancient documents, you have to authenticate the document

11   itself.

12        Also the concern that we have is the fact that it is

13   written clearly as if it's not the preacher writing it.

14   Perhaps he dictated it, you know, to someone else, but if

15   that's the case, that's not his transcription.  So the person

16   who wrote it down would have to be here to say, "That's what he

17   said word for word, not my interpretation of his statements."

18   So we would just object on all those grounds, Your Honor.

19            THE COURT:  The government's response?

20            MR. LAMPTON:  It is just simply an issue for the court

21   to decide based on all of the evidence, and that's why I wanted

22   the court to have the entire journal to look at it and to see

23   if it -- you can -- while the only thing that's relevant as far

24   as evidence in this case is what's on page 92 and 93.  In

25   deciding whether or not the government can prove it's

1390

1  authentic, then the court can look at the entire document and

2  examine what that document pertains to, if that record in 1964

3  is inconsistent with everything else in the journal, and it's

4  not.  It is exactly what it purports to be.  The court needs to

5  consider the age, and you can look at the condition of the

6  document in determining whether you think this is a document

7  that, in fact, meets the test of being over 20 years of age.

8       It doesn't necessarily have to be from Reverend Briggs to

9  be admissible.  It doesn't necessarily have to be in his

10 handwriting.  But when you look at the document that is his

11 discharge that contains his signature and you look at the name

12 Clyde Briggs as written in this document, you don't have to be

13 an expert to notice they are striking similarities.  That is

14 something that the court can consider in determining

15 authenticity.

16      This document was kept in the family's possession, not

17 separated, but with other family documents and other journals

18 pertaining to the church and to the activities of Reverend

19 Briggs.  This witness first noticed the journal or knew of its

20 existence in 1985 when he says he made some entries.  There is

21 nothing on page 92 or 93.  There are no strike-outs.  There is

22 no obvious changes.  The only possible change would be on a

23 date which you can see was originally July 12th to July 13th,

24 and that change is, frankly, not that material for one day to

25 the other.

1    But when you consider the history of the ancient documents
2    exception, when you consider what is needed to be proved under
3    the Federal Rules of Evidence and in Rule 901(8) ancient
4    documents or data, and when you look at the exception under
5    803, rule 16, I think clearly the government has met its burden
6    in proving the age, the authenticity, and the requisite matters
7    for it to be considered by the jury as evidence, and then the
8    jury would then look at the document and give it whatever
9    weight they deemed it is entitled to, but I think the first
10   hurdle that's admissibility has clearly been met by the
11   government.
12        THE COURT:  All right.  I need a copy -- not a copy,
13   but I need the journal and the discharge certificate.  Now I'm
14   going to recess for lunch and make my ruling after lunch.
15   Let's bring the jury back in.
16        MS. FITZGERALD:  Your Honor, before the jury comes, I
17   just wanted to remind the court that I believe the court had
18   indicated we would be taking a lengthy lunch today.
19        THE COURT:  Okay.  Ms. Nester, you haven't responded
20   to the government's motion.  How long is it going to take you
21   to make your response?
22        MS. NESTER:  Can I have two hours, please?
23        THE COURT:  Pardon?
24        MS. NESTER:  Two hours, an hour and a half.
25        THE COURT:  Two hours.  Let's see.  How many more

1   witnesses does the government have for today?

2          MS. FITZGERALD:  Your Honor, we have a number of

3   witnesses that would be available to us this afternoon, but

4   there's not an issue with having them remain and testify

5   tomorrow, if that's what we need to do.  We certainly have

6   enough witnesses to fill up the afternoon, but we can hold some

7   witnesses over if that's necessary.  Whatever is best for the

8   court.

9          THE COURT:  Then, what I would prefer is that we go

10  through the witnesses and be prepared to take Mr. Edwards first

11  thing in the morning, because if the defense wishes to have two

12  hours, I don't want to recess for two hours over lunch.  So,

13  then, you'll have your response to me, then, first thing in the

14  morning.

15         MS. NESTER:  I may be able to get it to you tonight,

16  but certainly first thing in the morning.

17         THE COURT:  Then we'll go through the testimony of the

18  witnesses until about 5:00.  All right.  Now, then.

19         MS. FITZGERALD:  Your Honor, counsel is indicating

20  that he doesn't believe that we will -- Your Honor, I just

21  remembered that we will not be calling Dr. Hayne, which we had

22  anticipated, and that was going to take a period of time.  I

23  had forgotten that.  He's not available today.  We won't be

24  able to call him until tomorrow.

25         THE COURT:  We'll take the witnesses that you have.

1    MS. FITZGERALD:  Thank you, Your Honor.

2    THE COURT:  Mr. Lucas?

3    MR. LUCAS:  Your Honor, I'm sorry, but while we were

4  discussing scheduling, I had a very close personal friend who

5  died last night.  I believe his funeral -- I believe her

6  funeral will be sometime on Friday.  I may be asking for some

7  time if we could possibly do that.

8    THE COURT:  All right.  We'll take that matter up

9  later, but thanks for advising me early.  Bring the jury in.

10    (Jury In)

11    THE COURT:  Please be seated.  We're going to take our

12  lunch recess now and return at -- make it 1:30.  It's about

13  12:20 now, so we'll come back at 1:30.  Recall the instructions

14  I have given you previously.  I give those same instructions to

15  you again.  All right.  I'll see you at 1:30.  All rise.  We're

16  in recess.

17    MR. LAMPTON:  Your Honor, can you caution the

18  witnesses.

19    THE COURT:  Do not talk to anyone at all about your

20  testimony, no one at all.  Okay.

21    MS. NESTER:  Your Honor, we have a private matter we

22  need to talk with you about for just one second before you

23  leave the courtroom with counsel.

24    THE COURT:  Okay.  We're in recess.

25    (Recess)

1        THE COURT:  I have reviewed the document in question

2   and the arguments of counsel.  Whether the information

3   contained within this document will be admissible is governed

4   by the rules of 803(16) and 901(b)(8).  901(b)(8) sets out the

5   standard to establish authenticity of the purported document.

6        I've gone through the document, and what I've found in the

7   document are matters pertaining to possible sermons, matters

8   pertaining to church finances, of events with the church and

9   matters of current events and, indeed, on the pages 92, 93, 94

10   are set out the events which concern this matter.

11        Also in the journal is a newspaper clipping from Saturday,

12   October 7th, 1964.  And the journal on page 93 is styled or

13   headed with the language, quote, Things Happened in 1964 in

14   Franklin County, unquote.

15        So the question is whether this is the contours or the

16   strictures for admissibility as an ancient document.  First,

17   some jurisprudence on the issue.  There's the case of *Dartez v.*

18   *Fiberboard Corporation* found at 765 F.2d 456, and this is a

19   Fifth Circuit decision.

20        On page 11 of that decision, the author sets out a decision

21   on 803(16) reciting that ancient documents are most frequently

22   authenticated under provisions of rule 901(b)(8) and then the

23   author sets out the contours of 901(b)(8) which reflect the

24   following:  That the document be in the condition as to create

25   no suspicion concerning its authenticity; that it be that it

1   was in a place where it, if authentic, would likely be; and, C,

2   that the document has been in existence for 20 years or more at

3   the time it is offered.

4        Further, I rely upon the case of *United States v. Kairys*.

5   This case is cited at 782 F.2d 1374.  On page 8 of that

6   decision -- that was rendered by the 7th Circuit and the cert

7   was denied in this case, and that cite is 476 U.S. 1153, 106

8   Supreme Court 2258.

9        On page 8 of that decision, the court, in discussing rule

10  901(b)(8), states that the question of whether evidence is

11  suspicious and therefore inadmissible is a matter for the trial

12  court's discretion.  Next, the court further stated in its

13  discussion on this matter of ancient documents that although

14  the rule requires that the document be free of suspicion, that

15  suspicion goes not to the content of the document but rather to

16  whether the document is what it purports to be.

17       Further in this same decision, the court explained, quote,

18  however, it is not necessary to show a chain of custody for

19  ancient documents, unquote.

20       Then in American Jurisprudence, Second Edition, in

21  discussion on these same matters, the authors recite that

22  although reasonable custody of the document must be

23  established, the document need not have remained in the same

24  place for the entire custodian period, unquote.

25       The court then has reviewed this document and concludes

1   that it is what it purports to be.  It is a journal of local

2   events that was maintained by its author.  The court is

3   persuaded that the purported author of the document is indeed

4   the author.

5        I have looked at the pages that are being offered by the

6   government, these pages being 92, 93, 94.  On those three

7   pages, this court has found five places where the author of the

8   document refers to Clyde Briggs.  The court has looked at that

9   handwriting of Clyde Briggs and compared it to that of the

10  separation papers, the honorable discharge papers of Clyde

11  Briggs, and the court is satisfied that the signature which

12  appears on the honorable discharge is clearly the signature --

13  is clearly the handwriting of the Clyde Briggs which appears in

14  the journal.

15       Apparently Reverend Briggs referred to himself in the

16  journal in the third person, so then he wrote at those five

17  places and described himself in the third person.  The

18  signature on the honorable discharge clearly shows a very

19  definitive "L-Y-D-E" as part of Clyde.  That "L-Y-D-E" is

20  reflected in all five of the Clydes -- of the handwriting in

21  the journal.  The "G-G" with a separated "S" are distinctive,

22  and the way these "G"s are formed are clearly shown in the

23  journal with a separated "S" as well as with a full "R" and a

24  full "I."

25       The "B"s change in the journals.  The writer of the journal

1    employed more than one "B", but this court is satisfied that

2    the signature, the hand that wrote "Clyde Briggs" on the

3    honorable discharge is the same hand that wrote the entries in

4    the journal.

5        So then this court is persuaded that the document is in

6    such condition that it creates no suspicion concerning its

7    authenticity.  The court is further persuaded that it was in a

8    place where it would likely have been, and the court is further

9    persuaded that this document has been in existence for 20 years

10   or more.  The court is further persuaded that it is an ancient

11   document which comports clearly with the requirements of

12   803 "16" and 901(b)(8).  Therefore, the objection to use of the

13   document is overruled.

14        MS. NESTER:  Your Honor, in light of the court's

15   ruling, we would move to redact -- actually substitute -- I'm

16   sure the family is not going to want to part with that journal.

17   It has got sentimental value.  We would not object to using a

18   copy of it to go back to the jury so it can be returned to the

19   family, but we do want everything redacted from the pages that

20   Your Honor mentioned, 92, 93 -- actually, I'm not quite certain

21   what on 94 is relevant to this case.  But we would object to

22   everything being -- we would ask the court to redact everything

23   on those pages except the entries that relate directly to this

24   case.  There's definitely 404(b) material in there.  There's

25   items that just have nothing to do with this matter, and we

1    would ask -- they have no probative value, and they are

2    extremely prejudicial.

3          THE COURT:  At the top of page 94, the journal

4    reflects that on Monday, August 10, that a car loaded with

5    white men came to the home of Reverend Clyde Briggs at Roxie

6    and shot two times at a light in his yard, broke the glass of

7    the light but the light kept on burning.  This is at the top of

8    page 94.

9          MS. NESTER:  Yes, sir.

10          THE COURT:  On 93 at the bottom -- on 93, the last two

11    paragraphs which take up the majority of the page deal with the

12    issue specifically here.  And on page 92, there is a

13    continuation of what was stated on 93, and indeed there is an

14    arrow which points over to these two lines which are to

15    complete the discussion at the bottom of 93.  Above those two

16    lines is a discussion on some matters which occurred back in

17    June, June 21st.

18      Now, then, what says the government to her question of her

19    statement that the matters should be redacted?

20          MR. LAMPTON:  Your Honor, first of all, I believe the

21    entire document should be admissible for the jury to view just

22    like the court has had the opportunity to view the original

23    journal.  The journal itself, its age, everything in it points

24    to the fact that it was written years ago, as the government

25    contends.  And so first of all, I'd ask for the court to admit

1   the entire journal, and I would, of course, ask the court to

2   allow us to substitute a copy after the trial so the family

3   could have the journal back.

4      But right now, I think that the journal itself is probative

5   of what the government is trying to prove, so that is what I

6   would ask the court -- the court to consider first that the

7   entire journal be admitted.  If the court rules that it is not

8   going to admit the entire journal, then I'd like to step down

9   and ask for the court to consider something else.  But first I

10  would ask the court to admit the entire journal as an exhibit.

11       THE COURT:  Now, going back to defense, Ms. Nester, on

12  your 404(b) challenge, what is it in here which would fit under

13  404(b)?

14       MS. NESTER:  I'm just referring now to those three

15  pages.  I assume I'm just going to refer to the three pages.

16  Obviously, we object to the whole -- there's writings that his

17  son wrote in there in the '80s that are definitely prejudicial

18  and not related at all to this case.

19       THE COURT:  And that could be explained to the jury.

20  But now what is your 404(b) argument?

21       MS. NESTER:  The 404(b) on page 92, the first entry

22  is, "On Sunday morning, June 21st, at" -- something -- I can't

23  read it -- I can't read that either -- "they turned a young

24  Negro man out of Meadville jail and," he says, "Ku Klux Klan

25  took charge of him and beat him unmerciful and left him for

1    dead.   The young man came to and made his escape.   He left
2    Franklin County or Mississippi."
3         First of all, there's zero reason to believe my client had
4    anything to do with that at all.   Second of all, it goes to the
5    same argument I've been making about bringing in other matters
6    of violence that are not related to this case.   I would ask
7    that that entire entry be stricken.
8              THE COURT:   Is there anything else?
9              MS. NESTER:   Not on that page, because I believe the
10   bottom part does directly relate to this case, the part with
11   the arrow on it.
12             THE COURT:   Anything else?
13             MS. NESTER:   Page 93 talks about something on -- the
14   first entry is related to the government's theory of the search
15   of the church.   The second entry deals with something that
16   occurred on May 24th, which is not a date that has any
17   relevance in this case.   It claims that he was harassed by some
18   white men who tried to stop him and yelled at him when he
19   wouldn't stop.   There's no suggestion my client was involved in
20   that.   It does involve someone who may be a witness in this
21   case.   If he's a witness, certainly the government can bring it
22   back up then for impeachment if they choose to.   But for
23   purposes of introducing it in their case in chief, it is
24   prejudicial.   The implication is that my client was involved
25   with it, which there's no evidence of that at all.   That's

1401

1   incredibly prejudicial, and we would ask that that entry be

2   stricken.

3       Then the bottom entry is about the recovery of the bodies

4   in this case.  So that is obviously relevant to the

5   government's theory.

6       Then on page 94 I believe is the third page, the top

7   section about what happened in August where some men came to

8   his house and shot up his light, again that's in August.  This

9   crime occurred in May.  There's no suggestion my client had

10  anything to do with that at all.  By allowing the jury to see

11  it, the jury is going to believe that for some reason it's

12  related to this case and imply that my client was involved in

13  that, which is beyond prejudicial.  We would ask for that to be

14  stricken.

15      I think the entry below it, since there's an argument that

16  may be relating to the -- this particular crime, I don't have

17  an objection with that remaining in since I think you could

18  make the argument that that might apply to this case.  But the

19  one above it we would ask to be redacted.

20          THE COURT:  All right.  Now, response.

21          MR. LAMPTON:  Your Honor, it all fits together, and

22  all of it could be -- should be considered by the jury in

23  determining the authenticity and the fact that this is a

24  genuine document.  And once again, the jury could be instructed

25  that they are to consider anything else as not probative of the

1   defendant's guilt but simply as probative as to the

2   authenticity and the worth and the weight that should be given

3   to the journal.  And once again, we think that it's important

4   that the jury have the opportunity to view the entire journal

5   in its appearance, in its entirety, so that they can form their

6   own opinion about its authenticity and its worth and its

7   weight.

8           THE COURT:  Let me look through here.  Let's see the

9   dates that concern us in the journal.  Start off with on page

10  93.  It says on Saturday, May 2nd.  Now, did you have

11  objection?

12          MS. NESTER:  No, sir.

13          THE COURT:  Don't have objection to that part?

14          MS. NESTER:  No, sir.

15          THE COURT:  Nor to the second part.  Is that correct?

16          MS. NESTER:  No, I do have objection to the second

17  part.

18          THE COURT:  "That on Sunday night, May 24," now, you

19  have a problem with that?

20          MS. NESTER:  Yes, sir.

21          MR. LAMPTON:  Your Honor, I'll point out that none of

22  those entries refer to the defendant.  They are, however,

23  corroborative of the fact that Reverend Briggs was being looked

24  at and what's perhaps being a target.  It's corroborative of

25  other evidence that the government has produced and intends to

1    produce.

2              THE COURT:  That's on 92, page 92.  The first

3    paragraph, it says, "On Sunday."  See where I'm directing you?

4              MR. LAMPTON:  No, sir, I don't have that in front of

5    me.

6              THE COURT:  The page before that on 93, the page

7    before that on 92.

8              MR. LAMPTON:  May I step out and obtain a copy of

9    that?  There's one outside.

10             THE COURT:  Pardon?

11             MR. LAMPTON:  Can I step out?  I'd rather for the

12   court have it and let me get a copy.

13             THE COURT:  Okay.

14       (Short Pause)

15             MR. LAMPTON:  Your Honor, I have a copy of page 92

16   before me now.  The question is the relevance of that.

17             THE COURT:  That's correct.

18             MR. LAMPTON:  Once again, it is corroborative of

19   evidence that the government is putting on.  It does not

20   mention the defendant in any way.  The handwriting is similar,

21   the fact that he's interested in these type matters is

22   significant, and the events here lead -- I believe could be

23   considered by the jury in determining whether or not the impact

24   document is authentic and whether the events that are directly

25   related are, in fact, authentic.  It shows he didn't single out

1404

1   one incident or just consider one incident important but that

2   he reported in his journal on all instances.   And once again it

3   does not mention the defendant in any way.

4          THE COURT:   All right.   Ms. Nester, any other

5   argument?

6          MS. NESTER:   Your Honor, you've ruled on authenticity

7   so they don't need to establish that anymore.   And just -- if

8   this jury is being given something to look at, I believe it's

9   fair for them to assume it has something to do with my client,

10  and that's the problem with it.

11         THE COURT:   Okay.   Then I'm going to allow the entire

12  journal to be shown to the jury.   I will do so on a limiting

13  instruction.   The limiting instruction will state that there

14  are other dates involved in this journal and the government

15  makes no assertion that this defendant was involved in any of

16  those other dates -- on those dates with other matters, that

17  the court is providing this journal in its full state in order

18  to allow the jury to review this journal as to whether they

19  think the events were faithfully recorded.

20      Any problem with the limiting instructions, Ms. Nester?

21         MS. NESTER:   No, sir.

22         THE COURT:   Government?

23         MR. LAMPTON:   No, Your Honor.

24         THE COURT:   Now, Ms. Nester, even though I have

25  admitted the document under the rules, in your arguments, do

1    you still intend to seek to persuade the jury that the events

2    here were not faithfully recorded?

3              MS. NESTER:  Can I have just a second, Your Honor?

4              THE COURT:  Okay.

5         (Short Pause)

6              MS. NESTER:  I respect the court's ruling that it's

7    authentic.  I believe that we have preserved our error for

8    purposes of appeal.  I don't believe that I need to go back in

9    and make another record in front of the jury simply to preserve

10   the error about --

11             THE COURT:  I'm not talking about that.  I'm asking

12   whether during the course of trial in either presentation of

13   evidence or closing argument you would challenge the content of

14   the writing as to whether the event described here actually

15   occurred.

16        Now, I'm going to tell you why I'm asking the question.

17             MS. NESTER:  Okay.  That would help me.  I'm not sure

18   I understand what you're asking me.

19             THE COURT:  The journal note recites events that

20   allegedly occurred when police came to the church.

21             MS. NESTER:  Yes, sir.

22             THE COURT:  Now, if you are challenging the content of

23   the journal on the point, then I think the government has the

24   right to show through the entire journal that the writer was

25   concerned with various events and kept a journal of them.

1    Therefore, as I said, the entire journal can be shown to the

2    jury on that point because then the jury can see that the

3    writer not only reflected on that incident but he reflected on

4    other events that would fall within the purview of civil rights

5    and events that would have occurred -- allegedly occurred

6    around him or to him on the matter of civil rights.

7        So if you're challenging the contents at this point through

8    the journal, then I think they have a right to show that he

9    just didn't make that one notation.  If only that matter is

10   shown to a jury, then that leaves open the question as to why

11   that was written down as opposed to the government's contention

12   that the jury should see the entire journal to see the context

13   in which all of this was taken.

14       MS. NESTER:  I understand, Your Honor.  I think now I

15   can answer your question.  It's my understanding that this

16   witness does not have personal knowledge other than the finding

17   of the journal about what happened at the church that day.  We

18   have no witnesses who are alive today that can rebut what is in

19   that journal, nor are we going to have any that are going to

20   put on in our defense.  There are no living witnesses that we

21   have been able to locate that can rebut what's in the journal.

22       I can't challenge the content of the journal with this

23   young man because he wasn't there and doesn't know.  Your Honor

24   has ruled on my objection on authenticity.  So if what you're

25   asking me is are we going to try to suggest during cross of

1  this witness that Reverend Briggs --

2          THE COURT:  Not this witness, but the entire trial.

3          MS. NESTER:  I have no witnesses who can rebut what is

4  in Reverend Briggs' diary.  There is no limit that we have been

5  able to uncover.

6      The answer to your question is, no, sir, in terms of the

7  content to try to impeach -- I think what you're asking me is

8  I'm going to try to impeach Reverend Briggs even though he's

9  not here, which I know I can do under Crawford, we don't have

10  any evidence to do that with.  So the answer is no.  We still

11  ask that that be the only thing shown to the jury.

12          THE COURT:  Well, Mr. Lucas objected before as to this

13  discussion on the matter of the search.

14          MS. FITZGERALD:  I think that was simply because

15  Ms. Fitzgerald was leading the witness to say something he had

16  not said.  As far as I know, there is no witness that's going

17  to come into this trial and say, "There was not a search.  We

18  were there, and it did not happen."  There's no evidence out

19  there.  So no.

20          THE COURT:  The government's theory Ms. Fitzgerald

21  gave me earlier was that this was some sort of pretense you

22  said to get into the church.

23          MS. FITZGERALD:  Your Honor, it's the government's

24  theory that in this case the law enforcement officers may have

25  told Reverend Briggs that they suspected a bomb was going to be

1   placed in the church in order to persuade Reverend Briggs to

2   unlock the church to allow them to do what was, in fact, a

3   search for guns.  It's apparent from the diary entry that

4   Reverend Briggs caught on to that and realized that it was, in

5   fact, a search for guns at some point.  However, I would also

6   like to remind the court that not only is the jury -- the jury,

7   whether or not defense challenges a particular item, is still

8   going to be looking at the diary as a whole and making its only

9   credibility determinations.  And the fact that if they look at

10   these entries and they see the selective service signature and

11   they see that repeated five different times in the journal,

12   they may have questions about why somebody refers to themselves

13   in the third person and may distrust that information if they

14   don't have all of the information available to them so that

15   they are persuaded -- not just the court, but so that the jury

16   is persuaded -- because that's who the government has to

17   persuade here.

18        So I would urge the court to stand by its initial ruling

19   and allow the government to introduce this diary in its

20   entirety.  It is relevant, it is probative, and we are entitled

21   to prove our case.  Whether or not the defense wishes to

22   challenge it, that doesn't preclude the jury from challenging

23   it.

24             THE COURT:  Okay.  Thank you.  Response?

25             MS. NESTER:  They are not entitled to prove things

1    that are not charged in this case, which is what they are

2    trying to do.  They are trying to get in over and over and over

3    again incidents of violence against other African Americans

4    that they can take a broad brush and paint my client with from

5    top to bottom.  They have been doing it from beginning.  They

6    are doing it again now.  There is absolutely nothing that

7    reading those things in context will assist the jury in

8    deciding whether or not to -- whether or not the rest of it is

9    valid, especially when it's not going to be rebutted.  It is

10   unrebutted testimony.

11       She can get up and say there's no one that says the search

12   didn't happen.  It's unrebutted.  So I don't know how much more

13   probative help she needs, short of making my client responsible

14   for every act of violence that happened in 1964 in Franklin

15   County, which is exactly what they are doing.

16       THE COURT:  Okay.  I am going to adhere to the earlier

17   ruling.  I'm going to let the jury see the entire journal, and

18   I'm going to give a limiting instruction.  We'll start in about

19   six minutes.

20       (Recess)

21       THE COURT:  Ms. Nester, are you finished with it?

22       MS. NESTER:  Yes, sir.

23       THE COURT:  Now, I said that I was going to submit a

24   limiting instruction to the jury.  Listen carefully and tell me

25   whether you have any objections.  I have admitted into evidence

1  this journal.  Included within its pages are incidents and

2  events totally unrelated to the matter pertaining to this

3  trial.  An incident is mentioned as having occurred on Sunday

4  morning, June 21, concerning the beating of a man who escaped

5  and left Franklin County.  Another incident is mentioned as

6  having occurred on Sunday, May 24th, where, according to the

7  journal, some whites tried to stop Reverend Briggs.  A third

8  episode mentioned in the journal allegedly occurred August 10,

9  where, according to the journal, some whites shot at a light in

10 the -- in Reverend Briggs' yard.

11      The government does not allege that this defendant here had

12 anything whatsoever to do with these matters and the government

13 will offer no proof of any connection.

14      I have admitted the journal in its entirety unredacted of

15 these -- bad writing.  I have admitted the journal in its

16 entirety unredacted, allowing all of its contents to be shown

17 to you, the jury, to allow you to assess the journal's

18 credibility upon considering it as a whole.  Is that all right

19 with the defense?

20           MS. NESTER:  That's fine.  I do have one request,

21 though.  The term "unredacted" is kind of a legal term of art,

22 and I think it's real important for the jury to know that we

23 made a decision not to eliminate any part.  If maybe you could

24 just put that maybe in layman's terms, because I think that's a

25 very important part of Your Honor's instruction that I want

1411

1    them to understand.

2         THE COURT:  Okay.  Any objection by the government?

3         MR. LAMPTON:  No, Your Honor.

4         THE COURT:  All right.  What about no deletions --

5    with no deletions?

6         MS. NESTER:  No, sir.

7         THE COURT:  Is that okay?

8         MS. NESTER:  That's fine, Your Honor.

9         MR. LAMPTON:  Yes, sir.

10        THE COURT:  Then one other matter.  You're asking for

11   the journal in its entirety, and I will admit the journal in

12   its entirety.  So, then, what is the number?

13        MR. LAMPTON:  G-32A.

14        THE COURT:  G-32A is admitted over objection.

15   (Exhibit G-32A marked)

16        THE COURT:  I also have the honorable discharge.

17        MR. LAMPTON:  The government would move that it be

18   admitted as G-32D.

19        THE COURT:  Is there any objection?

20        MS. NESTER:  Hearsay, and it's not relevant because

21   Your Honor has ruled on authenticity.

22        THE COURT:  I will put it in.  G-32D.

23        MR. LAMPTON:  The original journal is what number?

24   The original journal is 32A.  Let's be sure.

25        MR. LUCAS:  According to your exhibit list --

1412

```
1        MS. FITZGERALD:  It's C.  I'm sorry, Your Honor.
2        THE COURT:  32C is admitted over objection.
3        MS. FITZGERALD:  C is the journal, Your Honor.
4        THE COURT:  Pardon?
5        MS. FITZGERALD:  Government's 32C is the original of
6   the journal.
7        THE COURT:  32C is the original of the journal.
8   G-32A, is that the --
9        MR. LAMPTON:  That is a copy of the journal.
10       THE COURT:  A copy?
11       MS. FITZGERALD:  Correct.  And 32D, as in dog, is the
12  discharge paper.
13       THE COURT:  32D.
14     (Exhibit G-32D marked)
15       MR. LAMPTON:  Your Honor, the government would also --
16       THE COURT:  One second.  Hold on.  Let me finish this
17  first.  Mr. Lucas?
18       MR. LUCAS:  I'm sorry, Your Honor.  I'm just trying to
19  get this straight.  I've got the exhibit list that they
20  provided me and the numbers on their exhibit list do not match
21  up with --
22       MS. FITZGERALD:  I apologize, Your Honor.  We had two
23  different journals, and we had several copies and the numbering
24  seems to have gotten a little bit off.  32C -- I misspoke.  32C
25  is the second journal.  It's not the journal that's being
```

1    admitted here.

2          THE COURT:  32C is a copy?

3          MS. FITZGERALD:  No.  32C is a second journal.  It's

4    just another journal that was provided to us by Mr. Briggs.  It

5    doesn't have anything to do with --

6          THE COURT:  32C is not admitted.

7          MS. FITZGERALD:  Correct.  32C is not being offered.

8          THE COURT:  Okay.

9          MS. FITZGERALD:  32A is, in fact, the original of the

10   journal that is at issue here.

11         THE COURT:  Okay.

12         MS. FITZGERALD:  I'm sorry for the confusion.

13         THE COURT:  That's A.  So there's no C, and then I

14   have a D.

15         MS. FITZGERALD:  D is the discharge paper.

16         THE COURT:  Okay.  Now, there's one other item and

17   that's the clipping --

18         MR. LAMPTON:  Yes, sir.

19         THE COURT:  -- in the journal.

20         MR. LAMPTON:  Yes, sir.

21         THE COURT:  Now, do you move for the clipping in the

22   journal?

23         MR. LAMPTON:  Yes, sir.

24         THE COURT:  As I understand the testimony, the

25   clipping was already embedded in the journal?

1    MR. LAMPTON:  Yes, sir.

2    THE COURT:  What says the defense?

3    MS. NESTER:  Your Honor, that's media that accuses my

4    client of being guilty of torso murders.  Of course, we object

5    to that.  It is completely not relevant.  If it's simply a

6    matter of trying to establish that the article was preserved,

7    then they need to clip off the headline and the media report

8    and they can just simply introduce the pictures which are

9    already in and the date on top and redact it.  But, obviously,

10   to let in a press report of -- you know, of accusing my client

11   of murder, yes, we have an objection to that.

12   THE COURT:  Okay.  Now, I will allow the witness to

13   testify that there was a clipping concerning arrests, but I

14   will not let the clipping in itself.  So the clipping is marked

15   for identification.  Clipping for identification only and not

16   to be read to the jury.

17   MS. FITZGERALD:  G-85.

18   THE COURT:  G-85.  G-85 is the clipping.

19   MS. FITZGERALD:  Actually, Your Honor, I apologize.

20   This is a new exhibit and so is another one that we were going

21   to be offering.  Let's make that one G-86.

22   THE COURT:  G-86 is the clipping.

23   (Exhibit G-86 for ID marked)

24   MR. LAMPTON:  Your Honor, I'm going to leave it in the

25   journal and question him about it and make sure that this does

1    not go into evidence and not allow him to read anything from it

2    but just ask --

3           THE COURT:  Let me see.  I read it before, but let me

4    read it one more time.

5       (Short Pause)

6           THE COURT:  I think the pictures of both are in.

7           MS. NESTER:  They are, Your Honor.

8           THE COURT:  The arrest, I think, is also -- well, it

9    is.  It is also in.  But still the two pictures linked together

10   with the heading, quote, Held in Torso Murders, unquote, I

11   think may be prejudicial.  The witness may testify that an

12   article concerning arrests of these two persons was also found

13   in the journal.

14          MR. LAMPTON:  I will lead him through that.

15          THE COURT:  Okay.

16          MR. LAMPTON:  Let me just walk out and see him and

17   show this to him and tell him what not to say, what --

18          THE COURT:  Is that okay, Ms. Nester?

19          MS. NESTER:  I'm sorry, Your Honor.  I apologize.  I

20   couldn't hear Mr. Lampton.

21          THE COURT:  He wants to go outside and tell the

22   witness not to discuss -- mention that headline.

23          MS. NESTER:  Please.

24          THE COURT:  Okay.

25      (Short Pause)

1       (Jury In)

2            THE COURT:  Is the government ready to go forward?

3            MR. LAMPTON:  Yes.

4            THE COURT:  Defense?

5            MS. NESTER:  Yes.

6            THE COURT:  Bring in the witness first.

7       (Short Pause)

8                       DIRECT EXAMINATION

9   BY MR. LAMPTON:

10  Q.  Will you state --

11           THE COURT:  Wait a second.  In your absence, we have

12  done various things.  First of all, I have admitted into

13  evidence some additional items.  I've admitted G-32A, G-32A,

14  which is -- which will be referred to here as a journal.  I

15  have admitted G-32D, which will be referred to as some

16  discharge papers.  Those are two documents I have admitted.

17      In addition, we have sworn this witness and he will be

18  testifying presently.

19      Now, I will allow you to begin questioning of the witness

20  and at the appropriate time I will give the jury a limiting

21  instruction.  Remember he has been sworn outside your presence,

22  but he is sworn.  Now, then, you may start.

23                      DIRECT EXAMINATION

24  BY MR. LAMPTON:

25  Q.  Would you, please, state your name for the jury, please,

1   sir.

2   A.   Yes.  My name is John Ellis Briggs.

3   Q.   And where do you live, Mr. Briggs?

4   A.   Between Roxie and Biloxi.

5   Q.   And how old are you?

6   A.   I am 49.

7   Q.   Your parents were whom or are whom?

8   A.   Yes.  My mother is Mary Geraldine Briggs and my father is

9   Reverend Clyde Bennie Briggs.

10   Q.   Are your mother and father still alive?

11   A.   They're deceased.

12   Q.   When did your father die?

13   A.   January 18, 1965.

14   Q.   At an earlier time you gave me a photocopy of a picture of

15   your father.  Do you remember that?

16   A.   Yes, sir.

17   Q.   And does that photocopy accurately reflect your remembrance

18   of your father at that time?

19   A.   Yes, sir, at that time, it does.

20        MR. LAMPTON:  Your Honor, I'm going to offer as an

21   exhibit for the first time a photograph that I'm going to ask

22   him to identify as G-85.

23   BY MR. LAMPTON:

24   Q.   Can you identify that photograph?

25   A.   Yes, sir, I can identify this.  That's my father.

1418

1   Q.  And does that picture fairly and accurately reflect the way

2   you remember your father?

3   A.  Yes, sir.  It's a picture from a pastor appreciation

4   program that was dated from the 14th of February that was

5   supposed to be held the month after he passed away.

6   Q.  And how old were you when your father died?

7   A.  I was seven.

8          MR. LAMPTON:  Your Honor, the government will offer

9   the photograph as an exhibit.

10          THE COURT:  That's G what?

11          MR. LAMPTON:  85.

12          THE COURT:  G-85.  Any objection?

13          MS. NESTER:  I'm sorry.  No objection, Your Honor.

14          THE COURT:  G-85 is admitted.

15      (Exhibit G-85 marked)

16          MR. LAMPTON:  I'm going to attempt to display this on

17   the Elmo.

18          MS. FITZGERALD:  I don't believe it's on, Your Honor.

19   BY MR. LAMPTON:

20   Q.  If you look on the screen in front of you, Mr. Briggs, is

21   that a picture of your father?

22   A.  Yes, sir, it is.

23   Q.  What was your father's occupation?

24   A.  My father was a Baptist preacher.

25   Q.  And how long had he been a Baptist preacher, if you know?

1    A.   I have an ordination of him being ordained in 1947.

2    Q.   And prior to 1947, do you know what your father did, where

3    he was?

4    A.   He left the farm and went to the second world war.

5    Q.   And have you provided us with a document that purports to

6    be or that is his discharge from the armed services?

7    A.   Yes, sir.

8          MR. LAMPTON:   Your Honor, I'm going to publish for the

9    jury what has been marked as G-32B.

10   BY MR. LAMPTON:

11   Q.   Can you identify the document that I have shown to you?

12   A.   Yes, sir, I can.

13   Q.   And who does this document purport to be connected with?

14   Who is the person that this honorable discharge is referring

15   to?

16   A.   It says here Clyde Briggs.

17   Q.   And 34 would be what, if you know, the 34626130?

18   A.   I don't know if that's his service number or not.   I don't

19   know.

20   Q.   And then on the back, it has some information pertaining to

21   your father, and it shows where he served.   Where did your

22   father serve during the Second World War?

23   A.   It has on here Naples, Foggia, Rome, Arno, Southern France,

24   Rhineland, and Central Europe.

25   Q.   And does this document bear your -- what purports to be a

1    fingerprint and a signature?

2    A.  Yes, sir, it does.

3    Q.  You would have no idea if that is your father's fingerprint

4    or not, would you?

5    A.  I wouldn't unless it goes with the signature, sir.

6    Q.  As far as the signature goes, do you recognize that as the

7    signature of your father?

8    A.  Yes, sir.

9    Q.  You tell me that your father pastored a -- did you tell me

10   how many churches he pastored?

11   A.  Yes.  At that time in '64, simultaneously he was pastoring

12   five congregations in southwest Mississippi.

13   Q.  Did you tell the jury where those congregations were?

14   A.  I think I remember offhand, I'm not sure exactly.  I can

15   name at least Roxie, Centreville.  Roxie, Centreville.  I think

16   it was Doloroso, also at Crosby, and I'm thinking Monroe.  It's

17   outside of Meadville, I think.

18   Q.  Are you familiar with the church in Roxie, Mississippi?

19   A.  Yes, sir, I was baptized there.

20        MR. LAMPTON:  I'm going to publish for the jury, Your

21   Honor, Exhibit G-73C and ask the witness if he can identify

22   that exhibit.

23   BY MR. LAMPTON:

24   Q.  Can you identify what is shown in that photograph?

25   A.  Yes, sir.  That is the Roxie First Baptist Church in Roxie,

1421

1    Mississippi.

2    Q.  And has that church changed any over the years?  Do you

3    remember it any differently when you were a seven- or

4    eight-year-old?

5    A.  Yes, sir.  If you look at the picture to the left, that's

6    an addition to that left side -- the back to the left side

7    there as you look at the picture.

8    Q.  Yes, sir.  I understand the addition.  What is the

9    significance of that addition as far as the way the church

10   looked in 1964?  Was that addition there at that time?

11   A.  Oh, no, sir, it wasn't.

12   Q.  Other than the addition, does the front of the church and

13   its proximity to the road, is that the same as it was in 1964?

14   A.  Yes, sir.

15   Q.  Okay.  So if the jury looks at that, if they understand

16   that the annex was not there, they could consider that

17   everything else was pretty much the same as it was in '64?

18   A.  Yes, sir.

19   Q.  You told us that your father passed away in January of

20   1965?

21   A.  Yes, sir.

22   Q.  Where were you living then?

23   A.  I was living in Roxie at my mother and father's home.

24   Q.  And is that home that you lived in in 1964 in Roxie,

25   Mississippi, is it still there?  Is it still in existence?

1    A.   Yes, sir, it's still there on the hill.

2    Q.   Are you still connected with that home in any way?

3    A.   Yes, sir.

4    Q.   How are you connected to it?

5    A.   I go back and visit as much as possible.  My brother still

6    lives there.  And I'm in the process of building a cabin there

7    in Franklin County for when I go into town.  Usually that's

8    where I shower, you know.

9    Q.   Is the home still in the family?

10   A.   Yes, sir, it is.

11   Q.   How far is that home from the church that's up on the

12   monitor now?

13   A.   Five-minute, ten-minute walk.

14   Q.   And as far as --

15   A.   Maybe about three quarters of a mile, maybe, a mile.

16   Q.   Is it on the same road as the church is on?

17   A.   Yes, sir.

18   Q.   To your knowledge, did your father during his lifetime

19   maintain a journal or record of what he was doing in the

20   various churches and what was important to him that was

21   occurring in the community?

22   A.   To my knowledge, yes, he did.

23   Q.   And do -- is there a journal that has been admitted into

24   evidence, and I'm going to ask you -- I'm going to show you the

25   outside of the journal, and for the record, that is G-32A, and

1423

1   ask you if you can identify that journal.

2   A.  Yes, I can.

3   Q.  If you would, just take the jury through the history that

4   your family has with this journal.

5   A.  Yes.  With this journal, I headed to Europe, I think it was

6   in '81.  I first got information that my father had -- I've

7   always been inquisitive.  I was seven when my father died.

8   I've always been inquisitive about what happened with my

9   father's life.  So in '81 is when I first began to get some

10  inkling that my father had left some writings about him, that I

11  would be able to get some firsthand information about my

12  father, and it wasn't until '84 when my oldest brother passed

13  away that I -- the first time I actually seen the journal

14  themselves.  And I guess my mother was -- I don't know whether

15  she got them from my oldest brother or where she got them from,

16  but that was in '84.  And in '89 is when I basically -- '84 is

17  when I first began to read the journals and in '89, I was on my

18  way to Europe, and I had a chance to really spend more time

19  with the journal.  And then in '97, I returned from Washington

20  state back here to Mississippi.  My brother had taken ill, so I

21  came back.

22      And while I was here, in '97, my second oldest brother had

23  taken ill, so at that time he felt that I should know about the

24  journal and take care of it, because his prognosis was a

25  two-year prognosis.  He wanted me to look at the journal and

1424

1  take care of the journals after that.  This was in '97.

2  Basically, he kept the journals within his possession there at

3  his mom and dad's home, and when he passed away in 2002,

4  basically I knew where they were and I took possession of them.

5  When I say "took possession of them," they were there in the

6  house, but he had passed away, so I knew that he would like for

7  me to have them and to whatever would come about with it, and I

8  guess here I am today.

9  Q.  Was this the only journal or the only document that your

10 father kept that your brother and your family maintained and

11 kept for a family history?

12 A.  No.  There's other paperwork and another journal about

13 church activities.

14 Q.  When you would receive this journal from your brother or

15 from other people in the family, what else would come with that

16 journal?

17 A.  You mean as far as newspapers clippings or letters or

18 cards?

19 Q.  What other -- would you be given just that journal

20 individually or would you be given --

21 A.  Oh, no, sir.  It was a collection of my dad's -- the

22 journal that's on display here, another one that has some more

23 of his church activities and church membership, tithing and all

24 of that in it, and also some newspaper clippings that was

25 inside the manuals also.

1425

1    Q.  Now, while this journal was in your possession back in the

2    '80s or '90s, did you make any notes in it or is any of the

3    writing in this journal yours?

4    A.  Yes, sir, there is.

5    Q.  And if the jury were to look at the journal and come across

6    more of your writings, how would they know that it was your

7    writing and not something that purports to be your father's?

8    A.  Well, the handwriting is quite different, plus I have it

9    dated for I think it's October 1989, and another one -- entry

10   is dated sometime right after the current indictment of

11   Mr. Seale.  I had a radio program that I did, and I had taken

12   some notes in the journal.  I think it was sometime in January

13   of this year.

14   Q.  And other than those that you have put in there, is there

15   any other -- well, in addition to that, there's some -- there's

16   a notation on every page and who put those notations there and

17   when, if you can remember, and for what purpose?

18   A.  Yes, sir, the 18th of May of this year, one of your

19   investigators had come to pick up the journal in order to

20   verify the authenticity and to show that there had been no

21   changes.  He agreed that I would have a copy, but I would sign

22   off the journal as far as initialing it and dating it showing

23   that everything was as it was when I handed it over to him.

24   Q.  Those entries are initialed and dated in this year, 2007?

25   A.  Yes, sir, May of this year.

1    Q.  As far as the other writing in the journal, is the writing

2    of whom?

3    A.  I'm sorry, sir?

4    Q.  Other than what you describe your writings deal with the

5    radio program and dealing with some of your thoughts that are

6    dated in the 1980s, the notes just as to the initials of the

7    investigator, is there anything else in this diary that's

8    not --

9    A.  I'm not sure that's -- maybe the first page of the second

10   page.  I'm not sure whether or not it is my dad's or my

11   brother's.  I think the first or second page in that, I think

12   it is.

13         MR. LAMPTON:  Your Honor, may I just show him the page

14   that he has referred to?

15         THE COURT:  Okay.

16   BY MR. LAMPTON:

17   Q.  That's on the second page?

18   A.  Yes, sir.  That top portion in the blue ink, that is not my

19   writing.

20   Q.  That's not whose writing?

21   A.  That is not my writing in the blue ink there.  I don't know

22   whether it's my father's, whose it is.  Now, that writing where

23   it speaks the name of "I am" and the other and the black

24   writing in that.

25   Q.  The printed?

1   A.   Yes, sir.   The printing is mine.

2   Q.   Is whose?

3   A.   Mine.

4   Q.   I've asked you to look through the journal for the purpose

5   of being able to tell us what handwriting you believe to be

6   your father's and what handwriting you know is yours and

7   someone else's?

8   A.   Yes, sir, exactly.

9   Q.   Other than that first page with the blue writing and the

10   black printing and what you've already described, is there

11   anything else in the journal that you don't consider to be your

12   father's handwriting?

13   A.   Everything should be my father's handwriting.

14   Q.   If you would, just continue to trace the history of that

15   journal forward to after you received it in your possession up

16   to the point where it came to leave your possession and be here

17   today.   Just tell the -- I guess the rest of the story to the

18   ladies and gentlemen of the jury.

19   A.   Yes, after I did -- like I said, my second oldest brother,

20   when he became ill in '87, pretty much asked me to take of what

21   he had there, and it was placed in the loft there at our home

22   in 2002 when my brother passed away.   And I received, I guess,

23   the guardianship of the documents.   They have been in my

24   father's -- my mother's and father's loft there all of this

25   time until Mr. Lampton asked about a search warrant, possible

1  search warrant for May 2nd, 1964, and looking for that search

2  warrant, which I thought would be there because the church had

3  been searched --

4      MS. NESTER:  Objection, Your Honor.  This witness does

5  not have personal knowledge of that, and I would object to the

6  narrative form of testimony for exactly that reason.

7      THE COURT:  Counsel, ask your question.

8  BY MR. LAMPTON:

9  Q.  You were looking through the records in order to find what?

10 A.  A search warrant.

11 Q.  And in looking through the records, what did you find that

12 may have been of some significance involving the search of your

13 father's church on May 2nd of 1964?  Can you tell the jury

14 that.

15 A.  Yes, I found an entry that it was from that date or was

16 said to have been from that date that referred to the searching

17 of the church on May 2, 1964.

18 Q.  What did you do with that information?

19 A.  Let you know that I had found it, and I think it was

20 September of 2006 you came to look at it.

21 Q.  At that time what, if anything, did you give me?

22 A.  I think I gave you some copies of those relevant pages.

23 I'm sure I gave you copies of the relevant pages, yes.

24 Q.  At that time, did you maintain the original?

25 A.  Yes, sir.

1   Q.   And you maintained it until someone with my office asked

2   for it and initialed the pages and gave you a copy?

3   A.   Until the 18th of May this year, yes, sir.

4   Q.   When was the first time that you realized that there was an

5   entry in your father's journal that concerned the search of the

6   church that your father pastored in Roxie, Mississippi, in

7   1964?

8   A.   I pretty much known that the entry was there since '89.

9   Q.   When was the first time anyone connected with law

10  enforcement or prosecution asked to see that journal or was

11  made aware of what was in the journal?

12  A.   Last year.

13  Q.   And who asked for it?

14  A.   When you was looking for the search warrant and when I went

15  to look for the search warrant and found that entry there and

16  brought it back up to you and told you about what was there.

17  Q.   Prior to that time, do you have any knowledge of -- through

18  your family history of anything of that information being given

19  to any law enforcement officer?

20  A.   I have no knowledge.

21          MS. NESTER:  Object to hearsay.

22          THE COURT:  He said he had no knowledge.  Let's go on.

23          MR. LAMPTON:  Your Honor, I think at this time I'm

24  prepared to go into the journal.

25          THE COURT:  Go ahead.

1    BY MR. LAMPTON:

2    Q.   Do you remember what pages the entries are that concern the

3    search of the church?

4    A.   Yes, sir, it's page 93, top of page 93.

5    Q.   Are you familiar with this page?

6    A.   Yes, I am.

7    Q.   If you would, please, read that into the record so the jury

8    can follow along.  Can you see it clearly enough on your

9    monitor that you can read that?

10   A.   Yes, sir, I can.

11   Q.   Just take your time, if you would, just slowly read that

12   down to the first line.

13   A.   Starting at the top of the page?

14   Q.   Yes, sir.

15   A.   On page 93, "Things happened in 1964 in Franklin County.

16   On Saturday, May 2nd, state highway patrol and deputy sheriff

17   Kirby Schell come to Crosby, Mississippi, to get pastor of the

18   Roxie colored Baptist Church, Reverend Clyde Briggs, because

19   they had been informed that a group of guns was hid in the

20   church and some white men was going to bomb the church that

21   night.  No guns were found in the church, but the law officers

22   advised the pastor to see to the church being locked when all

23   leave the church."

24   Q.   The narrative or the entrances -- the entrance into your

25   father's journal is in the third person.  It doesn't refer to

1    I.

2    A.   Yes.

3    Q.   Is that unusual or are you able to tell the jury that that

4    entry was, in fact, made by your father?

5    A.   I assume that it was made by my father because there are

6    other entries where my father also speaks in the third person

7    as far as giving general statements about his ministry and the

8    way that a pastor is supposed to conduct oneself as a pastor of

9    a church.

10   Q.   Are you familiar with his handwriting?

11   A.   Yes, sir.

12   Q.   At this time so the jury can also have a chance to compare

13   his handwriting and reach a conclusion, I'm going to try with

14   some help --

15          MS. NESTER:   Just for the record, I renew the

16   objection we made outside the presence of the jury about this

17   line of testimony.

18          THE COURT:   Okay.

19   BY MR. LAMPTON:

20   Q.   I'm going to ask if you see two signatures there of Clyde

21   Briggs?

22   A.   Yes, sir, I do.

23   Q.   And I'm going to direct your attention to several other

24   places on that page.  Before I make -- allow you to make a

25   comparison to the jury, I'm going to ask you to read the next

1    entry on that page of the journal underneath what you just

2    read.

3    A.   Yes, sir.  "On Sunday night, May 24, Reverend Clyde Briggs

4    was coming from church service at New Bethel Baptist Church

5    east of Meadville, Mississippi, and when he got near Roxie,

6    Mississippi, two carloads of white men tried to stop him on the

7    highway."

8         MS. NESTER:  Your Honor, I object to him reading this

9    portion for the reasons Your Honor's already ruled on.  This is

10   not related.

11        THE COURT:  Let him finish reading this and then I'll

12   have an instruction to the jury.  Go ahead.

13   A.   "When he got near Roxie, Mississippi, two carload of white

14   men tried to stop him on the highway, but he would not stop.

15   They followed him all the way home, and one of the men, Jack

16   Davis, got out of the car and did a lot of big talk and told

17   Reverend Briggs that the next time they try to stop him, he

18   better stop."

19        THE COURT:  Now, ladies and gentlemen of the jury,

20   earlier I told you I had admitted the journal into evidence.

21   Included within its pages are incidents and events totally

22   unrelated to the matters pertaining to those of this trial.  An

23   incident is mentioned as occurring on Sunday morning,

24   June 21st, concerning the beating of a man who escaped and left

25   Franklin County.  The journal discusses another incident as

1433

1    having occurred on May 2nd -- excuse me -- on May 24th, when,

2    according to the journal, some whites tried to stop the

3    Reverend Briggs, which you just heard.  Another incident,

4    another episode mentions an August 10 date when, according to

5    the journal, some white men shot out the lights at Reverend

6    Briggs' yard.

7        Now, the government does not allege that the defendant here

8    had anything whatsoever to do with those matters and the

9    government will offer no proof in any attempt to connect this

10   defendant to those incidents.

11       I have admitted this journal in its entirety with no

12   deletions to any of its contents to allow you, the jury, to

13   assess the journal's credibility upon considering it as a

14   whole.

15       Now, then.  The last incident that the witness read is one

16   of the ones I just mentioned to you, and this incident is not

17   being attributed whatsoever to this defendant.  There's no

18   contention that he had anything to do with that incident.  I

19   have admitted the journal and all of its contents so that you

20   may assess the journal's credibility and authorship.

21   BY MR. LAMPTON:

22   Q.  Would you, please, refer to the monitor, and I have placed

23   the journal next to the discharge and with two signatures and

24   ask if you could examine those two signatures along with the

25   jury.

1434

1    A.  Yes, sir.  I see.

2    Q.  Have you done that?  I have moved to the next time the word

3    "Briggs" appears and ask you to view just the Reverend and the

4    Briggs and -- or just the word "Briggs" and just to view the

5    two as opposed to each other.  Have you done that?

6    A.  Yes, sir.

7    Q.  Let me ask you to read, please, just the next entry into

8    the journal that purports to mention the events of another day.

9    Would you read that.

10   A.  Yes, sir.  "On Monday, July 13th" -- written over a 12, it

11   looks like -- "the body of two young Negro men were found in

12   the Mississippi River.  The men were Henry Dee and Charles

13   Moore of Meadville, Mississippi.  On that same night, someone

14   shot into the home of Reverend Clyde Briggs with a rifle."

15   Q.  Does that -- there's an arrow, I believe, and, if you

16   would, let's -- first of all, I believe there's a Clyde Briggs

17   on that page, and it has now been in close proximity to the

18   Clyde Briggs on the discharge, and ask if you've had an

19   opportunity to view both those signatures.

20   A.  I see them both, yes.

21   Q.  And then we're going to the next page.  Instead of being

22   94, this is now page 92.

23   A.  The previous page was 93.

24   Q.  And this is page 92 that I'm showing you now.  And can you

25   read that entry for us.  First of all, read the entry if you

1    know which one, if any, pertains to July 13th.

2    A.  Yes, sir.  The arrow on the right side of the page there is

3    a continuation of -- is pointing from the page 93 back to page

4    92.  It says, "These two young men had not been seen since the

5    early part of May in Meadville, Mississippi."

6    Q.  And then the top entry applies or purports to be an entry

7    concerning a different day and a different occurrence.  If you

8    would, read that for us, please.

9         MS. NESTER:  Objection to him reading that one.  It's

10   unrelated as well, Your Honor.

11        THE COURT:  Okay.  He can read it, and I will advise

12   the jury as I have earlier.  Go ahead.

13   A.  "On Sunday morning, June 21st, at dawn of day, they turn a

14   young Negro man out of Meadville jail, and the Ku Klux Klan

15   took charge of him and beat him unmerciful and left him for

16   dead.  The young man came to and made his escape.  He left

17   Franklin County or Mississippi."

18        THE COURT:  Again, I advise the jury that this

19   reference, this paragraph has nothing to do with this

20   defendant.  The government is not contending that it does.

21   This has been allowed -- I've allowed this to remain for your

22   consideration when you assess the credibility of the journal

23   and its authorship.

24   BY MR. LAMPTON:

25   Q.  I'm going to direct your attention now to page 94 and ask

1  you if you would read that entry, please.

2  A.  Yes, sir.  On page 94, "On May, August 10, a carload of

3  white men come to the home of Reverend Clyde Briggs at Roxie

4  and shot two times at a light in his yard, broke the globe of

5  the light, but the light kept burning."

6  Q.  And that has the name Briggs --

7  A.  Reverend Clyde Briggs.

8  Q.  -- written?

9       THE COURT:  And, again, this incident has nothing to

10  do with the defendant.  The government does not contend as much

11  and will not offer any evidence to show any connection.  I have

12  allowed this to remain for your consideration so that you may

13  assess the credibility of the journal, as well as its

14  authorship.

15  BY MR. LAMPTON:

16  Q.  And I have the signature from the discharge of Clyde Briggs

17  and the Clyde Briggs that is written in the journal and ask if

18  you've had an opportunity to view them together and to compare

19  them.

20  A.  Yes, sir.

21  Q.  And can you read the last entry on that page.

22  A.  Yes, sir.  Same page.  "No arrest was made in connection

23  with any of those crimes, although each of them was reported to

24  law officers of Franklin County, Mississippi."

25  Q.  Based on having compared the signature of Clyde Briggs on

1  the discharge to the Clyde Briggs in the journal and based on

2  your own knowledge of your father's writing based on having

3  observed different letters and things that you know were

4  written by him, do have an opinion as to whether that writing

5  is your father's or not?

6          MS. NESTER:  Object to him asking for an opinion, Your

7  Honor.  This is not an expert witness.

8          THE COURT:  He can give a lay opinion.

9  BY MR. LAMPTON:

10  Q.  You may answer that question.

11  A.  I think it is my father's writings.

12  Q.  Do you know reasonably of any other person that it could

13  be?

14  A.  No, sir.  I can't think of anyone.

15  Q.  Located in that journal was an old newspaper clipping.  Are

16  you aware of that?

17  A.  Yes, sir.

18          MR. LAMPTON:  And, Your Honor, I'm going to hand him

19  Exhibit 86 for identification only.

20  BY MR. LAMPTON:

21  Q.  I'm going to ask if you've ever seen that clipping before.

22  A.  Yes, sir, I have.

23  Q.  And where did you first see it?

24  A.  It was found in my father's journal.

25  Q.  The same journal that's in evidence that we've been looking

1    at?

2    A.  Yes, sir.

3    Q.  I don't want you to read it.  I just simply want you to

4    tell the ladies and gentlemen of the jury who is -- if you know

5    who is pictured in the photograph.

6    A.  According to this, it's James Seale and Charles Edwards.

7    Q.  And what is the date of that clipping?

8    A.  It says here Saturday, October 7, 1964.

9         MS. NESTER:  Your Honor, we need to see that for just

10   a minute, please.  I'm sorry.

11        MR. LAMPTON:  You can just give that back to the court

12   security officer.

13        THE COURT:  Take it back to him.

14   BY MR. LAMPTON:

15   Q.  Do you have any other brothers and sisters that are still

16   alive that are older than you are that were living at home when

17   these events took place?

18   A.  Yes, sir, I do.

19   Q.  And who are they?

20   A.  I have a brother Joseph, a brother Ed Bennie, I have a

21   sister Chastisy.

22   Q.  And are any of them here today?

23   A.  Yes.  My sister is here and my brother Joseph is here.

24   Q.  Joseph is sitting in the courtroom, isn't he?

25   A.  Yes, he is.

1439

1  Q.  Chastisy would have been how old, if you know, when these

2  events occurred?  You would have been seven?

3  A.  She was 13 or 14.  She's six or seven years older than I

4  am, yes.

5          MR. LAMPTON:  Tender the witness.

6          THE COURT:  Cross-examination.

7                          CROSS-EXAMINATION

8  BY MS. NESTER:

9  Q.  Good afternoon.

10  A.  Hello, ma'am.  How are you?

11  Q.  Just to get this straight, make sure I understand, you are

12  the person who provided this piece of evidence to the

13  government.  Is that right?

14  A.  Yes, ma'am.

15  Q.  It came from your hands to their case?

16  A.  Yes.

17  Q.  Okay.  And we all agree that if this, in fact, was written

18  back in 1964, you were a child then?

19  A.  Seven, yes.

20  Q.  So you were not present when this diary was created?

21  A.  No, ma'am, I wasn't.

22  Q.  You can't say that you saw anyone making an entry into this

23  diary?

24  A.  No, ma'am, I can't.

25  Q.  You actually can't say that you even have a recollection of

1   these events yourself because you were a child.  Correct?

2   A.  I have recollection of the shooting in the home both times.

3   Q.  Okay.  But I'm talking about the diary being created?

4   A.  Oh, no, no, ma'am.

5   Q.  Okay.  All right.  And the first time you became aware of

6   this piece of evidence was about 30 years -- I'm sorry -- 25

7   years after 1964 in the '80s, I think you said '89?

8   A.  Well, the first time I became aware that the writings exist

9   was in '81.  The first time I came into contact with the

10  journal, actually seeing the journal, was in '84.

11  Q.  That was 20 years later.  Right?

12  A.  Yes, ma'am.

13  Q.  And at that point, your father was dead?

14  A.  Yes.

15  Q.  Okay.  And so he wasn't there for you to ask about this at

16  all?

17  A.  No, ma'am.

18  Q.  And during that period of time, you can't say what happened

19  to this journal, can you?

20  A.  Oh, no, ma'am, I can't.

21  Q.  And even after '84, other people still maintained

22  possession of this diary that were not you -- right -- people

23  in your family?

24  A.  Yes, my brother.

25  Q.  You can't say what happened to this diary during that

1441

1   period of time?

2   A.   Cannot, no, ma'am.

3   Q.   Okay.   But then at some point in time it came back in your

4   hands.   Right?

5   A.   Yes, ma'am.

6   Q.   And, obviously, I guess it's a given, you weren't even born

7   when your father supposedly signed this document.   Right?

8   A.   No, ma'am.

9   Q.   And this is a copy?

10   A.   Yes, ma'am.

11   Q.   Do you have the original?

12   A.   Not with me, I don't, but I do have the original, but not

13   with me.

14   Q.   Okay.   You didn't give the original to the government?

15   A.   No, ma'am.

16   Q.   Now --

17   A.   I gave -- well, they had possession of the original, which

18   they made a copy of, yes.

19   Q.   All right.   Let's look at this.   At some point this diary

20   comes back in your hands and you start writing in it yourself.

21   Right?

22   A.   Yes, on page 58.

23   Q.   Let's look at some of this.   This right here, this letter

24   to the president of Persia, did you write that?

25   A.   Yes, ma'am.

1    Q.  All right.  And you wrote that back in -- it looks like the

2    '80s.  I can't totally tell.

3    A.  '89.

4    Q.  And you call yourself the servant of I am?

5    A.  Yes, ma'am, in the books of Exodus.

6    Q.  I'm sorry?

7    A.  From the book of Exodus, the name of God, coming from the

8    burning bush.

9    Q.  Is this a rough draft of a letter you wrote to the

10   president of Persia?

11        MR. LAMPTON:  Excuse me, Your Honor.  The only

12   relevance would be that it is not Reverend Briggs' writing,

13   what he wrote about or what he meant to do with it.  It's,

14   frankly, irrelevant other than it is not Reverend Briggs'

15   handwriting.

16        THE COURT:  Okay.  The objection is overruled.

17        MS. NESTER:  Thank you, Your Honor.

18   BY MS. NESTER:

19   Q.  Was this a rough draft of a letter you were going to send

20   to the president of Persia?

21   A.  Yes, please.

22   Q.  Did you actually send the president of Persia this letter?

23   A.  I think I did send a copy of it.

24   Q.  Did you get an answer?

25   A.  Not that I'm aware of.  I don't have a copy of anything.

1    As a matter of fact, I think I sent it to the -- one of the

2    embassies or someone at the United Nations that was a

3    representative of Iran at the time.

4    Q.  Let's look at this other page.  Okay.  Is that your

5    handwriting?

6    A.  Yes, ma'am, it is.

7    Q.  All right.  And you have in here some references to whether

8    or not the FBI murdered your father?

9    A.  Yes, ma'am.

10   Q.  Do you believe the FBI murdered your father?

11          MR. LAMPTON:  To which, Your Honor, the government

12   would object.

13          MS. NESTER:  It's in there.

14          THE COURT:  The objection is overruled.

15          MS. NESTER:  Thank you, Your Honor.

16   BY MS. NESTER:

17   Q.  Do you believe the FBI murdered your father?

18   A.  I believe they were in complicity with the Klan, yes.

19   Q.  And the FBI and the Klan were working together?

20   A.  That is my understanding, yes.

21   Q.  And how do you think they killed your dad?

22   A.  I believe it was by poisoning.

23   Q.  And do you believe that the government has taken any role

24   in covering this up as you indicate here on the bottom of the

25   journal where you say "cold case" or "covered up case"?  What

1  do you mean when you say that?

2  A.  Well, certain -- I have been doing quite a bit of research

3  myself over the years now that there's certain things that may

4  be contradictory that the government have made, certain

5  statements that they have made.

6  Q.  All right.  And you have off to the side here, right here,

7  a reference to the death -- "gain info about Deacons of Defense

8  and daddy's role."

9  A.  Yes.

10  Q.  What is the Deacons of Defense?

11  A.  The Deacons of Defense is an organization during the early

12  '60s and actually into the mid and maybe later '60s of

13  African-American men who felt that the government was not

14  upholding their role of protecting their families, their

15  congregation and themselves, and they decided to form alliances

16  to be able to protect their own families, their own selves,

17  their own churches, because they felt that the government was

18  not providing that type of protection.

19  Q.  Was your father a member of the Deacons of Defense?

20  A.  As far as I know, he was, he was one of the organizers.

21  Q.  He was an organizer?

22  A.  From what I've been told.  It's hearsay.  I guess you call

23  it hearsay, but from what I've been told, yes.

24  Q.  And when you say that they were protecting themselves and

25  their families because the government wouldn't, in what way

1445

1   were they protecting themselves and their families?

2   A.  Well, basically by arming themselves and also by

3   instructing and having meetings to instruct people how to

4   secure perimeters, how to make sure that they are armed, use of

5   firearms to be able to protect themselves.

6   Q.  How are they getting the firearms to the members of the

7   community, the African-American community?

8        MR. LAMPTON:  Your Honor, once again, I would object

9   to this as just not being relevant and the witness not having

10  any personal knowledge of it.

11       THE COURT:  I'll sustain the objection on personal

12  knowledge.

13       MS. NESTER:  Okay.

14  BY MS. NESTER:

15  Q.  Let me go back, then.  You gave an interview to some

16  reporters with the Jackson Free Press awhile back, didn't you?

17  A.  Yes, ma'am.

18  Q.  And in that interview, you were asked about whether or not

19  you had an understanding that there were guns hidden in

20  Franklin County?

21       MR. LAMPTON:  Excuse me, Your Honor.  Once again, I

22  would object to an interview that he gave as just not being

23  relevant.

24       THE COURT:  Well, I'll sustain the objection as to

25  personal knowledge.

1          MS. NESTER:  Okay.  Let me ask it this way, then.

2          THE COURT:  You said an understanding.  You have to

3   establish personal knowledge.

4          MS. NESTER:  All right.

5   BY MS. NESTER:

6   Q.  Did you make a statement to the Jackson Free Press that you

7   believed that there were --

8          MR. LAMPTON:  Excuse me, Your Honor.  I object to

9   this.

10         MS. NESTER:  I'm going to ask him, but I've got to

11  give him a statement.

12         THE COURT:  I'm going to excuse the jury.  Let me

13  excuse the jury.  All rise.

14     (Jury Out)

15         THE COURT:  You may be seated.  Let me hear what the

16  question is.

17         MS. NESTER:  Thank you, Your Honor.  It's a series of

18  three, and I'm glad that we're doing it outside the presence.

19  So if you could let me ask all three before you make your

20  ruling.

21  BY MS. NESTER:

22  Q.  First of all, did you make a statement to the Jackson Free

23  Press that you believed that there were, in fact, guns hidden

24  in Franklin County even if they were not found in the church

25  that night?

1    A.  Yes, I told them that I had knowledge from talking to

2    people that there was guns being brought in and stored and

3    hidden in Franklin County.

4    Q.  You did make that statement and it was published in the

5    media?

6    A.  Yes, ma'am.

7    Q.  All right.  And the knowledge that you have about that

8    information, how did you obtain that knowledge?

9    A.  As I was saying earlier when the jury was here, I've been

10   inquisitive about my father's life.  I've asked uncles.  I've

11   asked people that were in part of my father's congregations and

12   different people that my father had associated with over the

13   years and basically this is the conclusion that I've come up

14   with, is that there was guns being moved in and out of Franklin

15   County.

16   Q.  Did you ever talk with your mom about it?

17   A.  The only thing I had about my mom about it was that the

18   searching of the church as to how it tied in with the gun

19   running and encyclopedias, encyclopedias that had come and

20   how -- the rumor had began to spread about the guns; but that's

21   basically most of all what my mother knew about it.

22   Q.  And you say "gun running", I mean, what are you talking

23   about?  Your dad was involved in shipping guns?

24   A.  No.  My dad was supposedly involved in receiving guns.

25   Q.  How do you know that?

1   A.   Just by what I've heard.

2   Q.   And the research that you have done, have you uncovered any

3   documents that have revealed that to you, any historical

4   documents or it's been through histories that have been

5   provided to you?

6   A.   No, ma'am.

7   Q.   Just what people have told you?

8   A.   Yes, ma'am.

9   Q.   Can you identify who has told you that information?

10  A.   Yes.  My uncle Percy, my uncle Ernest.  They're both

11  deceased.  Also have people like my -- well, not my godfather.

12  The guy I'm named after, he have told me incidents of things

13  that would happen --

14          MR. LAMPTON:  Your Honor, I realize this is outside of

15  the presence of the jury, but I would still object to it as,

16  frankly, just being a fishing expedition and having no

17  relevance to what's before this jury.

18          THE COURT:  Okay.  Let me see where you're going.  Go

19  ahead.

20  BY MS. NESTER:

21  Q.   Anyone else that gave you that information that's still

22  alive today?

23  A.   No, ma'am.

24  Q.   Everybody that's told you that is deceased?

25  A.   Yes, ma'am.  I'm sorry.  Pretty much like this case, I

1    guess.

2    Q.  When they told you that, is that when you recorded it in

3    this journal?

4    A.  I'm sorry?

5    Q.  When they gave you that information, you recorded it in

6    this journal?

7    A.  I don't have anything in a journal about -- I didn't record

8    anything in a journal -- you mean as far as the interview I

9    gave?

10   Q.  No.  I'm talking about at the -- your reference to the

11   Deacons of Defense in this journal.

12   A.  Oh, no, ma'am.  That was done January of this year.  That

13   entry was January of this year.

14   Q.  And where did you get the information about your father's

15   role in the Deacons of Defense?

16   A.  Over the years between, I would say, '77.  Like I say, I --

17   coming with the military service, I come in and out of town

18   back and forth and basically just talking to people, being

19   inquisitive.

20   Q.  And when you put your information in this journal about the

21   Deacons of Defense, why did you put that in this journal?

22   A.  It was in the process of having an interview on the radio,

23   and I was bringing the journal itself with me and it was just

24   something that because it was all -- the program was about the

25   Dee/Moore case, and I put notations in there.  And actually

1    what you can see there are points that I was going to make

2    during the radio interview.

3            MS. NESTER:  Your Honor, at this point, we're ready to

4    argue, but I would ask the witness to step outside while we

5    make our presentation to the court.

6            THE COURT:  All right.  Step outside for a moment.

7        (Short Pause)

8            THE COURT:  Okay.  Make your argument.

9            MS. NESTER:  Your Honor, the government has moved to

10   introduce this journal into evidence over my objection.   The

11   court has allowed this journal to come in and has repeatedly

12   instructed the jury that it is coming in to allow them to judge

13   the credibility of this journal as a whole, every page.  This

14   issue, this man has written down, clearly I have a right to

15   impeach him on the information that he's putting in this

16   journal that is either he has personal knowledge or else he can

17   be impeached because he wrote down things he has no knowledge

18   of.  Either way, I'm entitled to attack the credibility of

19   these notes.  It's in the government's exhibit.  I didn't want

20   it in; they did.  It's in, and now I have a right to impeach

21   this witness about it.

22           THE COURT:  Ms. Nester?

23           MS. NESTER:  Yes, sir.

24           THE COURT:  Then you remember that I advised the jury

25   that they are not -- they are only to consider the journal as a

1  whole as to its authorship and to its credibility, but the

2  witness has already testified as to what notes he put in there.

3      MS. NESTER:  Yes, sir.

4      THE COURT:  It is not being admitted for that, and I

5  will advise the jury further that his notes do not bear on this

6  matter either.  So, then, there's no reason to impeach him on

7  what he put in there when I'm going to give this instruction.

8      When I heard again that the witness had put something in

9  the journal and had written something at length, the thought

10 occurred that this ought to be redacted, but the government did

11 not ask for any kind of redaction.  I agree with you on that,

12 that the government did not ask for a redaction.  Therefore, I

13 allowed you to ask him what he had put in the journal and talk

14 about that portion.  I saw it when I reviewed it, but the

15 government wanted it in its entirety so I put it in in its

16 entirety.  But that -- those portions written by the witness

17 have no bearing on this case.

18     MS. NESTER:  Well, the only concern I have, Your

19 Honor, is this man has given statements to the press that he

20 apparently had no knowledge about which affects his credibility

21 as a witness.  They're asking this jury to take this man's word

22 about this document, about his father, about everything, and

23 the man has made statements publicly that are unsupportable,

24 and I have a right to impeach his credibility because the

25 government has turned him into a witness.

1          THE COURT:  I have allowed you to explore that

2   already.

3          MS. NESTER:  Yes, sir.

4          THE COURT:  You've done it in front of the jury.

5          MS. NESTER:  Yes, sir.

6          THE COURT:  Now, I don't see what further inquiry

7   needs to be made when you have already questioned him about his

8   beliefs and why he made notations in the journal.

9          MS. NESTER:  Well, the concern that I have at this

10  point is the government's repeatedly made the statement to this

11  court that the search of the church was a ruse, and actually

12  this individual has spoken with members of his family that said

13  that they actually were running guns through the churches back

14  then, and I do think the jury is entitled to know that.

15         THE COURT:  How can you get that in under the Rules of

16  Evidence?  What's your exception?  Clearly, you know it's

17  hearsay.

18         MS. NESTER:  Yes.

19         THE COURT:  What's your rule of evidence?  What's your

20  exception?

21         MS. NESTER:  Well, the government has brought in the

22  evidence about the search.  I have a right to flesh out the

23  search.  When they put their witness up there, they got him to

24  testify to the hearsay of what he was told by the brother who

25  was locking up the church.  I'm not offering this stuff for the

1    truth of matter asserted.  I'm offering it to show that there's

2    alternative theories in the same family, in the same community

3    that rebut the theories that the government has.

4           THE COURT:  Sounds to me like you're offering for the

5    truth of the matter asserted.  Now, I'm asking you again, what

6    rules of evidence do you have that you want to point to?  What

7    is the exception?

8           MS. NESTER:  It's pure impeachment, Your Honor, and

9    it's pure rebut to rebut what the government has already put on

10   through their witness through hearsay.

11          THE COURT:  All right.  Then, you apparently have no

12   rule and it is not admissible.

13      Now, you want to examine the witness on some other points?

14          MS. NESTER:  One moment, please, Your Honor.

15          THE COURT:  Okay.

16    (Short Pause)

17          MS. NESTER:  I found one rule, 803, Section 23.

18          THE COURT:  I don't think that's going to fit, but

19   I'll let you go ahead and make your argument for the record.

20          MS. NESTER:  That's all right.  I won't waste your

21   time.

22          THE COURT:  Go ahead.  Ms. Nester, you can put it on

23   the record if you want to.  The rule you're referring to is

24   when no other rule applies and the court feels that some

25   indicia of reliability is established by the trustworthiness of

1    something associated with the testimony that the court ought to

2    let it in.

3            MS. NESTER:  Yes, sir.

4            THE COURT:  All right.

5            MR. LAMPTON:  Your Honor, the government would ask

6    that the jury be instructed that the testimony from this

7    witness that he has no personal knowledge of should not be

8    considered, it should be stricken.

9            THE COURT:  Well, I didn't say I would do that.

10           MR. LAMPTON:  I'm sorry?

11           THE COURT:  I did not agree to that.

12           MR. LAMPTON:  I just asked you.

13           THE COURT:  Yes, I'm going to overrule that

14   objection -- well, deny that request.

15           MS. NESTER:  I do have some more questions for the

16   witness, Your Honor.

17           THE COURT:  Okay.  Let me hear what they are so I know

18   if I have to excuse them.

19           MS. NESTER:  I'm not going to go into -- I'll leave

20   that alone.  I know you made your ruling, and I'll respect it

21   about the Deacons of Defense.

22           THE COURT:  No, I mean, where are you going with the

23   rest of the journal, though, so I will know before I have to

24   excuse the jury again?

25           MS. NESTER:  I'm just going to point out that this is

1   the only section of the journal where there's any relation or

2   any indication about this particular year and that none of the

3   rest of the journal has year entries or anything to do with

4   this case at all.  That's all.  I'm just going to wrap up with

5   that.

6            THE COURT:  Are you saying there's no other reference

7   in the journal to a year?

8            MS. NESTER:  No.  To this incident.  Those are the

9   only pages that relate to this case.

10           THE COURT:  I was going to remind you that there are,

11   I think, some other references to years.  Do you still intend

12   to use the journal?

13           MS. NESTER:  Yes, sir.

14           THE COURT:  Okay.  In what respects?

15           MS. NESTER:  What I just told you.

16           THE COURT:  That's all?

17           MS. NESTER:  Yes, sir.

18           THE COURT:  Bring the witness in.

19     (Short Pause)

20           THE COURT:  Now bring the jury in.

21     (Jury In)

22           THE COURT:  You may be seated.  Ms. Nester.

23           MS. NESTER:  Thank you, Your Honor.

24   BY MS. NESTER:

25   Q.  Okay.  The only other thing I want to say is we're very

1    clear these two pages you wrote, not your father?

2    A.  Yes, ma'am.

3    Q.  Okay.  And all the rest of this journal, the only pages --

4    the only pages in this journal that relate -- that may relate

5    to the case here and now are those three entries on pages 92,

6    93, and 94.  Right?  I'm going to show you in just a sec.  Is

7    that right?

8    A.  Yes, ma'am.  That's related to this case.

9    Q.  And that's the part about the young men not having been

10   seen since May?

11   A.  Yes, ma'am.

12   Q.  And that's the part about May 2nd, him being asked to come

13   to the church?

14   A.  Yes, ma'am.

15   Q.  And then that's the part about on July 13th their bodies

16   being recovered?

17   A.  Yes, ma'am.

18   Q.  And this part about someone shooting into his house the

19   night the bodies were recovered, that doesn't have anything to

20   do with this that we're here today.  We're talking about just

21   the first part of that entry?

22   A.  The Saturday, May 2nd, or the --

23   Q.  No, sir.  July 13th?

24   A.  Yes, July 13th, is when they shot in the house supposedly

25   also.

1  Q.  I understand that your --

2           THE COURT:  Speak directly in that microphone.  You

3  need to lean forward.

4  BY MS. NESTER:

5  Q.  She's just got to hear to type what you're saying.  I

6  understand your dad's house got shot into that night, but the

7  portion of that entry that relates to this case is the portion

8  just mentioning that the young men's bodies were found that

9  day.  Right?

10  A.  Yes.  Yes.

11           MS. NESTER:  That's all I have.  Thank you.

12  A.  You're welcome.

13           THE COURT:  Redirect?

14                    REDIRECT EXAMINATION

15  BY MR. LAMPTON:

16  Q.  I believe you've already covered this, but you were how old

17  when all these events happened?

18  A.  I was seven.

19  Q.  Do you have the original of that discharge?

20  A.  Of my father's discharge, yes.  I don't have it with me,

21  but I do have it.

22  Q.  I understand.  But the copy is an accurate copy of that

23  original?

24  A.  Oh, yes, sir.  Yes.

25           MR. LAMPTON:  I believe that's all I have, Your Honor.

1     THE COURT:  Okay.

2         MR. LAMPTON:  Other than did we talk about another

3  limiting instruction or not?

4         THE COURT:  The jury has been advised earlier that I

5  have admitted the journal in its entirety and with no deletions

6  so that you may judge the credibility of the journal as well as

7  its authorship.  So you've heard the testimony concerning the

8  journal, and you have the journal, and you make those

9  determinations from those points.  That's the instruction.

10 Now, then, either side anticipate recalling this witness?

11        MR. LAMPTON:  No, Your Honor.

12        MS. NESTER:  No, sir.

13        MR. LAMPTON:  Unless there's some issue about the

14 discharge.  May he be just subject to recall if that comes up?

15        THE COURT:  Well, he's -- if you need to call him

16 later, then he is still under the rule of sequestration.  If

17 you're sure that he will not be needed later, then he is not

18 subject to the rule and may remain in the courtroom, but you

19 would have to make that call.

20        MR. LAMPTON:  I'm going to ask that he remain subject

21 to the rule.

22        THE COURT:  Okay, then.  You may be called again so

23 you can't come into the courtroom nor discuss any testimony

24 with anyone who is present in the courtroom.  Okay.  You can

25 step down.  Call your next witness.

1          MR. LAMPTON:  Chastisy Briggs Middleton.

2          THE COURT:  All right.  The next witness will be

3     Chastisy Briggs who?

4          MR. LAMPTON:  Middleton.

5          THE COURT:  Chastisy Middleton.  Okay.  We've had a

6     couple of breaks, and I thought we'd had a break, but we have

7     not had a break for the court reporter, nor, for that matter,

8     for counsel in the courtroom or the parties.  So even though

9     you all have gone out and come back in and because you had, I

10    took that to be a break, but it's not a break for them.  So I

11    will take a recess now for the other parties to the trial.  So

12    about 15 minutes.

13         (Jury Out)

14         (Recess)

15         (Jury In)

16                    CHASTISY MIDDLETON,

17     Having first been duly sworn, testified as follows:

18                    DIRECT EXAMINATION

19    BY MR. LAMPTON:

20    Q.  Good afternoon.

21    A.  Good afternoon.

22    Q.  Would you state your name for the court.

23    A.  Chastisy Briggs Middleton.

24    Q.  Will you spell your first name.

25    A.  C-H-A-S-T-I-S-Y M-I-D-D-L-E-T-O-N.

1   Q.   Where do you live, Ms. Middleton?

2   A.   Fayetteville, North Carolina.

3   Q.   How long have you lived there?

4   A.   Sixteen years today.

5   Q.   And are you employed?

6   A.   Yes.

7   Q.   What do you do?

8   A.   I'm a supervisor at a linen company.

9   Q.   And how long have you been a supervisor at the particular

10  linen company you're at now?

11  A.   The one I'm at now?  Just a year.

12  Q.   And before that what did you do?

13  A.   The same type of work, assistant supervisor at National

14  Linen Service for ten years.

15  Q.   Did you know the man that testified just before you did?

16  A.   Yes.

17  Q.   And how do you know him?

18  A.   That's my brother.

19  Q.   Now, are you younger or older than your brother?

20  A.   Older.

21  Q.   Back in 1964, how old would you have been?

22  A.   Thirteen.

23  Q.   And how old was John?

24  A.   John was born in '57.

25  Q.   Now you're making me do the math.  Was he around 7 years of

1461

1   age?

2   A.   Probably.

3   Q.   You're about six years older than he is?

4   A.   Uh-huh.

5   Q.   Okay.  Where did you live back in the '60s when you were

6   growing up?

7   A.   In Roxie, Mississippi.

8   Q.   And who did you live with?

9   A.   With my mother and father, Clyde Briggs and Mary Geraldine

10  Briggs.

11  Q.   Did you live anywhere else during the early '60s?

12  A.   No.

13  Q.   We know that your father was a preacher.  Is that correct?

14  A.   True.

15  Q.   And did you attend church with him?

16  A.   Yes, I did.

17  Q.   Did you know Charles Eddie Moore during his lifetime?

18  A.   Yes.

19  Q.   And how did you know Charles Eddie Moore?

20  A.   He would come to school that I was going to at the time,

21  sit in on our classes sometimes.

22  Q.   Where are you going to school then?

23  A.   At Lillie Mae Bryant High School.

24  Q.   And do you know where he was going to school at that time?

25  A.   He was in college at that time.

1   Q.   Do you know where he was going to college?

2   A.   Alcorn.

3   Q.   Did he attend church with you, and was your father one of

4   his pastors?

5   A.   Not that I remember.

6   Q.   And he didn't attend the Roxie Baptist Church, did he?

7   A.   Not that I can remember.

8   Q.   You were there, ma'am, just about every Sunday, weren't

9   you?

10   A.   Yes.

11   Q.   Did you know Henry Hezekiah Dee during his lifetime?

12   A.   Yes.

13   Q.   And how did you know Henry Dee?

14   A.   Just knowing him around town.

15   Q.   Was there anything unusual about the way he appeared from

16   other young men his young age?

17   A.   Yes.  He -- basically the way we wore his hair.

18   Q.   Would you just -- you're a lady.  If you would, just kind

19   of fill us in on that.

20   A.   I remember him wearing his hair what we called back then

21   was a process, like your hair straightened.

22   Q.   Yes, ma'am.  If his hair wasn't processed, what would he

23   wear, if you know?

24   A.   Well, what we call it back then, I would say we would call

25   it a do rag.  That's what they call it today.  But it's like a

1  scarf that's tied around your head.

2  Q.  Did you know if he had any connection with Illinois, the

3  state of Illinois?

4  A.  I don't know for sure.  I've heard that he had went to

5  Chicago and came back home.

6  Q.  And where did he attend church, if you know?

7  A.  I don't know.

8  Q.  Do you know whether or not he attended the Roxie Baptist

9  Church?

10  A.  I don't remember him attending.

11  Q.  Do you know where his family lived out from Roxie, the

12  Hunts, the Dees?  Do you know where they lived?

13  A.  I knew his sister.

14  Q.  Which sister was there?

15  A.  Thelma Dee that attended Roxie Church.

16  Q.  And she lived where?

17  A.  She lived there in Roxie, as far as I can remember.

18  Q.  Let me direct your attention to --

19        MR. LAMPTON:  First of all, Your Honor, may I have the

20  witness shown the journal that we have talked about,

21  Exhibit 32A.

22        THE COURT:  Okay.

23  BY MR. LAMPTON:

24  Q.  I have shown you what purports to be a handwritten journal

25  and let me ask you, Ms. Middleton, if you can identify that

1464

1    document.

2    A.   Yes.

3    Q.   And how can you identify it?   What do you know it to be?

4    A.   A journal with some of my father's handwriting in it.

5    Q.   Do you know what other handwriting is in the journal other

6    than your father's?

7    A.   It looks like some of my brother John's handwriting.

8    Q.   Would you look on pages 92, 93, 94 and 95, please, and can

9    you tell whose handwriting is on those pages?

10   A.   My father's.

11   Q.   Now, on page 93, if you would turn to that page.   I'm going

12   to ask you if you have any knowledge or any remembrance of the

13   events that are related on Saturday, May 2nd, when your

14   father's church in Roxie was searched for guns.

15   A.   Yes.

16   Q.   Were you old enough to where you could remember on your own

17   what happened?

18   A.   I remember when it was during maybe a week or so before

19   that time.   Daddy received encyclopedias through the post

20   office.   They came in two large boxes, and he brought them to

21   the house.   But on -- I remember later my mother saying that

22   the church had been searched for guns.

23   Q.   Did your mother attribute the encyclopedias to the search

24   at all?

25   A.   No.

1      MR. LUCAS:  Your Honor, we would object to any --

2      THE COURT:  Hod it one second.

3      MR. LUCAS:  It's clearly hearsay.

4      THE COURT:  I'll sustain the objection.

5      MR. LAMPTON:  Your Honor, I would seek not to admit

6  anything for the truth, but that it was just simply said.

7      THE COURT:  I'll sustain the objection.

8  BY MR. LAMPTON:

9  Q.  Were you aware that those encyclopedias arrived at the

10  house before the church was said to have been searched?

11  A.  Yes.

12  Q.  If you would, just describe for the jury, if you remember,

13  how big the boxes were and what was in the boxes and where your

14  father went to get those boxes.

15  A.  He went to -- he picked the boxes from the post office.  He

16  said that's what he was going to the post office and he came

17  back home with the big boxes.  They were about this long and

18  maybe that wide.

19      THE COURT:  You need to estimate that for the record.

20      MR. LAMPTON:  Approximately three feet by three feet.

21  BY MR. LAMPTON:

22  Q.  Does that sound right about the boxes, about three feet by

23  three feet?

24  A.  Probably.

25  Q.  And were you there when the encyclopedias were brought

1    home?

2    A.  Yes.

3    Q.  Did you know Oscar Hughes at that time?

4    A.  Yes.

5    Q.  Would you tell the ladies and gentlemen of the jury who

6    Oscar Hughes was, how you knew him in May of 1964.

7    A.  He was a deacon at Crosby Baptist Church, one of the

8    churches my father pastored.

9    Q.  Were he and your father friends?

10   A.  Yes, they were.

11   Q.  Will you look at the next entry in the journal that talks

12   about Sunday night, May 24th.

13          MR. LUCAS:  Your Honor, we would object to any

14   discussion of this.  We've already been through this with

15   Mr. Briggs.

16          THE COURT:  Let me hear the question.

17   BY MR. LAMPTON:

18   Q.  Do you have -- your father in that entry mentions a man

19   named Jack Davis.

20   A.  Yes.

21   Q.  And did you know Jack Davis?

22   A.  Yes.

23   Q.  And how did you know him?

24   A.  I knew him --

25          MR. LUCAS:  Your Honor, I renew my objection to this.

1          THE COURT:  One second.  Hold it.  I need to excuse

2   you all again.  All rise.

3      (Jury Out)

4          THE COURT:  You may be seated.  Now, Mr. Lampton,

5   where are we going?

6          MR. LAMPTON:  I was going to ask her -- and I can do

7   that outside the presence of the jury -- if she knew Jack Davis

8   and how she knew him.  And then I was going --

9          THE COURT:  Mr. Lucas, you can have a seat.

10         MR. LAMPTON:  I was going to ask her if you had

11  occasion to see Jack Davis on the night of May 24, 1964.

12  A.  Yes, I did.

13         THE COURT:  Now, let me see that journal again,

14  please.

15     (Short Pause)

16         THE COURT:  Ask the questions.

17  BY MR. LAMPTON:

18  Q.  Did you have occasion to see Jack Davis on Sunday night,

19  May 24th of 1964?

20  A.  Yes, I did.

21  Q.  And where did you see him?

22  A.  At our home.

23  Q.  And would you just tell the court very briefly under what

24  circumstances you saw him and what happened.

25  A.  Daddy had went to church, and we would stay up until he got

1  home, me and my mother.  And he was blowing his car horn coming

2  home.

3  Q.  "He" being?

4  A.  My father.  And we always would have lights off in the

5  house waiting for him to come in.  We would leave the gate to

6  the house -- to the driveway open for him to come back in so he

7  wouldn't have to get out and open the gate.

8       And that night when he got to the house, he pulled in the

9  yard under the carport and a car of men pulled in behind him

10  inside the yard.  And the car door was open, and Mr. Jack Davis

11  got out of his car, came to the side of my father's door, the

12  driver's side, and he said something to him.  I don't know what

13  he said, but then he got back in his car and left.

14       MR. LAMPTON:  Your Honor, while the jury is out, I

15  would also ask her about Monday, July 13, the day that people

16  first began to realize that the bodies of Charles Eddie Moore

17  and Hezekiah Dee had been found and ask if you remembered that

18  day and someone shooting the rifle in the house.

19  A.  Yes.

20  BY MR. LAMPTON:

21  Q.  And what do you remember about that day?

22  A.  I remember that the shooting in the house -- the shooting

23  in the house or the shooting at the globe, the light?

24  Q.  First of all, the shooting into the house.

25  A.  The shooting in the house, my father was out of town doing

1   a revival meeting in Hattiesburg.  And the shot came through my

2   bedroom.  When he would go on revival out of town, I would

3   always sleep in the front room with my mother so I wasn't in

4   the room when the shot came through.

5       I remember him coming back home from the revival, picking

6   me up and taking me back to Hattiesburg for the rest of the

7   week to stay with him until the revival was over.  He brought

8   me back home with him.

9   Q.  And then I believe you mentioned one other occasion when

10  something around your house was shot into.  Do you remember

11  when that was?

12  BY MR. LAMPTON:

13  A.  I remember the globe being shot at -- at the light and the

14  streetlight at the back of the house, the globe being shot, but

15  I remember that happening.

16  Q.  Do you know if that put the light out or not?

17  A.  No, it didn't.  It didn't go out.

18      MR. LAMPTON:  Your Honor, that's what I would tender

19  as being Ms. Middleton's testimony concerning the events in the

20  journal.

21      THE COURT:  Response?

22      MR. LUCAS:  Your Honor, we just went through a long

23  questioning and argument about the journal and about these

24  items in the journal, and the government assured the court that

25  the only reason they wanted those items in was just to show

1    that Reverend Briggs kept up with things around the locality in

2    the journal and to bolster the items that were actually

3    relevant that were in the journal.  Now they bring a witness in

4    to testify as to the items that the court has already said

5    should not be regarded by the jury in the journal.  We would

6    object to that testimony coming in.

7           THE COURT:  These witnesses were on your witness list.

8    Is that correct?

9           MR. LAMPTON:  Yes, sir.

10          THE COURT:  And is the defense saying that you were

11   not provided the name of this witness and the last witness?

12          MR. LUCAS:  No.  We knew that John Briggs was going to

13   testify, and we knew that Ms. Middleton was going to testify.

14          THE COURT:  Did you know the substance of their

15   expected testimony?

16          MR. LUCAS:  I was not expecting her to testify to

17   bolster items that the court had ruled were irrelevant to the

18   trial.  She could very easily have come in and testified that

19   she remembered on May 2nd the search of the church, which would

20   have been relevant testimony, but I had no idea she was going

21   to be brought in to bolster these items contained within the

22   journal that the court has already ruled were not relevant.

23          THE COURT:  All right.  What says the government?

24          MR. LAMPTON:  I mean, I think they are relevant in

25   determining the --

1        THE COURT:  I'm not talking about relevance at this

2   point.  I'm asking about what you advised the defense as to the

3   witness' expected testimony.

4        MR. LAMPTON:  Yes, sir.  They have a 302 that was

5   prepared by the FBI that they have seen.  It talks about the

6   guns and the transportation.  It talks about Jack Davis, and it

7   is very similar to her testimony.  She talks about the shooting

8   traveling through the Middleton's (sic) bedroom, the shooting

9   was investigated by Deputy Sheriff Kirby Shell.  It talks about

10  the vehicle, the unknown make and model pulled into the

11  driveway behind the father's vehicle.

12       THE COURT:  You can stop.  I'm going to overrule the

13  objection, but I will give another limiting instruction to the

14  jury.  The limiting instruction will advise the jury that this

15  witness' testimony does not pertain to the specific charges

16  here before the court, that the witness' testimony should be

17  adjudged by the jury only as to the credibility and authorship

18  of the journal.

19       MR. LUCAS:  Your Honor, if we might have just a

20  moment, we -- I'm not certain that I have seen her 302.  I'm

21  not certain we received it.  Ms. Nester is going to check.

22       THE COURT:  Okay.

23       MR. LUCAS:  We have witness files on everyone

24  containing their 302s, and we don't have one on her.

25       (Short Pause)

1472

1        MR. LUCAS:  Your Honor, I can't find where we have

2    received a 302 on Mrs. Middleton.  I wanted to double-check

3    because we did receive some on Reverend Middleton, who is a

4    different individual with the same name.

5        MR. LAMPTON:  Your Honor, there's been a good deal of

6    discovery given out.  I have the 302.  I'll let counsel look at

7    it.

8        MS. NESTER:  There's no Bates number.

9        MR. LAMPTON:  If it wasn't given to them, it was

10   certainly an oversight, and I will provide it to them now.

11   Maybe they need to take a break to look at it or talk to the

12   witness, but it was -- the 302 was prepared in August of 2006.

13   So we've had it for -- certainly for a while and her name has

14   been on the witness list.

15       THE COURT:  Give them the 302, and I will take a

16   recess now for the balance of the afternoon.  We'll resume

17   tomorrow morning after they've had a chance to look at the 302

18   and then to prepare for any cross-examination.  Who will be the

19   witnesses for tomorrow?

20       MS. FITZGERALD:  Your Honor, that's actually a topic

21   that we need to discuss with the court.  One of the items that

22   the court has reserved ruling on, if the court would be so

23   inclined after excusing the jury this afternoon, we would like

24   to readdress because it will impact what witnesses testify

25   tomorrow, and that's specifically the admissibility of the --

1   and maybe I shouldn't be doing this in front of the witness.

2          THE COURT:  Okay.  Let me have you step down for a

3   moment.

4          MS. FITZGERALD:  Sorry.  I just realized that she was

5   still sitting there.

6          MR. LAMPTON:  She needs to be told she shouldn't talk

7   about her testimony and --

8          THE COURT:  Don't talk to anyone about your testimony

9   or anything that's transpired in this courtroom.  Okay.  All

10  right.  Now, then, yes.

11         MS. FITZGERALD:  That's the admissibility of the

12  defendant's letter to the Franklin Advocate, and at this time,

13  Your Honor, the government would renew its request to allow the

14  admission of that particular item, particularly since the court

15  has now had an opportunity to look at case law, et cetera,

16  regarding ancient documents.  We anticipate that the chancery

17  clerk, Jimmy Jones, will be coming with a bound volume of the

18  Franklin Advocates which he is required by state statute to

19  maintain, the chancery clerk is required to maintain.  He has a

20  1964 bound volume that contains this particular newspaper that

21  had the letter in it.  Obviously, the circumstances under which

22  it was found then subject it -- indicate that it is, in fact,

23  authentic.  It has been in existence for more than 20 years.

24  There's no suspicion as to its authenticity and, therefore, any

25  other issue with regard to that document simply goes to its

1474

1  weight.

2      THE COURT:  Now, you're arguing a motion that I don't

3  have in front of me right now.  I was -- I was dealing with

4  something else.

5      MS. FITZGERALD:  Thank you, Your Honor.  That is one

6  issue that we --

7      THE COURT:  One second, hold it.  Wait a minute.  Was

8  the 302 furnished?

9      MS. FITZGERALD:  I'm not sure, Your Honor.  I'm not

10  sure.  We're trying to go through our discovery list to see if

11  it was.

12      THE COURT:  Mr. Lucas, were there items submitted to

13  you Bates stamped?

14      MR. LUCAS:  I'm going to let Ms. Nester address that,

15  Your Honor.

16      MS. NESTER:  Your Honor, we got our Jencks Act

17  material on the 25th of May, which was the day that they had --

18  were required to turn over all the Jencks Act.  They take the

19  position that all the 302s are Jencks Act.  I have a complete

20  set of what we got Bates stamped 1245 -- I'm sorry -- 1405

21  through 1645 consisting of the Jencks Act materials, and we --

22  so far everyone that's testified we have received except for

23  Ms. Middleton.  She is not in here.

24      THE COURT:  Now, have you carefully gone through that

25  group?

1   MS. NESTER:  Yes, sir.  We also don't have a witness

2   file for her.  What we did when we got the Jencks Act material

3   was went through and copied everything in it and put it in the

4   witness file, and we don't even have a witness file for her.

5   So, I mean, it's just not in here.

6   MS. FITZGERALD:  Your Honor, I will accept counsel's

7   representations.  If it was not provided, it was simply an

8   oversight, and I apologize.  We'll be more than happy, again,

9   to provide the 302 to her at this point.  She has been on the

10  witness list.  There hasn't been any inquiry of the government

11  saying, "We don't have anything on this witness.  Do you have

12  something?"  We would have been happy to provide it.  Again, if

13  it has not been provided, and I accept counsel's

14  representations that they didn't receive it, then it was simply

15  an oversight.

16  THE COURT:  What about the rest of the witnesses?

17  MS. FITZGERALD:  Is the court inquiring as to the

18  witnesses for tomorrow?

19  THE COURT:  And whether the 302s for the remaining

20  witnesses have been submitted.

21  MS. FITZGERALD:  I can check with counsel, but I

22  believe that they all have.

23  THE COURT:  Okay.  I want to be sure that they have.

24  MS. FITZGERALD:  I understand.

25  THE COURT:  Now, then, first of all, I want you all to

1   meet after I recess to determine, if you can, whether this 302

2   was actually received by defense.  Secondly, whether the 302s

3   have been submitted on all the other witnesses who are expected

4   to testify for the government.

5            MS. FITZGERALD:  Yes, Your Honor.

6            THE COURT:  Then, I turn to the defense, Ms. Nester,

7   you're supposed to submit to me a response to the motion

8   concerning a letter and -- of another witness, not the witness,

9   but a matter from the FBI report.

10           MS. NESTER:  Yes, sir.  I will get that to you either

11  tonight or first thing in the morning as we discussed.

12           THE COURT:  Have it to me at least by 8:00.

13           MS. NESTER:  Yes, sir.

14           THE COURT:  Now --

15           MS. FITZGERALD:  I'm sorry, Your Honor.  I'm not sure

16  what we're talking about.

17           MS. NESTER:  The response to Gilbert.

18           MS. FITZGERALD:  Oh, Gilbert.  Yes.

19           THE COURT:  The Gilbert matter.  She's going to get me

20  my response, then, no later than 8:00 in the morning and, of

21  course, the response to the government.

22           MS. NESTER:  Yes, of course.

23           THE COURT:  And then, thereafter, I will have a

24  session with you all, first of all, on this 302 matter

25  concerning this witness, 302 matters concerning all other

1   witnesses, because I want to be sure those 302s have been

2   submitted, and then the response to the Gilbert matter.  Now,

3   how many more witnesses do you have tomorrow and then we come

4   back to this other point that you made or these other questions

5   you have?

6           MS. FITZGERALD:  Your Honor, I'm not sure how quickly

7   we're going to be going.  I'm happy to tell -- I provided

8   defense counsel with our witnesses.  I'm happy to tell who we

9   still have outstanding at this point, but there are a couple of

10  issues that the court hasn't ruled on.  We still have

11  outstanding Wesley Luckey, we still have Dr. Hayne, and I

12  haven't spoken with him about his schedule for tomorrow.  We

13  still have Wayne Finley.  We still have Don Irby.  We still

14  have Donald Butler.  We still have Reesie Timmons.  We still

15  have R. W. Middleton.  We still have Linda Luallen, Jimmy

16  Jones, Mary -- I can't remember her middle name -- but Mary --

17  may be Mary Lou Webb.  Jim Ingram, Thomas Moore, possibly Jerry

18  Mitchell, and Ed Putz.

19          THE COURT:  How many witnesses?  I didn't count them.

20  How many are there?

21          MS. FITZGERALD:  Fifteen, 16, including Ms. Middleton,

22  17 including the remainder of Mr. Edwards.  The majority of

23  these witnesses we expect to be fairly short.

24          THE COURT:  Now to the next matter, on the matter of

25  the letter allegedly written by Mr. Seale.

1    MS. FITZGERALD:  Yes, Your Honor.

2    THE COURT:  I would have to have an evidentiary

3  hearing on that point.

4    MS. FITZGERALD:  I can proffer to the court that the

5  expected testimony of the chancery clerk will be this is a

6  bound volume from 1964 of all of the Franklin Advocates that

7  were published during the year of 1964 which he found in the

8  chancery clerk area where he maintains all of the volumes

9  throughout all of the years and which he is required to

10  maintain by state statute.

11    THE COURT:  That this article appeared in the paper?

12    MS. FITZGERALD:  He will testify that these are

13  Franklin Advocates and the letter, in fact, appears in a

14  Franklin Advocate newspaper that is maintained by the chancery

15  clerk, yes, Your Honor.

16    THE COURT:  Okay.

17    MS. FITZGERALD:  So at that point, the government --

18  it's not -- it's not violative of the confrontation clause or

19  Crawford because it's nontestimonial that we go into whether or

20  not it's hearsay exception.  The hearsay exception is 803(16),

21  an ancient document.  Then we go to 901(8) and determine

22  whether or not it's an ancient document that is

23  self-authenticating or -- not self-authenticating -- but that

24  it is properly authenticated.  This witness we expect will

25  testify that this particular ancient document is located in a

1    place where it is likely to be located if it were, in fact,

2    what it purports to be, that there are no circumstances and no

3    suspicions that it is not what it purports to be, and that it

4    has, in fact, been in existence for 20 years or more.  At that

5    point, any other issue goes to its weight, not to its --

6            THE COURT:  On authentication, then, what's your proof

7    on authentication?

8            MS. FITZGERALD:  Your Honor, it's a newspaper that has

9    been in existence for 20 years and is maintained by the

10   chancery clerk.

11           THE COURT:  I understand that, but you are arguing

12   that the author is the defendant.

13           MS. FITZGERALD:  Your Honor, that, again, goes

14   actually to the weight.  It doesn't go to the admissibility.

15           THE COURT:  Okay.  I understand your argument, but --

16           MS. FITZGERALD:  Your Honor, I would refer -- if I

17   could have just a moment, I can refer the court to a case.  I

18   believe this is also mentioned in the government's trial brief,

19   which we provided to both the court and counsel I believe on

20   May 25th.  And I'm referring the court to *Dallas County v.*

21   *Commercial Union Assurance Company*.  It is 286 F.2d 388.  It's

22   a January 17th, 1961, opinion in the Fifth Circuit.

23       And in that case, they admitted a newspaper article that

24   contained hearsay, saying that it is a newspaper that was

25   publicly printed, that there has been no -- nothing that has

1    happened in the intervening time period to cast any aspersions

2    on its authenticity and that that's an ancient document and

3    that was the end of inquiry, a newspaper article that was

4    properly authenticated as being one in that newspaper and that

5    it had been in existence for 20 years or more.   That was the

6    end of the inquiry, as it should be in this case.

7        In this particular case, that document has been maintained.

8    There's no suspicion as to what it is.   There has been no

9    intervening controversy or anything else.   And we can also call

10   the publisher, the now publisher of the newspaper, who is the

11   wife of the individual who was the publisher at the time.   And

12   she would be expected to testify that there were certainly no

13   complaints, no lawsuits, no anything -- nothing that was ever

14   brought to her attention that anybody ever indicated that the

15   author of that article -- of that particular letter was anybody

16   other than the defendant and that she would have expected if

17   somebody had published a letter like that and it had not been

18   authored by the person who is purported to be the author, that

19   they would have received such a complaint.

20       THE COURT:   I will hear whatever evidence you have

21   relevant to that newspaper article tomorrow afternoon, but I

22   want to hear some other testimony tomorrow morning.   What

23   witnesses would you have that you could call tomorrow morning,

24   because by the time we get to that testimony, I would have

25   expected it might take some time.   I'll probably be recessing

1481

1     after that.  Do you have other witnesses you can call during

2     the day?

3         MS. FITZGERALD:  I do, Your Honor.  If I could stick

4     with that point for just a moment.  If we're going to be

5     calling Ms. Webb, she had requested that she be able to testify

6     on Friday, and I have not spoken with her, and I hadn't had a

7     chance to relay to her counsel's concern with regard to the

8     funeral.  Her paper is published on Thursdays, and she's

9     indicated that it would be -- of any day of the week, that

10     would be the very worst one for her to have to come up here

11     for.  I am simply relaying that to the court.  If the court

12     wishes her to be here, I will make sure that she is.

13         THE COURT:  No, but I'm not going to take the

14     witnesses out of turn if they relate to this matter of the

15     article.  Do you have witnesses who are specifically to testify

16     about something concerning the article?

17         MS. FITZGERALD:  I'm not sure that I understand the

18     court's question.

19         THE COURT:  Earlier when you were asking me about --

20     when you made the comment about the witnesses who are to·

21     testify, that you have left to call --

22         MS. FITZGERALD:  I was referring to the chancery

23     clerk, Mr. Jimmy Jones, and to Mrs. Webb.

24         THE COURT:  Okay.  I understand that.  We'll take

25     those up later, then.

1482

1    MS. FITZGERALD:  That's fine.

2    THE COURT:  Who will you call tomorrow morning?

3    MS. FITZGERALD:  We anticipate recalling

4  Ms. Middleton-Briggs, we anticipate calling Wesley Luckey,

5  perhaps Dr. Hayne.  I'll need to check with his schedule.

6  Wayne Finley.  I'm not sure what the status is on Mr. Irby, if

7  we are able to get him here.  I'm not sure what the status is

8  with regard to either Mr. Butler or Mr. Timmons.  If they are

9  available, then they would be tomorrow.  If they are not, then

10 we would be moving into Mr. Middleton and Ms. Luallen.

11    THE COURT:  Now, do you need to call any more

12 witnesses to verify the contents of this journal?

13    MS. FITZGERALD:  No, Your Honor.

14    THE COURT:  So this is the last witness or the only

15 witness on it?

16    MS. FITZGERALD:  Yes, Your Honor.

17    THE COURT:  Okay, then.  Now, Ms. Nester, you said you

18 can have my brief for me tomorrow morning at 8:00?

19    MS. NESTER:  Yes, sir.

20    THE COURT:  Then at 9:00, we'll congregate and I'll

21 tell the jury to come back at 9:30.  Now, the issues before the

22 court are the one on the Gilbert matter and on the 302.

23    MS. FITZGERALD:  That's correct.

24    THE COURT:  And the 302s in general.  Are there any

25 other matters I need to take up now?

1          MS. FITZGERALD:  Your Honor, as referenced in the

2    government's brief, the government is not -- is seeking both to

3    admit Mr. Gilbert's statement and to admit Edwards'

4    November 6th of 1964, 302 and the reasons for that as set forth

5    in the government's brief.

6          THE COURT:  Okay.  Are there any other issues I need

7    to hear about now?

8          MS. FITZGERALD:  Your Honor, I might seek

9    clarification.  Cocounsel is advising me that he believes that

10   there is an outstanding ruling with regard to Ms. Luallen's

11   testimony, and I have to admit that I don't recall whether

12   there was or was not, but that may be something that we need to

13   address.

14         THE COURT:  What is it?

15         MR. GIBSON:  Your Honor, there was a motion in limine

16   that was argued before we began opening statements in this

17   case.  Ms. Nester was objecting to portions of Ms. Luallen's

18   testimony.  The argument was along the lines of 404(b).  It was

19   proffered as motive evidence and also it's intrinsic to this

20   case in that the government's position is that the defendant's

21   racist motivation and racist expressions to Ms. Luallen were

22   relevant in its case in chief.

23       There was also the matter of her proffered testimony that

24   she had seen personally the defendant's Klan robe that was

25   stored in his home, along with home movies that had been

1    displayed to her by the defendant taken by the defendant at

2    Klan rallies in the 1960s.  My understanding -- and I will, of

3    course, defer to the court, but my understanding was that we

4    had moved past the admissibility of the robe and her testifying

5    about the movies that she had shown, but the court had inquired

6    of me specifically, as I recall, the timing and the dates

7    relevant to the comments made by the defendant which we contend

8    are consistent with a racist motivation as it connects to this

9    crime.

10        And after the hearing on the motion in limine, my

11   understanding from the court was that you were holding that

12   ruling in abeyance until later in the trial, and if I'm in

13   error about that, then I'm sure the court can correct me, but

14   that was my understanding of the ruling.

15        THE COURT:  This is not the witness who will testify

16   tomorrow?

17        MR. GIBSON:  Well, she could potentially testify

18   tomorrow, Judge, based on the -- our attempt to coordinate now

19   given that Mr. Edwards' testimony is outstanding and needs to

20   be completed and also Dr. Hayne.  In order to accommodate the

21   court and fill the day for the jury, we wanted to make sure we

22   had witnesses available.  If we get down to Ms. Luallen, we

23   would have to address that issue and get clarification prior to

24   her testimony.

25        THE COURT:  Okay.

1        MS. FITZGERALD:  Your Honor, I do expect that we will

2    get to her tomorrow.

3        THE COURT:  Okay.  Then advise me prior to her

4    testimony that we need to take the matter up, and I'll take it

5    up outside the presence of the jury.

6        MR. GIBSON:  Very well.

7        THE COURT:  Now, does the defense have any matters you

8    need me to be aware of or be apprised of before we recess for

9    the afternoon?

10        MS. NESTER:  No, sir.

11        MR. LUCAS:  I can't think of any, Your Honor.

12        THE COURT:  Okay.  Then I'll see counsel and the

13    parties here at 9:00 tomorrow, and I'm going to tell the jury

14    to come at 9:30.  Bring the jury in.

15        MR. LUCAS:  Your Honor, I have found out the funeral

16    that I spoke of earlier is Friday at 10:30, Your Honor.

17        THE COURT:  Well, take that up tomorrow with me.  It's

18    Friday at 10:30?

19        MR. LUCAS:  Yes, sir.  It's a Catholic funeral, which

20    they normally take substantially longer than Baptist funerals

21    which I'm used to.

22        THE COURT:  Bring the jury in.

23      (Jury In)

24        THE COURT:  You may be seated.  We're going to recess

25    for the balance of the afternoon and resume tomorrow morning at

1    9:30, 9:30.

2         And you recall the instructions I gave you previously.

3    Okay.   You know not to pay any attention to anything which

4    might appear in the news, nothing.   And not to discuss the case

5    with anyone nor let anyone talk to you at all about this case.

6    Now, then, I'll see you all tomorrow morning at 9:30, 9:30.

7    All rise.

8         (Jury Out)

9              THE COURT:   We are in recess until 9:30.

10        (Recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

                    CERTIFICATE OF REPORTER

2

3        I, CHERIE GALLASPY BOND, Official Court Reporter, United

4   States District Court, Southern District of Mississippi, do

5   hereby certify that the above and foregoing pages, pages 854

6   through 1487, contain a full, true and correct transcript of

7   the proceedings had in the aforenamed case at the time and

8   place indicated, which proceedings were recorded by me to the

9   best of my skill and ability.

10        I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13

14        This the 14th day of September, 2007.

15

16                    *Cherie Bond*

17                    CHERIE GALLASPY BOND

18

19

20

21

22

23

24

25